# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| **ROY E. PERKINS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 7:14-CV-1814-SLB** |
| | ) | |
| **J E F F E R S O N   S .   D U N N ,** | ) | |
| **Commissioner, Alabama Department** | ) | |
| **of Corrections, WALTER MYERS,** | ) | |
| **Acting Warden, Holman Correctional** | ) | |
| **Facility,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>MEMORANDUM OPINION</u>

This case is presently before the court on Roy E. Perkins's Petition for a Writ of Habeas Corpus by a Person in State Custody under a Death Sentence, (doc. 1),[1] seeking relief from his state-court conviction for capital murder and death sentence. Perkins was convicted of capital murder and sentenced to death for the murder of Cathy Gilliam. He has filed this petition seeking habeas relief pursuant to § 2254.

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record and citations to page numbers in such documents refer to page number assigned to the document in the court's electronic filing system. Unless otherwise indicated, citations to the state-court records reflects the volume, tab, and page numbers assigned by respondent.

For the reasons set forth below, the court finds that Perkins's Petition for a Writ of

Habeas Corpus is due to be denied.

## **TABLE OF CONTENTS**

I. <u>THE OFFENSE CONDUCT</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. <u>THE SENTENCING ORDER</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III. <u>PROCEDURAL HISTORY</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IV. <u>STANDARD OF REVIEW</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

V. <u>EVIDENTIARY HEARING</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

VI. <u>DISCUSSION OF PERKINS'S CLAIMS</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
   A. THE STATE VIOLATED THE FOURTEENTH AMENDMENT DUE
       PROCESS CLAUSE BY FAILING TO DISCLOSE MATERIAL,
       EXCULPATORY EVIDENCE AND OFFERING A FALSE
       STIPULATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
       1. Due Process Violation Under *Brady v. Maryland* . . . . . . . . . . . 20
       2. Due Process Violation under *Napue v. Illinois* and *Giglio v. United
         States* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
   B. THE STATE TRIAL COURT VIOLATED PERKINS'S RIGHT TO
       COUNSEL BY REPLACING HIS COUNSEL MIDWAY THROUGH
       THEIR PRETRIAL PREPARATIONS. . . . . . . . . . . . . . . . . . . . . 43
   C. FAILURE TO GRANT A CHANGE OF VENUE . . . . . . . . . . . . . . . . 52
   D. ADMISSION OF COLLATERAL-ACT EVIDENCE DENIED PERKINS
       A FAIR TRIAL AND RELIABLE SENTENCE . . . . . . . . . . . . . . . 63
       1. Overlooked Claims or Presumed Ruling on the Merits . . . . . . . . 69
       2. Admission of Evidence of Prior Acts and Perkins's Right to Due
         Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
         a. Evidence of the Rapes of D.W. and B.P. . . . . . . . . . . . . . . 79
         b. Incident at Darlene Hall's House . . . . . . . . . . . . . . . . . . . . 84
         c. The Gray Truck and the .357 Magnum Handgun . . . . . . . 88
       3. Failure to Give Limiting Instruction. . . . . . . . . . . . . . . . . . . . . . 92

    E.  SUFFICIENCY OF THE EVIDENCE. . . . . . . . . . . . . . . . . . . . . . . . . 96
    F.  CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL . . . . . . 102
        1. Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102
            a. The Performance Prong . . . . . . . . . . . . . . . . . . . . . . . . . 104
            b. The Prejudice Prong . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106
            c. Deference Accorded State Court's Decisions . . . . . . . . . 108
        2. Failure to Strike Juror V.H. . . . . . . . . . . . . . . . . . . . . . . . . 110
        3. Failure to Request a Limiting Instruction. . . . . . . . . . . . . . . 132
        4. Failure to Investigate and Present Available Mitigating Evidence
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151
        5. Failure to Challenge Perkins's Rape Conviction . . . . . . . . . . . 177
    G.  THE JURY'S CONSIDERATION OF EXTRINSIC EVIDENCE – THE
        BIBLE IN THE JURY ROOM . . . . . . . . . . . . . . . . . . . . . . . . . . . 202
    H.  PERKINS IS INTELLECTUALLY DISABLED; THEREFORE, HIS
        DEATH SENTENCE VIOLATES THE EIGHTH AMENDMENT
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207
        1. The IQ Test Score – Intellectual Functioning . . . . . . . . . . . . . 215
        2. Adaptive Functioning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 218
        3. Failure to Grant Evidentiary Hearing . . . . . . . . . . . . . . . . . . . 220
    I.  THE *BATSON* CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 222

VII. <u>CONCLUSION</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 232

CERTIFICATE OF APPEALABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . 232

## I. <u>THE OFFENSE CONDUCT</u>

The following summary of the evidence relevant to the offense is taken from

the opinion of Alabama Court of Criminal Appeals on direct appeal.

On August 9, 1990, at approximately 4:00 p.m., 33-year-old Cathy
Gilliam was abducted at gunpoint from her home in the Tuscaloosa
County community of New Lexington. Candace Gilliam, Mrs. Gilliam's
daughter, testified that she was in her bedroom at approximately 4:00
p.m. on August 9, when she heard her mother scream.   After this

testimony, Candace, who was 14 years old at the time of the trial, was excused from the courtroom; in lieu of further live testimony from Candace, it was stipulated that her testimony would have been as follows had she continued to testify: When she heard her mother scream a second time, Candace went to the kitchen. There she saw a man holding her mother and pointing a black pistol at her mother's head. She heard her mother yell for help and say "something about a rapist." [(Doc. 10, Vol. 11 at 1755.)] Candace watched as the man led her mother outside to a vehicle parked behind her mother's car. She could not see the vehicle well, but did notice that it was bigger than a car and that it was gray in color. At that point, Candace telephoned her grandmother. Candace was unable to give a detailed description of the man who had abducted her mother, but she did tell police that the man had brown, straight hair and a thin beard, and that he was not much taller than her mother.

Maudeen Hood, a resident of New Lexington who lived two to three miles from the Gilliam residence, testified that at approximately 5:00 p.m. on August 9, Cathy Gilliam knocked on her back door. According to Hood, Mrs. Gilliam stated that she had been shot and that she was going to die, and she asked Hood to call her father-in-law and to take her to the hospital. Hood stated that she helped Mrs. Gilliam into her kitchen, where Mrs. Gilliam lay on the floor; Hood then telephoned Mrs. Gilliam's father-in-law. When no one answered, Hood telephoned for help. Mrs. Gilliam told Hood that her assailant was about her husband's size, had long brown hair, a beard, and a mustache, and was driving a gray pickup truck. Mrs. Gilliam also told Hood that her assailant had brought her to Hood's house and that he had said that he did not mean to shoot her.

At approximately 5:15 p.m. on August 9, Norman Eldon Willingham, an Alabama state trooper, and Harry Montgomery, Chief Deputy Sheriff of the Tuscaloosa County Sheriff's Department, arrived at the Hood residence. Willingham testified that upon arriving, he saw Mrs. Gilliam lying on the kitchen floor; she had a gunshot wound to her chest. He stated that although Mrs. Gilliam had been shot in the chest, he immediately noticed that there was no hole in the front of her shirt.

He stated that Mrs. Gilliam appeared pale, that she was having trouble breathing, and that she was complaining of pain and asking for help. When Willingham asked Mrs. Gilliam to describe her assailant, Mrs. Gilliam told him that he was a white male, approximately 30 years old, with medium-length hair and facial hair, and he was driving a gray full-size pickup truck. In addition, Mrs. Gilliam told Willingham that she had been sitting down when she was shot, and that it had been at least one hour since the shooting. Montgomery testified that he asked Mrs. Gilliam if she knew her assailant, and that she responded that she did not.

Gary Wayne Hunnicut, fire chief with the Samantha Volunteer Fire Department, testified that he was dispatched to the Hood residence on August 9, 1990. He stated that when he arrived, Donnie Hallman, a fellow volunteer, was already on the scene treating Mrs. Gilliam. In addition, both Willingham and Montgomery were present. Hunnicut testified that while he and Hallman were treating Mrs. Gilliam, he heard either Willingham or Montgomery ask Mrs. Gilliam if Perkins was her assailant. According to Hunnicut, Mrs. Gilliam "grunted" and nodded her head in the affirmative. [(*Id.*, Vol. 12 at 1987.)] In addition, Hunnicut said he heard Mrs. Gilliam grunt and saw her nod her head in the affirmative when either Willingham or Montgomery asked her if she had been shot with a pistol.

Scott Sassaman, a paramedic with the Suburban Ambulance Company, testified that he arrived at the Hood residence at approximately 5:46 p.m. on August 9. Hallman was already working on Mrs. Gilliam. Sassaman stated that he took over Mrs. Gilliam's treatment and put Mrs. Gilliam in "mass trousers" — air-filled pants that move blood from the lower body to the upper extremities. [(*Id.* at 2023.)] Sassaman stated that he saw no gunpowder residue on Mrs. Gilliam. According to Sassaman, Mrs. Gilliam was placed in the ambulance at approximately 6:00 p.m. While in the ambulance, Sassaman said, Mrs. Gilliam expressed concern about her family and stated that she was going to die. Mrs. Gilliam died in the ambulance on the way to the hospital.

On August 10, 1990, Kenneth Warner, the State Medical Examiner for Tuscaloosa County, performed an autopsy on Mrs. Gilliam. Warner testified that Mrs. Gilliam died from a gunshot wound to her chest that destroyed her liver. He stated that, in addition to the gunshot wound, there was a stab wound just above Mrs. Gilliam's right collarbone. The hyoid bone in Mrs. Gilliam's neck was broken, Warner said, and there was hemorrhaging in her neck muscles. Warner stated that these injuries were consistent with a struggle having taken place. Warner also stated that he found no evidence that Mrs. Gilliam had been raped and that there was no gunpowder residue around the gunshot wound. He testified that if Mrs. Gilliam was wearing a shirt at the time of the shooting, the absence of gunpowder residue around the wound would be meaningless, but that if Mrs. Gilliam was not wearing a shirt when she was shot, the absence of gunpowder residue would indicate that the fatal shot was fired from at least 18 inches away.

Vernon Hudson, Chief Deputy of the Fayette County Sheriff's Department, testified that he was driving south on Highway 63 on August 9, 1990, at approximately 5:30 p.m., when he saw Perkins, whom he knew personally, driving north in a gray pickup truck. Hudson stated that he knew Perkins was wanted in connection with the shooting of a woman in Tuscaloosa County, so he turned around and followed Perkins. According to Hudson, he lost sight of the pickup truck briefly when he turned around, but he saw dust on a dirt road off Highway 63 and he turned down the road. Hudson said he found a gray, 1979 Chevrolet pickup truck abandoned just off the dirt road, and that the keys were in the ignition. Hudson stated that he notified a dispatcher that he had found the truck Perkins was driving and that he stayed with the truck until the homicide unit arrived, at which time, he said, he turned the truck over to Investigator J.R. Simpson. Hudson testified that he found the truck approximately one-half mile from the homes of Perkins's mother and grandmother.

Investigator Simpson testified that he responded to a call regarding an abandoned truck believed to have been driven by Perkins. He stated that when he arrived in Fayette County just off Highway 63, he took photographs of the abandoned truck. He stated that the truck

had a gunshot hole in the front windshield and a gunshot hole in the roof of the cab.  On cross-examination, he stated that he believed both holes were caused by shots fired from within the truck, most likely from the driver's side.  The truck was towed to the homicide unit's impound lot and was "processed" for evidence by Simpson and Dr. John McDuffie, a trace-evidence examiner with the Alabama Department of Forensic Sciences.

At trial, Perkins stipulated to the following facts, which the trial judge read to the jury:

> "The defendant caused the death of Cathy Gilliam with a .357 Magnum pistol.  That's number one.  Number two, the defendant, Mr. Roy Perkins, was in the 1979 Chevrolet gray pickup truck shown in State's Exhibit number 23.  Number three, Cathy Gilliam's blood was found in the 1979 gray Chevrolet pickup truck shown in State's Exhibit number 23."

[(*Id.*, Vol. 13 at 2087.)]

The State presented evidence that Simpson and McDuffie found a wallet containing Perkins's driver's license and a fragment of a projectile in the gray truck.  Fibers from the shorts Mrs. Gilliam was wearing at the time of her abduction were also found in the truck.  Perkins's fingerprints were found on the outside of the driver's door of the truck.  Further, both the driver and front passenger seats contained reddish stains; the stained portions of the seats were cut out and sent to Dr. Phyllis T. Rollan, a forensic serologist with the Alabama Department of Forensic Sciences.  Dr. Rollan testified that the stain found on the back of the front passenger seat was consistent with Mrs. Gilliam's blood.

After the abandoned truck was discovered, the police began searching for Perkins in Fayette County.  Bobby Mason, an enforcement agent with the Alabama Alcoholic Beverage Control Board, testified that he participated in the search for Perkins in Fayette County.  He stated that on August 11, 1990, he found a campsite in the woods near

the homes of Perkins's mother and grandmother. At the campsite, Mason found quilts, cigarettes, various food items, wire-cutters, 10 feet of rope, and a .357 Magnum handgun.

Baxter Pate, a police officer with the City of Northport, also helped in the search for Perkins. Pate testified that at approximately 3:50 p.m. on August 12, 1990, he found Perkins lying on the ground in the woods near the houses of his mother and grandmother. Pate stated that Perkins was crying and whimpering and that he said, "Please, please, don't shoot me." [(*Id*. at 2106.)] After Pate told Perkins not to move, Perkins again stated, "Please, don't shoot me," and then said, "I didn't mean to do it . . . . I didn't mean to hurt her." [(*Id*. at 2107.)] Pate stated that he called for backup, and that several officers arrived and handcuffed Perkins. At the time of his arrest, Perkins had a gunshot wound to his right knee that he suffered during a struggle with Mrs. Gilliam.

Darlene Hall, a resident of New Lexington who lived approximately one to two miles from the Gilliam residence, also testified at trial. Hall stated that at approximately 3:50 p.m. on August 9, 1990, Perkins came to her home and asked to use her telephone to call a tow truck. According to Hall, she recognized Perkins from a picture in a newspaper article she had been reading, and she immediately retrieved a gun from her bedroom closet. Perkins left when he saw the gun. At trial, Hall positively identified Perkins as the man who had come to her home on August 9.

In addition to Hall's testimony, the State also presented evidence of two rapes allegedly committed by Perkins in the two weeks preceding the abduction of Mrs. Gilliam – one committed on August 1, 1990, and one committed on August 6, 1990. The State presented testimony from the alleged rape victims, B.P. and D.W.; from the doctors who treated them following the alleged rapes; from the nurses who administered the rape kits; from Dr. Rollan, who performed DNA tests on the rape kits from both victims and compared them to Perkins's DNA; and from the police officers who investigated the alleged rapes.

*Perkins v. State*, 808 So. 2d 1041, 1052-56 (Ala. Crim. App. 1999), *aff'd* 808 So. 2d

1143 (Ala. 2001), *cert. granted and judgment vacated in part sub nom. Perkins v.*

*Alabama*, 536 U.S. 953 (2002).

## II. <u>THE SENTENCING ORDER</u>

The pertinent portions of the trial court's sentencing order are set forth below:

### STATUTORY AGGRAVATING CIRCUMSTANCES

1.  Alabama Code § 13A-5-49(1)  <u>The capital offense was committed by a person under sentence of imprisonment.</u>  This was proved beyond a reasonable doubt.  The Defendant was on parole for a ten (10) year sentence in Case No. CC 83-9 in Fayette County, Alabama, when he committed the offense, and thus was under a sentence of imprisonment.  Parole equates to being under sentence of imprisonment.

2.  Alabama Code § 13A-5-49(2)  <u>The defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person.</u>  This was proved beyond a reasonable doubt.  The Defendant was convicted of Rape, First Degree, in Case No. 90-96 in Fayette County, Alabama, on his plea, and Defendant was sentenced to ninety-nine (99) years in prison.  Defendant was represented by Hon. Steven M. Nolen.  Court records and testimony of [B.P.] show this circumstance.  The conviction must exist at the time of sentencing, not necessarily at the time of the act.

3.  Alabama Code § 13A-5-49(3)  <u>The defendant knowingly created a great risk of death to many persons</u>.  This circumstance does not exist.

4.  Alabama Code § 13A-5-49(4)  <u>The capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary or kidnapping.</u>  This was

proved beyond a reasonable doubt. This is an aggravating component of the capital offense. The Defendant committed the capital offense while he was engaged in . . . the commission of a kidnapping. The jury verdict finding Defendant guilty of Murder Kidnapping in the First Degree (capital murder) established this circumstance beyond a reasonable doubt.

5. Alabama Code § 13A-5-49(5)  <u>The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.</u>  This circumstance does not exist.

6. Alabama Code § 13A-5-49(6)  <u>The capital offense was committed for pecuniary gain.</u>  This circumstance does not exist.

7. Alabama Code § 13A-5-49(7)  <u>The capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.</u>  This circumstance does not exist.

8. Alabama Code § 13A-5-49(8)  <u>The capital offense was especially heinous, atrocious or cruel compared to other capital offenses.</u> This circumstance does not exist.

The Court did not rely on any statutory aggravating circumstance except for the three (3) circumstances above stated to have been proved. The facts did not establish the existence of any other statutory circumstance. The Court has not considered any fact or thing as a non-statutory aggravating circumstance.

## STATUTORY MITIGATING CIRCUMSTANCES

The Court has reviewed all statutory and non-statutory mitigating circumstances, whether or not suggested by Defendant.

1. Alabama Code § 13A-5-51(1 )  <u>The Defendant has no significant history of prior criminal activity.</u>  This circumstance does not exist. Defendant does have a significant history of prior criminal activity as is shown by the presentence report, excluding the juvenile

charges. Defendant's history shows crimes of violence, including a rape for which he was on parole when the murder of Cathy Gilliam occurred. There was also testimony of two rapes by Defendant within several days previous to the date of said murder.

2.   Alabama Code § 13A-5-51(2)   The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. This circumstance does not exist. Defendant had some degree of mental or emotional disturbance, but the Court does not find it to be to an extreme degree. Dr. Goff stated that Defendant could tell the difference between right and wrong at the time of the offense in this case. The MMPI-2 results indicated Defendant might have been trying to overstate or exaggerate any disturbance.

Defendant's use of alcohol and drugs could have contributed to his disturbance. If so, it was voluntary an his part. Defendant was also able to elude large search parties for a few days during a manhunt for him. Two isolated incidents of seizures seem to have been caused by alcohol or other substance abuse.

3. Alabama Code § 13A-5-51(3) The victim was a participant in the defendant's conduct or consented to it. This circumstance does not exist. There was no participation or consent by the victim.

4.   Alabama Code § 13A-5-51(4)   The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor. This circumstance does not exist. There was no evidence of an accomplice, and the Defendant's participation was major. Defendant admitted causing the death of Cathy Gilliam.

5.   Alabama Code § 13A-5-51(5)   The defendant acted under extreme duress or under the substantial domination of another person. This circumstance does not exist. No evidence showed Defendant was under duress or that another person had anything to do with Defendant's actions in this case.

6.  Alabama Code 13A-5-51(6)  <u>The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.</u>  The Court finds that this circumstance exists.  Dr. Goff said that Defendant s intelligence was in the lowest 6-7% or below 92% of the population.  Defendant had a long history of alcohol abuse with possible organic brain dysfunction. Evidence also showed that Defendant abused drugs.

Dr. Goff also diagnosed Defendant as borderline personality disorder with paranoid features.  This most likely affected his judgment. No psychosis was found through the evidence.

7.  Alabama Code § 13A-5-51 (7)  <u>The age of the defendant at the time of the crime.</u>  This circumstance does not exist.  Defendant was thirty (30) years of age at the time this offense occurred.  Defendant's creative suggestion of his being morally immature is rejected. Defendant has had extensive criminal justice experience.  Age is not a mitigating circumstance.

Therefore, only one statutory mitigating circumstance exists.  As to non-statutory mitigating circumstances considered, these include any aspect of the Defendant's character or record and any of the mitigating circumstances of the offense and all other relevant mitigating circumstances that the Defendant offered as a basis for a sentence of life imprisonment without parole instead of death.

The Court considers the following non-statutory mitigating circumstances to exist.

(1)  Defendant took Victim near Ms. Hood's house.  However, Victim said she'd been shot about an hour earlier.  This was a belated act, at best, and Defendant may have been merely getting rid of the Victim.

(2)  Defendant was drinking alcohol, taking pills and abusing drugs during the general period of time of the offense.  However, this was voluntary.

(3)  Defendant suffers from borderline personality disorder, is an alcoholic, is of borderline intelligence, and probably has organic brain dysfunction.

(4)  Defendant was under mental or emotional disturbance, although not to an extreme degree.

(5)  Defendant lacked socialization and had a horrible childhood, involving the death of his father, the drowning of his brother in his presence, the sexual abuse of his sister by his stepfather in his presence, physical abuse of Defendant by his stepfather, being run away from home at a very early age and being sexually abused.

(6)  Defendant's intelligence is below 92% of the population, and he has a full scale I.Q. of 76.

(7)  Defendant and his family were very poor, and Defendant had to "raise himself".  His mother and stepfather and other family members were alcoholics.

The Court considered all of the evidence as to non-statutory mitigating circumstances, including the testimony of Mr. Ed Owens, Dr. John Goff and Ms. Kathleen Snow, the presentence investigation, the videotape offered by Defendant and all other evidence submitted on circumstances of the Defendant's life, childhood, poor housing, and family background.  The Court carefully searched for and considered all evidence in this case for circumstances of mitigation because this is a capital murder case.

## WEIGHING CIRCUMSTANCES

The Court has found three (3) existing statutory aggravating circumstances beyond a reasonable doubt.  The Court has found only one (1) statutory mitigating circumstance to exist based on the evidence, and has considered several existing non-statutory mitigating circumstances.  The Court has weighed the three (3) existing statutory aggravating circumstances and has weighed the one (1) existing

statutory mitigating circumstance and all of the existing non-statutory mitigating circumstances. After having weighed the foregoing circumstances, the Court has found that the three (3) existing statutory aggravating circumstances greatly outweigh all existing mitigating circumstances, both statutory and non-statutory.

In deciding the sentence, the Court has ordered, received and reviewed the presentence investigation report of Mr. Carl Archibald, except that the last paragraph of the report was not considered. Therefore, Mr. Archibald's concurrence with or recommendation of the death sentence was not considered. The report did not contain any victim impact statement.

The Court has considered the recommendation of the jury in its advisory verdict, as required by law, but made this consideration in view of the fact that the advisory jury verdict is not binding on the Court. Although the advisory verdict does not require the Court to give the death sentence, the Court has been unable to justify a sentence of life imprisonment without parole after having weighed all of the circumstances previously stated. Furthermore,, after full and thorough consideration, the Court is compelled to accept the recommendation of the jury. The Court fixes the Defendant's punishment as death.

(Doc. 10, Vol. 24, Tab 45 at 348-54.)

### III.  PROCEDURAL HISTORY

In April 1994, a Tuscaloosa County jury found Perkins guilty of the capital murder of Mrs. Gilliam and recommended, by a vote of ten to two, that he should be sentenced to death.  (*Id.,* Vol. 16, Tab 25 at 2751; *id.*, Vol. 18, Tab 36 at 3019.)  On June 3, 1994, the trial court followed the jury's recommendation and sentenced Perkins to death.  (*Id.*, Vol. 24, Tab 45 at 354.)

Perkins appealed his conviction and sentence to the Alabama Court of Criminal Appeals, which affirmed in 1999. *See Perkins*, 808 So. 2d 1041. The Alabama Supreme Court affirmed the Court of Criminal Appeals on March 30, 2001. *Ex parte Perkins*, 808 So. 2d 1143 (Ala. 2001).

Perkins petitioned the United States Supreme Court for writ of certiorari. The Court granted his petition. The Supreme Court vacated the judgment and remanded the case "for further consideration in light of *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002)."[2] *Perkins v. Alabama*, 536 U.S. 953 (2002).

On remand, after declining to allow additional evidence to be presented, the Alabama Supreme Court held:

> Applying the plain-error standard of review, we hold that because, applying the most common definitions of mental retardation, we find no indication in the record that Perkins is mentally retarded, no reversible error occurred and the imposition of the death sentence in this case is not unconstitutional. Therefore, we affirm the judgment of the trial court sentencing Perkins to death.

*Ex parte Perkins*, 851 So. 2d 453, 457 (Ala. 2002). The United States Supreme Court denied Perkins's petition for writ of certiorari October 6, 2003. *Perkins v. Alabama*, 540 U.S. 830 (2003).

---

[2]The *Atkins* decision held that "executing a mentally retarded individual violates the ban on cruel and unusual punishments found in the Eighth Amendment to the United States Constitution." *Ex parte Perkins*, 851 So. 2d 453, 454 (Ala. 2002)(citing *Atkins*, 536 U.S. at 317-18).

Perkins filed a petition for post-conviction relief, commonly referred to as a Rule 32 Petition after Ala. R. Crim. P. 32, in the Circuit Court of Tuscaloosa County on January 29, 2004. The Circuit Court held an evidentiary hearing on some of the claims in Perkins's Rule 32 Petition, as amended. On July 30, 2009, the Circuit Court denied Perkins's Rule 32 petition as amended. (*See* doc. 10, Vol. 56, Tab 135 at 4488-4534.) Later, on September 3, 2009, the Circuit Court amended its order to deny two claims it had overlooked in its July 2009 order. (*See id*., Tab 137 at 4551-52.)

Perkins appealed the denial of his Rule 32 Petition and the Court of Criminal Appeals affirmed. *Perkins v. State*, 144 So. 3d 457, 499 (Ala. Crim. App. 2012). The Alabama Supreme Court granted, but later quashed his writ of certiorari. The Supreme Court denied his petition for writ of certiorari on October 6, 2014. *Perkins v. Alabama*, 135 S. Ct. 56 (2014).

On September 23, 2014, Perkins filed the instant Petition for a Writ of Habeas Corpus by a Person in State Custody under a Death Sentence, pursuant to 28 U.S.C. § 2254.[3] (Doc. 1.)

---

[3]This case was reassigned to the undersigned on September 28, 2018. (*See* doc. 37.)

# IV. **STANDARD OF REVIEW**

As to any claim "adjudicated on the merits in State court proceedings," this court may not grant the Petition

. . . unless the adjudication of the claim –

> "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. [42 U.S.C. § 2254(d).]
>
> In applying this "highly deferential standard for evaluating state-court rulings, . . . state-court decisions [must] be given the benefit of the doubt." [*Cullen v.*] *Pinholster*, 563 U.S. [170, 181], 131 S. Ct. [1388], at 1398 [(2011)](internal quotation marks omitted). They must be reviewed solely on "the record that was before the state court that adjudicated the claim on the merits." *Id*., at [181] . . . . And the prisoner must rebut any state court factual findings he seeks to challenge by clear and convincing evidence under § 2254(e)(1). *Burt v. Titlow*, 571 U.S. [12], [18], 134 S. Ct. 10, 15, 187 L. Ed. 2d 348 (2013).

*Brumfield v. Cain*, 135 S. Ct. 2269, 2288-89 (2015). "Deciding whether a state court's decision involved an unreasonable application of federal law[, § 2254(d)(1),] or was based on an unreasonable determination of fact[, § 2254(d)(2),] requires the federal habeas court to train its attention on the particular reasons – both legal and factual – why state courts rejected a state prisoner's federal claims, and to give appropriate deference to that decision." *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92

(2018)(internal quotations and citations omitted). Nevertheless, "'[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review,' and 'does not by definition preclude relief.'" *Brumfield*, 135 S. Ct. at 2277 (quoting *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003)).

"When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge." *Johnson v. Williams*, 568 U.S. 289, 303 (2013). However, "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary. That presumption stands unless rebutted by evidence from the state court's decision and the record that leads very clearly to the conclusion that the federal claim was inadvertently overlooked in state court." *Pittman v. Sec'y, Fla. Dep't of Corr.*, 871 F.3d 1231, 1245 (11th Cir. 2017)(internal citations and quotations omitted), *cert. denied* 139 S. Ct. 102 (2018).

The "backward-looking language" of § 2254(d) "requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.*, the record before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). Also, the "[s]tate court

decisions are measured against [the Supreme] Court's precedents as of 'the time the state court renders its decision.'" *Id.* (quoting *Lockyer v. Andrade*, 588 U.S. 63, 71-72 (2003)).

## V. <u>EVIDENTIARY HEARING</u>

Perkins has asked the court for an evidentiary hearing on two of his claims – his claim that he is ineligible for the death penalty because he is intellectually disabled and his claim that the prosecution used its peremptory strike in a racially discriminatory manner. "If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) [and (d)(2)] on the record that was before that state court." *Cullen*, 563 U.S. at 185; *see Landers v. Warden*, 776 F.3d 1288, 1295 (11th Cir. 2015)(applying *Cullen* to claim brought pursuant to § 2254(d)(2)). "Therefore, before a habeas petitioner may be entitled to a federal evidentiary hearing on a claim that has been adjudicated [on the merits] by the state court, he must demonstrate a clearly established federal-law error[, § 2254(d)(1),] or an unreasonable determination of fact[, § 2254(d)(2),] on the part of the state court, based ***solely*** on the state court record." *Landers*, 776 F.3d at 1295 (emphasis added). "Once a petitioner has demonstrated such an error or unreasonable determination, the decision to grant an evidentiary hearing rests in the discretion of the district court." *Id*. (internal citations and quotations omitted).

For the reasons set forth below, the court finds that Perkins has not demonstrated his right to relief under § 2254(d), based on the state court record. Therefore, his request for an evidentiary hearing is denied.

## VI. <u>DISCUSSION OF PERKINS'S CLAIMS</u>

## A. THE STATE VIOLATED THE FOURTEENTH AMENDMENT DUE PROCESS CLAUSE BY FAILING TO DISCLOSE MATERIAL, EXCULPATORY EVIDENCE AND OFFERING A FALSE STIPULATION

Perkins alleges that the State violated *Brady v. Maryland*[4] by failing to disclose a video-taped interview of Candace Gilliam shortly after her mother's murder and that it violated *Giglio v. United States*[5] by insisting that the stipulation as to the content of Candace's testimony include a false statement that she had heard her mother cry, "Rapist," as she was being abducted. For the reasons set forth herein, the court finds that Perkins is not entitled to relief on either claim.

### 1. Due Process Violation Under *Brady v. Maryland*

In his Petition, Perkins states:

29. The State violated Perkins's right to due process of law by suppressing a video that was favorable to the defense and material. The video would have critically weakened the State's most compelling evidence of intent to rape, strengthened the defense's theory of the crime, changed the character of the State's remaining evidence, and

---

[4]*Brady v. Maryland*, 373 U.S. 83 (1963).

[5]*Giglio v. United States*, 405 U.S. 150 (1972).

20

dampened the State's gripping emotional narrative. The state court's holding that suppression of the video did not undermine confidence in the verdict is contrary to and involves an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). It also is based on an unreasonable determination of the facts in light of the evidence in the record. *See* 28 U.S.C. 2254(d)(2).

. . .

30. The State prosecuted Perkins for capital murder on the theory that he intentionally killed Cathy Gilliam in the course of a first-degree kidnapping. [(Doc. 10, Vol. 1 at 2-3; *see* Ala. Code § 13A-5-40 (a)(1) (1975)(identifying the capital offense).)] To establish a first-degree kidnapping, the State argued that Perkins abducted Gilliam with the intent to sexually abuse her. [(*Id.*, Vol. 11, Tab 16 at 1709; *see* Ala. Code § 13A-6-43(a)(4) (1975)(defining first-degree kidnapping).)] Under the relevant criminal statute, a person could be guilty of first-degree kidnapping if he abducted someone with the intent to sexually abuse the victim or with the intent to physically injure the victim. Ala. Code § 13A-6-43 (a)(4) (1975). However, the prosecutor stated in explaining his theory of the case before trial, "I don't think there's any reasonable interpretation of this case other than [Perkins] was going to take [Cathy Gilliam] and rape her, not that he was going to physically injur[e] her . . . ." [(Doc. 10, Vol. 11, Tab 16 at 1709.)]

31. It was undisputed that Cathy Gilliam was not raped. [(*Id.*, Vol. 12 at 2029; *id.*, Vol. 13 at 2153-54.)] It also was undisputed that Perkins brought Gilliam to a nearby home after the shooting, [(*id.*, Vol. 12 at 1943)], and that Gilliam survived for at least one hour and spoke about the crime to people around her, [(*see*, *e.g.*, *id.* at 1920-21, 1941-45)]. When she recounted the incident to first responders and others, she provided a detailed description of the man who abducted her, [(*id.* at 1920, 1942)], described the man's vehicle, [(*id.* at 1920, 1943)], and described how she was positioned when she was shot, [(*id.* at 1920, 1930, 2028-29)], among other things. She said that the man who shot her brought her to the home, [(*id.* at 1943)], and that he said he did not mean to shoot her, [(*id.* at 1944-45)]. She said that the man had not

raped her.  [(*Id*. at 2029.)]  She did not mention an attempt to sexually assault her.

32.  The issue of whether Perkins had the intent to rape was central to the defense.  Perkins conceded that he was responsible for shooting Gilliam.  [(*Id*., Vol. 13 at 2087; *id*., Vol. 16 at 2659-60.)]  However, he maintained throughout the trial that the shooting was accidental and that he did not intend to sexually assault her.  [(*Id*., Vol. 16 at 2642-45, 2654-58.)]  In his opening statement to the jury, Perkins's counsel stated that Perkins was "not guilty of capital murder" because "the evidence in this case will not prove that Roy Perkins intended to hurt Mrs. Gilliam."  [(*Id*., Vol. 11, Tab 18 at 1735-37.)]  Counsel emphasized this theme repeatedly; it was the backbone of the defense.  [(*See*, *e.g*., *id*. at 1737 ("He did not intend to hurt her, physically.  And he did not intend to rape her or sexually abuse her."), 1740 ("[T]he evidence in this case will show that Mr. Perkins never intended to kill Mrs. Gilliam [and] that he never intended to physically harm her or sexually abuse her."); *id*., Vol. 15, Tab 22 at 2632-38 (arguing State failed to prove intent to rape); *id*., Vol. 16 at 2641-45 (arguing State's evidence consistent with defense theory of no intent to rape), 2650-51 (explaining difference between first and second degree kidnapping and arguing that Perkins did not intend to sexually abuse victim), 2652-56 (arguing State's circumstantial evidence insufficient to convict Perkins of capital murder because it failed to establish intent to sexually abuse), 2657 (arguing that if attempted rape had occurred, victim would have mentioned it when she gave details of crime to police), 2657-58 (arguing Perkins went to victim's home because he was running from police), 2658 ("So there was never any intent to physically injure or sexually abuse.").

33.  At trial, the State presented evidence of what Cathy Gilliam said at the moment of the abduction from its first witness, Gilliam's fourteen-year-old daughter, Candace Gilliam.  [(*Id*., Vol. 11, Tab 19 at 1742.)]  Candace Gilliam testified that she was present when her mother was abducted.  [(*Id*. at 1742-46.)]  She was the only eyewitness to that event.  After she became emotional on the stand, . . . there was a brief recess and defense counsel offered to "stipulate to what she said she

saw," [(*id*., Vol. 11, Tab 19 at 1748)]. The State represented that Candace Gilliam would testify that she heard Cathy Gilliam "yell for her help and something about a rapist." [(*Id*. at 1755.)] The defense agreed to the stipulation based on the State's account of Candace Gilliam's statement.[6] The defense had no reason to doubt the State's representations; the district attorney followed an open file policy, [(*id*., Vol. 1 at 86; *id*., Vol. 4 at 245)], and his "open file" did not contain any statement of Candace Gilliam that contradicted the State's version of what her testimony would be, [(*see id*., Vol. 63 at 195-96; *id*., Vol. 64 at 420)].

34. After the stipulation was entered, the State used the "cry of rapist," [(*id*., Vol. 11, Tab 17 at 1734)], to argue that Perkins intended to sexually assault Cathy Gilliam, [(*see, e.g.*, *id*., Vol. 15, Tab 21 at 2616, 2622; *id*, Vol. 16, Tab 23 at 2669-70; *see also id*., Vol. 11, Tab 17

_____

[6]The following stipulation was read to the jury after Candace left the stand:

Miss Candace Gilliam would state as follows to this effect: When she heard her mother screaming a second time, Candace went to the kitchen to see what was happening. Candace . . . saw a man with what she believes was a black pistol pointed at her mother's head. And he was holding her with his other hand. She heard a broom drop. Candace heard both of them say something, but she is not sure what was said. The man said: "Drop the broom." She had a broom in her hand. Candace heard her mother yell for her help and something about a rapist. The man led her mother to a vehicle behind her mother's car. She is not sure what kind of vehicle, but she did see an antenna, gray windshield, bigger than a car. At that point, Candace ran back to a room and called her grandmother. Candace was unable to give a physical description of the man other than . . . One, thin beard unlike her father's beard. The hair was straight like regular hair. Two, brown hair appeared to be windblown hair. Three, not much taller than her mother. Four, she believed the pistol was black in color. Candace was unable to pick anyone out of a lineup.

(Doc. 10, Vol. 11, Tab 19 at 1754-55.)

at 1716)].  Defense counsel attempted to curb the prosecution's use of the stipulated testimony in closing argument:

> MR. FREEMAN [District Attorney]: [. . .] [Candace Gilliam] hears her mother saying the word, rapist . . . . [D]id he say something to [Cathy Gilliam]?  She used the word, rapist.[7]

> MR. STEVERSON [Defense Attorney]:  Judge, at this time, we're going to object to that continuous – I think the testimony that they brought out was that they heard somebody say it.  But I don't think there's any testimony that [Mr. Freeman knows] who said it.  I think that's a misstatement – to say that Mrs. Gilliam –

> MR. FREEMAN:  No, sir.  Miss Candace Gilliam testified that she heard her mother say the word, rapist.

---

[7]In the prosecution's rebuttal closing argument during the guilt phase of the trial, the prosecutor said:

> . . . Now something was said about why we put Candace Gilliam on.  I think it's pretty obvious.  She was an eye witness.  She saw what this man did.  She saw that this man abducted her mother.  This man kidnapped her mother.  Does that not make her a very important witness?  Of course, it does.  She saw the man take her mother away with one hand on . . . her shoulder and another hand with a gun [in it], pointed at her mother's head.  Does that not make her an important witness?  Of course, it does.  So the next thing we know is that about an hour later – Oh, and another thing, she hears her mother saying the word, rapist.  Now that suggests perhaps that Cathy Gilliam had seen that same newspaper that Mrs. Hall had seen just a little earlier.  Cathy Gilliam may very well have recognized Roy Perkins.  How else would she know immediately that he was a rapist, or did he say something to her?  She used the word, rapist.

(Doc. 10, Vol. 16, Tab 23 at 2668-69.)

MR. LEMLEY [Asst. District Attorney]: Your Honor, the stipulation that I have right here in front of me, Candace heard her mother yell for help and something about rapist.

MR. STEVERSON: Right. That's exactly right.

MR. LEMLEY: She heard her mother yell for help and something about rapist.

THE COURT: Okay. Well [the prosecutor] can draw his inferences. Go ahead now.

[(*Id.*, Vol. 16, Tab 23 at 2669-70.)]

35. The State's most direct evidence that Perkins intended to rape Gilliam was the stipulation that she "used the word, rapist." This statement was unconditionally admitted. The State's remaining evidence of intent consisted of collateral-act evidence. The main collateral-act evidence alleged that Perkins had raped two women in the weeks before this incident. [(*See id.*, Vol. 12 at 1862-912.)] Other collateral-act evidence involved the testimony of Darlene Hall, who said that Perkins drove up to her house and acted suspiciously shortly before the abduction of Cathy Gilliam. Hall's testimony did not support the State's argument that Perkins intended to rape Cathy Gilliam. Hall herself acknowledged that the man she identified as Perkins did not threaten or attempt to harm her when they encountered each other on Hall's front porch. [(*Id.*, Vol. 11, Tab 19 at 1778-79.)] In fact, she went inside to make a telephone call for him. [(*Id.* at 1775-76.)]

36. Without evidence that Cathy Gilliam cried "rapist," the State's case for capital murder was weak. There was little about the abduction of Gilliam to indicate a rape motive. Without the cry of "rapist," the State would have had no substantial evidence to connect the collateral acts to the Gilliam abduction.

37. On its own, the collateral-act evidence was consistent with the defense's theory. Defense counsel pointed out that, at the time of

Cathy Gilliam's abduction, warrants had been issued, Perkins's photograph was in the local papers, and Perkins was "on the run, he kn[ew] the police [were] coming after him." [(*Id.*, Vol. 16 at 2654.)] There was no evidence that Perkins was wanted when the collateral rapes occurred, which made the circumstances of Cathy Gilliam's abduction materially different. The collateral rapes provided an explanation for why Perkins approached Darlene Hall and abducted Cathy Gilliam: he was running from the police. [(*See*, *e.g.*, *id.* at 2642-45, 2654-55.)] The collateral-act evidence was emotionally charged and inflammatory, but it supported the defense's theory that Perkins did not intend to kill, injure, or sexually abuse Gilliam, which would have been sufficient to avoid a capital murder conviction.

38. Unlike the collateral-act evidence, "Cathy's cry of rapist," [(*id.*, Vol. 11, Tab 17 at 1734)], could not be reconciled with the defense's theory; it radically undercut it. The State used the "cry of rapist" to show that Perkins's intent was the same as it had been during the collateral crimes. [*Id.*, Vol.15, Tab 21 at 2616; *see id.*, Vol. 16, Tab 23 at 2669-70.)] The State had no other evidence that clearly connected the collateral rapes to the abduction of Gilliam.

39. Perkins was found guilty of capital murder and sentenced to death. [(*Id.*, Vol. 2 at 288-89; *id.*, Tab 3 at 354.)] His conviction and sentence were affirmed on direct appeal. *Perkins v. State*, 808 So. 2d 1041 (Ala. Crim. App. 1999), *aff'd sub nom. Ex parte Perkins*, 808 So. 2d 1143 (Ala. 2001), *vacated sub nom. Perkins v. Alabama*, 536 U.S. 953 (2002), *remanded sub nom. to Ex parte Perkins*, 851 So. 2d 453 (Ala. 2002).

40. In Rule 32 proceedings, Perkins discovered that – despite the State's open-file policy and its representation at trial that Candace Gilliam heard her mother's "cry of rapist" – the State possessed a videotaped interview in which Candace Gilliam stated that she did not know what, if anything, her mother said when she was abducted. P.C. 5298 at 05:37-05:55. In the interview, which was conducted thirteen days after the offense, a victims' services officer repeatedly asked Candace Gilliam if she heard her mother say anything at the time of the

abduction. Candace Gilliam repeatedly answered, "No." When the officer continued to press her, Candace Gilliam explicitly stated that she could not make out any of her mother's words. [(*Id.*)] It is undisputed that the State concealed that video from the defense. [(*Id.*, Vol. 56, Tab 135 at 4489.)]

41. In his Rule 32 petition, Perkins argued that the State's suppression of the video violated *Brady v. Maryland*, 373 U.S. 83 (1963). [(*Id.*, Vol. 50, Tab 126 at 3391-97.)] *Brady* held that a prosecutor violates the Due Process Clause when the following three elements are met: (1) the prosecution suppresses evidence, (2) the suppressed evidence is favorable to the defense, and (3) the suppressed evidence is material to guilt or punishment. *Brady*, 373 U.S. at 87. Additionally, the State's knowing false representation about Candace Gilliam's testimony constituted a due process violation under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972).

42. At the Rule 32 evidentiary hearing, Perkins's trial counsel testified that if they had known about the video, they would not have agreed to the stipulation concerning Candace Gilliam's testimony. [(*See* doc. 10, Vol. 63 at 195-96; *id.*, Vol. 64 at 420.)] Thus, had the video been disclosed, "Cathy's cry of rapist" either would not have been presented, or it would have been undercut on cross-examination. Had cross-examination occurred, the jury would have learned that the suppressed video captured Candace Gilliam's account less than two weeks after the incident and included an extensive examination of exactly what she saw and heard. She provided specific details about the location of her mother's car, P.C. 5298 at 06:45-07:50, relative positions of objects, [(*id.*)], and the alleged weapon, [(*id.* at 05:05-05:35)]. And she said repeatedly that she did not hear what, if anything, her mother said.

43. The Rule 32 circuit court found that the State suppressed the video. [(Doc. 10, Vol. 56, Tab 63 at 4488-89.)] The court also found that the video "was favorable impeachment evidence." [(*Id.* at 4490.)] The court held that the video was not material, however, because it

would not have "changed the outcome of the case."  [(*Id.*)]  The circuit court denied relief.  [(*Id.*)]

(Doc. 1 ¶¶ 29-43 [footnotes added].)

Perkins appealed the Rule 32 court's decision and the Alabama Court of Criminal Appeals affirmed the circuit court's decision; it held:

> Not only did Perkins fail to satisfy the requirements for establishing a *Brady* violation, Perkins also failed to satisfy the requirements for showing that this claim was based on newly discovered evidence.[8]  Perkins did show that the State failed to disclose Candace's

---

[8]The Court of Criminal Appeals cited Alabama's rule regarding newly discovered evidence offered at the post-conviction stage, which states:

(e) Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:

> (1)  The facts relied upon were not known by the petitioner or the petitioner's counsel at the time of trial or sentencing or in time to file a post-trial motion pursuant to Rule 24, or in time to be included in any previous collateral proceeding and could not have been discovered by any of those times through the exercise of reasonable diligence;

> (2)  The facts are not merely cumulative to other facts that were known;

> (3)  The facts do not merely amount to impeachment evidence;

> (4)  ***If the facts had been known at the time of trial or of sentencing, the result probably would have been different***; and

> (5)  ***The facts establish that the petitioner is innocent of the crime for which the petitioner was convicted or should not have***

statement and that the statement would have been relevant for impeachment. However, contrary to Perkins's assertions, the stipulated testimony was not the only evidence that tended to establish Perkins's intent. Two witnesses testified that in the two weeks before the kidnapping and murder of Gilliam, Perkins had raped them. B.P. testified that she knew Perkins and that he had asked her to go with him to return a car to a friend. She said that after they had been driving for several minutes Perkins turned down a dirt road, put a knife to her

---

*received the sentence that the petitioner received*.

Ala. R. Crim. P. 32.1(e)(emphasis added), *quoted in Perkins*, 144 So. 3d at 468. The court noted "that because of the conjunctive 'and' between (4) and (5), [Perkins] must meet all five prerequisites of Rule 32.1(e), Ala. R. Crim. P., in order to prevail." *Perkins v. State*, 144 So. 3d at 468 (Ala. Crim. App. 2012) (quoting *Payne v. State*, 791 So. 2d 383, 397-98 (Ala. Crim. App. 1999)). However, Supreme Court precedent does not require a showing of actual innocence, *see* Ala. R. Crim. P. 32.1(e)(5), before a petitioner can establish a violation of *Brady* or *Giglio* sufficient to set aside his conviction. Instead, at least in federal court, a showing of actual innocence "is merely a gateway through which a habeas petitioner must pass to have his otherwise procedurally barred constitutional claim [such as a *Brady* claim] considered on the merits." *Cunningham v. Dist. Attorney's Office for Escambia Cty.*, 592 F.3d 1237, 1273 (11th Cir. 2010)(quoting *Schlup v. Delo*, 513 U.S. 298, 315 (1995))(internal quotations omitted). Therefore, any *Brady* or *Giglio* claim that is not procedurally barred may be raised in this court without a showing of actual innocence; the petitioner must show that the withheld favorable evidence is material, and "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433.

Moreover a procedurally barred claim may be raised if the petitioner can show either cause and prejudice or actual innocence.

Nevertheless, because the Alabama court addressed the merits of Perkins's *Brady* and *Giglio* claim and did not dispose of these claims on this procedural ground, the validity of Alabama's rule requiring a showing of actual innocence to establish a *Brady* and/or *Giglio* claim will not be addressed.

throat, and raped her.  D.W. testified that, as she was getting out of her vehicle at her grandmother's house, Perkins came up behind her and put a knife to her throat.  She said that he drove her to an abandoned building and raped her.  Darlene Hall also testified that minutes before Gilliam was abducted, Perkins came to her house, knocked on her door, asked if her husband was at home, and asked to use her telephone to call a tow truck because, he said, his car was stuck in a field.  Hall said that she did not open the door and that Perkins left.  On direct appeal, this Court held that the collateral acts were admissible to show Perkins's intent.  *Perkins,* 808 So. 2d at 1084.

Perkins failed to establish that there is a reasonable probability that, had Candace's pretrial statement been disclosed, the outcome of the trial   would have been different.  *Williams,* 710 So. 2d at 1296-97. Therefore, this Court agrees with the circuit court that Perkins failed to meet his burden of proving a *Brady* violation.

*Perkins*, 144 So. 3d at 468-69 (footnote added).

In his Petition, Perkins argues, "The state court's ruling that the suppressed video was not material was contrary to and involved an unreasonable application of clearly established federal law, *see* 28 U.S.C. § 2254(d)(1), and was based on an unreasonable determination of the facts in light of the evidence in the record, *see* 28 U.S.C. § 2254(d)(2)."  (Doc. 1 ¶ 45.)

Under clearly-established Supreme Court precedent, "[t]here are three components of a true *Brady* violation:  [1] The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently;

and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "Such evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id*. at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985); citing *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995)). "Consequently, the issue before [the court] . . . is legally simple but factually complex. [The court] must examine the trial record, evaluate the withheld evidence in the context of the entire record, and determine in light of that examination whether there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017). "The question is not whether the defendant would more likely than not have received a different verdict with the [withheld] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. "In other words, favorable evidence is subject to constitutionally mandated disclosure when it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Cone v. Bell*, 556 U.S. 449, 470 (2009)(quoting *Kyles*, 514 U.S. at 435 and citing *Banks v. Dretke*, 540 U.S. 668, 698-99 (2004) and *Strickler*, 527 U.S. at 290). "[U]ndisclosed evidence can require a new trial even if it is more likely than not that a jury seeing the new

evidence would still convict." *Hays v. State of Ala.*, 85 F.3d 1492, 1498 (11th Cir. 1996).

However, withheld evidence is not material if, when considered in the context of the entire record, "it is too little, too weak, or too distant from the main evidentiary points" of the case. *See Turner*, 137 S. Ct. at 1894.

Perkins argues:

> Under [the] circumstances, "[d]isclosure [of the interview of Candace] would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *Kyles*, 514 U.S. at 441. A video that undercuts a prosecutor's most direct, proximate evidence of intent is material to guilt and should be disclosed, particularly in a capital case. Disclosure would have severed the link between the collateral acts and the Gilliam abduction, putting the whole case in a different light. And it would have created a reasonable probability of a different result by allowing the jury to fairly consider the defense's theory based on all of the available information. The state court's contrary conclusion, which rests solely on a finding of other admissible evidence to support intent, is objectively unreasonable.

(Doc. 1 ¶ 55 [footnote omitted].) The court disagrees.[9]

Perkins's defense to the capital charge was that he did not abduct Mrs. Gilliam with the intent to rape her or otherwise to physically harm her and that he did not

___

[9]Although, for the reasons set forth herein, the court finds that the withheld video was not material and, thus, will not support a claim for habeas relief, the failure to disclose the video was an egregious violation of the district attorney's duty. Nothing set forth in this Memorandum Opinion should be interpreted as this court approval of the prosecutors' conduct in failing to produce the video of Candace Gilliam's statement in a timely manner.

intend to kill her when he shot her.  Therefore, he was not guilty of kidnapping in the first degree and not guilty of capital murder, although he may have been guilty of a lesser-included offense such as felony murder.  The State argued that Perkins abducted Mrs. Gilliam with the intent to rape or sexually assault her.  In addition to Candace's statement that she saw her mother being abducted at gunpoint and heard her mother say "something about rapist," the State based its case on two rapes perpetrated by Perkins in the two weeks prior to his kidnaping Mrs. Gilliam; the fact that he had a gun and a knife; the forensic evidence from the truck showing several bullet holes; and the autopsy report.

Considering the entire record, the court finds that the Alabama court's determination – that the withheld video of Candace's interview, in which she said she did not hear what her mother said, is not material and the failure to disclose it did not prejudice Perkins's defense – is not unreasonable.  The evidence presented at trial showed that Perkins had raped two women in the days prior to his kidnapping of Mrs. Gilliam.  He had a gun and a knife when he took Mrs. Gilliam from her home. However, he did not rape Mrs. Gilliam and, after he shot Mrs. Gilliam, he let her go near Maudeen Hood's house.  When she got to Ms. Hood's house, Mrs. Gilliam was able to speak; she told Ms. Hood and first responders that she had not been raped and that Perkins had told her that he did not mean to shoot her.

Other evidence showed that there was a struggle for the gun during which Perkins was shot in the leg and Mrs. Gilliam was shot in the chest. The truck also had gunshot holes in the windshield and the roof of the cab proving multiple gunshots were fired within the cab of the truck. Mrs. Gilliam died from a gunshot wound to the chest that destroyed her liver. No gunpowder residue was found around her wound or on her clothing indicating that she was shot from a distance of about 18 inches. Moreover, there was no hole in her shirt from the gunshot proving that her shirt was not covering her chest at the time she was shot, which may indicate that Perkins was taking her clothes off at the time he shot her. She also had wounds to her neck that appeared to be knife wounds.

In light of these facts whether Candace heard Mrs. Gilliam called out "rapist" or whether, as Candace stated in her first interview, she did not hear what her mother said, does not appear to be material. Mrs. Gilliam was taken from her home at gun point by Perkins, who had raped two women in as many weeks. Perkins shot Mrs. Gilliam in an apparent struggle for the gun and at the time of the shooting Mrs. Gilliam's shirt was raised, exposing her abdomen. There is no question that the State failed to disclose relevant impeachment evidence that it had a duty to disclose. The court finds some possibility that, had Candace testified that she did not hear what her mother said, the jury may have credited the defense's position that Perkins did not

kidnap Mrs. Gilliam with the intent to rape her or to otherwise cause her physical harm.

However, "As a condition for obtaining habeas corpus from a federal court, [Perkins] must show that the state court's ruling on [his *Brady*] claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond *any* possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. at 103 (emphasis added). "Phrased more simply and maybe a little more clearly: if some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied." *Hill v. Humphrey*, 662 F.3d 1335, 1346 (11th Cir. 2011)(quoting *Loggins v. Thomas*, 654 F.3d 1204, 1220 (11th Cir. 2011))(internal quotations omitted).

Considering the evidence at trial in light of Candace's prior statement, the court cannot say that no fair-minded jurist could agree with the Alabama court's decision that "Perkins [had] failed to establish that there [was] a reasonable probability that, had Candace's pretrial statement been disclosed, the outcome of the trial would have been different." *Perkins*, 144 So. 3d at 469. Although some fair-minded jurists might disagree, trial evidence of the two sexual assaults occurring days before his abduction of Mrs. Gilliam and of Perkins's abduction of Mrs. Gilliam at gunpoint – even assuming Mrs. Gilliam did not say anything about a rapist – is strong evidence that

Perkins abducted Mrs. Gilliam with the intent to sexually assault her. Therefore, the Alabama court's decision that Perkins did not establish a *Brady* violation is entitled to deference.

Based on the foregoing, the court finds that Perkins is not entitled to any relief based on his claim that he was denied due process by the prosecution's failure to disclose the tape of Candace's initial interview.

## CONCLUSION

The state court's factual findings are supported by the record and must be given deference by this court. Perkins has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner that was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Alabama Court of Criminal Appeals unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Perkins is not entitled to habeas relief on this ground.

### 2. Due Process Violation under *Napue v. Illinois* and *Giglio v. United States*

Perkins alleges that "the State's knowing false representation about Candace Gilliam's testimony constituted a due process violation under *Napue v. Illinois*, 360

U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972)." (Doc. 1 ¶ 41.)

He argues:

> A truthful stipulation would have stated that Candace Gilliam *might* testify that she did not hear her mother say any words, as she told the police in the videotaped interview. The stipulation offered by the prosecution did not have that qualification. Therefore, the stipulation was false, the jury was given a materially untrue depiction of Candace Gilliam's credibility, and Perkins was denied a reliable determination of guilt.

(Doc. 1 ¶ 60 [emphasis added].) He contends that the Alabama court's decision "adjudicated the claim on the merits and denied relief . . . [w]ithout reaching the question of whether the false testimony was material . . . because Perkins had not called Candace Gilliam to testify at the Rule 32 hearing." (*Id*. ¶ 62.) Therefore, he contends that the state court's decision is not entitled to any deference because –

> 64. Clearly established federal law holds "that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence." *Miller v. Pate*, 386 U.S. 1, 7 (1967). The rule against using false evidence applies not only to falsification of the substance of a witness's testimony, but also to false representations about a witness's credibility. *Giglio*, 405 U.S. at 154.

> 65. To determine whether a prosecutor knew that evidence was false, clearly established federal law holds that a court must determine whether "the prosecution knew, or should have known," that the evidence was false. *Agurs*, 427 U.S. at 103. Knowledge of the prosecutor's "superiors" and "associates" is attributed to the prosecutor regardless of actual knowledge. *See*, *e.g.*, *Giglio*, 405 U.S. at 154. And knowledge of falsity may be inferred from the record. *See*, *e.g.*, *Miller v. Pate*, 386 U.S. at 6.

66. The state court decision is contrary to clearly established federal law under 28 U.S.C. § 2254(d)(1).  The test that applies to this sort of claim asks whether the "prosecution deliberately misrepresented the truth." *Miller v. Pate*, 386 U.S. at 6.  Instead of addressing that issue, the state court addressed the separate issue of what Candace Gilliam would say if called as a witness. *Perkins*, [144 So. 3d at 470] ("Candace did not testify.").  However, Candace Gilliam's testimony would not undo the prosecutor's misrepresentation as to Candace Gilliam's account.  Because the state court chose to focus on what the witness did not say at the Rule 32 hearing instead of addressing what the prosecutor actually did at trial, its decision is contrary to clearly established federal law under 28 U.S.C. § 2254(d)(1). *See Lafler v. Cooper*, 132 S. Ct. 1376, 1390 (2012) (holding state court decision contrary to federal law where state court resolved claim by addressing wrong issue).

67. Similarly, the state court decision involved an unreasonable application of clearly established federal law under 28 U.S.C. §2254(d)(1) by failing to consider all of the facts in support of this claim.  The state court's analysis consisted of an observation that "[i]nconsistent statements by a witness do not, by themselves, establish that one statement is false and the other is true." *Perkins*, [144 So. 3d at 470].  The state court unreasonably ignored that the misconduct here was not based on the witness's two statements, but on a stipulation that the prosecutor represented falsely as the witness's only statement. [(Doc. 10, Vol. 11, Tab 19 at 1748.)]  The state court's decision involved an objectively unreasonable application of clearly established federal law under 28 U.S.C. § 2254(d)(1) because the court failed to recognize the significance of the stipulation and the circumstances surrounding it. *See Rompilla v. Beard*, 545 U.S. 374, 389-90 (2005)(holding "the state courts were objectively unreasonable" in denying claim where totality of circumstances supported relief).

68. The state court decision is also based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2).  The evidence in the record established that the prosecutor misrepresented Candace Gilliam's account of what she witnessed.  The state court's failure to

consider that evidence and make that finding, in addition to being an unreasonable application of law, constitutes an unreasonable determination of the facts. *See Adkins*, 710 F.3d at 1254 ("Because the court overlooked material facts in its factfinding, it . . . unreasonably determined the facts . . . .").

69. The state court did not address whether the false evidence was material. *See Perkins*, [144 So. 3d at 469-70]. Therefore, this issue was not adjudicated on the merits by the state court and should be reviewed de novo by this Court. *See* 28 U.S.C. § 2254(d); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003)("[O]ur review is not circumscribed by a state court conclusion with respect to [one part of a two-part test], as neither of the state courts below reached this prong of [test].").

(*Id*. ¶¶ 64-69.)

The Court of Criminal Appeals rejected Perkins's claim on appeal; it held:

Perkins next argues that the State violated his constitutional right to due process by knowingly using false testimony by informing the defense that Candace would testify that her mother yelled something about a rapist as she was being forced from the house. According to Perkins, the State's representation was false because a pretrial statement by Candace indicated that she did not know what her mother yelled.

. . .

To prove a *Giglio v. United States,* 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), violation, the petitioner must show that: (1) the State used the testimony; (2) the testimony was false; (3) the State knew the testimony was false; and (4) the testimony was material to the guilt or innocence of the accused. *Williams v. Griswald,* 743 F.2d [1533,] 1542 [(11th Cir. 1984)]. "[T]he defendant must show that the statement in question was 'indisputably false,' rather than merely misleading." *Byrd v. Collins,* 209 F.3d 486, 517 (6th Cir. 2000) (quoting *United States v. Lochmondy,* 890 F.2d 817, 823 (6th Cir.

1989)). "The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." *Lochmondy*, 890 F.2d at 822. "[I]t is not enough that the testimony is challenged by another witness or is inconsistent with prior statements, and not every contradiction in fact or argument is material." *United States v. Payne*, 940 F.2d 286, 291 (8th Cir. 1991)(citing *United States v. Bigeleisen*, 625 F.2d 203, 208 (8th Cir. 1980)). "[T]he fact that a witness contradicts himself or herself or changes his or her story does not establish perjury." *Malcum v. Burt*, 276 F. Supp. 2d 664, 684 (E.D. Mich. 2003)(citing *Monroe v. Smith*, 197 F. Supp. 2d 753, 762 (E.D. Mich. 2001)).

 At the postconviction evidentiary hearing, Candace did not testify. No evidence was presented that the stipulated testimony was, in fact, false. Inconsistent statements by a witness do not, by themselves, establish that one statement is false and the other is true. *See United States v. Payne, supra.* Accordingly, Perkins failed to meet his burden of proving a *Giglio* violation, and the circuit court correctly denied relief on this claim.

*Perkins*, 144 So. 3d at 469-70.

Supreme Court law "has long been established that the prosecution's 'deliberate deception of a court and jurors by the presentation of ***known false evidence*** is incompatible with rudimentary demands of justice.'" *Banks*, 540 U.S. at 694 (quoting *Giglio*, 405 U.S. at 153 (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)))(emphasis added). Nothing in any Supreme Court case implies that a habeas petitioner can state a claim based on the prosecutor's knowing presentation of false testimony or failure to correct testimony he knows to be false without showing that

the testimony is actually false; or that a prosecutor has deliberately presented known false evidence when he represents the substance of a witness's statement without equivocation, even though the witness has given inconsistent statements over the course of an investigation.  Other than proof of the undisclosed interview, Perkins failed to show that the prosecutors *knew* the stipulation – Candace heard her mother cry "rapist"  – was false.

The law is well established that:

> [A] prior statement that is ***merely inconsistent*** with a government witness's testimony is ***insufficient*** to establish prosecutorial misconduct. *United States v. Michael*, 17 F.3d 1383, 1385 (11th Cir. 1994)("We refuse to impute knowledge of falsity to the prosecutor where a key government witness'[s] testimony is in conflict with another's statement or testimony."); *Hays v. Alabama*, 85 F.3d 1492, 1499 (11th Cir. 1996) (determining there was no due process violation where "there has been no showing that [the witness's] later, rather than earlier, testimony was false"); *United States v. Gibbs*, 662 F.2d 728, 730 (11th Cir. 1981) ("Though knowing prosecutorial use of false evidence or perjured testimony violates due process . . . it is not enough that the testimony . . . is inconsistent with prior statements."); *United States v. Brown*, 634 F.2d 819, 827 (5th Cir. Jan. 1981)("[D]ue process is not implicated by the prosecution's introduction or allowance of false or perjured testimony unless the prosecution actually knows or believes the testimony to be false or perjured; it is not enough that the testimony is challenged by another witness or is inconsistent with prior statements.").

*United States v. McNair*, 605 F.3d 1152, 1208-09 (11th Cir. 2010)(emphasis added).

In dicta the Supreme Court has held, "A mere claim that a witness gave inconsistent testimony is not enough to charge the prosecution's knowing use of false testimony;

*it may well be that the witness'[s] subsequent statements were true, in which event the claim of inconsistency is not a constitutional objection.*" *Price v. Johnston*, 334 U.S. 266, 288 (1948)(citing *Mooney*).  Although some fair-minded jurists might disagree, the Alabama court's decision – that Perkins failed to prove a *Giglio* violation because he did not prove that the stipulated testimony was, in fact, false, as opposed to merely inconsistent with Candace's pretrial interview – was not contrary to or an unreasonable application of clearly established law or an unreasonable determination of the facts.

Based on the foregoing, the court finds that Perkins is not entitled to any relief based on his claim that he was denied due process by the prosecution's presentation of false testimony or failure to correct false testimony.

## CONCLUSION

The state court's factual findings are supported by the record and must be given deference by this court.  Perkins has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner that was objectively unreasonable in light of such precedent.  Given these considerations, this court cannot conclude that the Alabama Court of Criminal Appeals unreasonably applied, or

reached a decision contrary to, clearly established federal law. Therefore, Perkins is not entitled to habeas relief on this ground.

## B. THE STATE TRIAL COURT VIOLATED PERKINS'S RIGHT TO COUNSEL BY REPLACING HIS COUNSEL MIDWAY THROUGH THEIR PRETRIAL PREPARATIONS

Perkins claims, "The state trial court violated [his] right to counsel by removing his lawyers, who had represented [him] for a year and were willing to continue representing him, where there was no serious potential for a conflict of interest or any other harm, and removal served no legitimate state interest." (Doc. 1 ¶ 72.) He alleges:

> 73. Roy Perkins was arrested on August 12, 1990, and charged with capital murder. [(Doc. 10, Vol. 1 at 2-3, 134.)] The trial court formally appointed the Tuscaloosa County Public Defender's Office [hereinafter PDO] to represent him 19 months later. [( *Id*. at 7 [March 10, 1992].)] Ricky McKinney and George Taylor became Perkins's counsel and represented him for the next year. [(*See, e.g., id*. at 7-14, 17-39, 47-58; *id*., Vol 2, Tab 2 at 290-92; *id*., Vol. 3 at 25-27; *id*., Vol. 19, Tab 41 at 25-32.)]

> 74. By late-October 1992, Perkins's counsel had undertaken substantial preparation of a defense. Counsel had requested a mental-health evaluation. [(*Id*., Vol. 1 at 18 [July 31, 1992].)] They had begun seeking expert assistance and filed a motion to proceed ex parte on requests for funds in order to protect "the independence of the defense" and avoid disclosure of trial strategy. [(*Id*. at 20-39.)] They moved for permission to allow Perkins to participate in his defense as co-counsel. [(*Id*. at 47, ¶ 4 [Oct. 7, 1992].)] They had begun compiling evidence in support of a motion for change of venue. [(*Id*., Vol. 4 at 226.)] Most importantly, they understood the evidence and issues likely

to arise at both the guilt and penalty phases, as reflected in a discovery motion that asked for disclosure of statements or recordings of specific witnesses. [(*Id*., Vol. 1 at 52-54 (Oct. 7, 1992).)] Counsel also sought information about the physical evidence and tests performed by the Alabama Department of Forensic Sciences, [(*id*. at 54-55)], information about Perkins's mental state and life history, [(*id.* at 55-57)], and information relevant to the existence of aggravating or mitigating circumstances, [(*id*. at 54)], among other things.

75. Approximately a year after Perkins's counsel began preparing a defense, the prosecution filed a motion to disqualify the [PDO] from representing Perkins. [(*Id*. at 63-64 (February 16, 1993).)] The motion alleged that a former police detective named Shirley Fields had left the Tuscaloosa Police Department and accepted new employment as an investigator for the [PDO]. [(*Id*. at 63.)] This was a problem, according to the motion, because Fields was "deeply" involved in Perkins's prosecution, held confidential information, and would be "consulted extensively" during the prosecution's trial preparations. [(*Id*. at 64.)]

76. The prosecution's motion was heard the following month. Shirley Fields testified at the hearing. He said that he was not deeply involved in the prosecution, or even actively involved in it. [(*Id*., Vol. 2, Tab 5 at 14.)] According to Fields, "My only involvement in Mr. Perkins'[s] case was that I was present when Investigator Simpson processed a truck at the homicide office," [(*id*. at 12)], and "Simpson actually did all of the processing," *id*. Fields testified that he had not questioned any of the witnesses in the case, that he had no independent recollection of any conversations that he had with any of the investigators or prosecutors assigned to the case, and that he had no active role in supervising any of the officers assigned to the case apart from "the process of processing the vehicle." [(*Id*. at 13.)] With regard to the prosecution's anticipated need for extensive consultations with Fields, Fields disavowed participation in trial strategy, [(*id*. at 14)], and could not recall a single conversation "with anyone from the District Attorney's Office regarding this particular case," [(*id*. at 13)].

77. Perkins wanted the public defender's office to represent him, [(*id.*, Vol. 3 at 27)], the public defender's office was willing to represent Perkins, [(*id.* at 28)], and Perkins opposed the prosecution's motion, [(*id.* at 24-26)]. Based on the evidence presented at the hearing, Perkins's counsel argued that Fields

> was not substantially participating in the case, did not participate in the investigation beyond being present and perhaps discussing with Officer Simpson while Officer Simpson performed the processing of the vehicle. He did not participate in the interview of any witnesses. He did not participate in the interview of the defendant. His . . . actual supervision in this particular case is virtually nonexistent . . . . We don't feel under the circumstances that he did substantially participate in the investigation of Mr. Perkins'[s] case and that under those circumstances, there is not an actual conflict . . . .

[(*Id.* at 26.)] Counsel represented that Perkins waived any potential conflict related to the possibility that Fields might be called as a witness at trial and cross-examined by a co-worker, although it was "difficult to envision" that occurring. [(*Id.*)] [Footnote] Counsel added, "We feel like under the circumstances, he has developed a relationship with his attorney, Mr. McKinney, a trust in Mr. McKinney and a confidence in that representation which would be materially damaged if he was required to change counsel at this time." [(*Id.* at 27.)]

[Footnote:] As expected, Fields did not testify at Perkins's trial.

78. The trial court granted the prosecution's motion and disqualified the [PDO]. [(*Id.*, Vol. 1 at 65 (March 19, 1993).)] Several weeks later, the public defender's office filed an unopposed motion for reconsideration and factfinding. [(*Id.* at 70.)] The trial court granted the motion and entered a new order stating that there was "no evidence" of a conflict of interest under the ethics rules, but that the [PDO] was disqualified in order to avoid the "appearance of impropriety." [(*Id.* at 71 (April 19, 1993).)]

79. In the months that followed, the trial court appointed former Tuscaloosa County District Attorney's Office prosecutors Dennis Steverson and James Smith to represent Perkins. [(*Id.*, Vol. 2, Tab 2 at 292-93.)] They met with Perkins for the first time in August 1993. [(*Id.* at 293; *id.*, Vol. 1 at 74.)]

(Doc. 1 ¶¶ 73-79 and n.8 [footnote 7 omitted].)

On direct appeal, the Alabama Court of Criminal Appeals found:

In February 1993, over a year before Perkins's trial, the State filed a motion to disqualify the public defender's office from representing Perkins based on a potential conflict of interest. The State argued that the hiring of Shirley Fields – a former captain in the Tuscaloosa homicide unit and second in command of that unit during its investigation of Mrs. Gilliam's murder – as an investigator with the public defender's office, created a potential conflict of interest because Fields had been involved in the murder investigation in a supervisory capacity, was privy to confidential government information concerning the case that was not subject to disclosure, and was a possible witness for the State at Perkins's trial. At a hearing on the motion in March 1993, Fields testified that he played a supervisory role in the investigation of Mrs. Gilliam's death, that he was privy to sensitive information about the investigation, that he participated in the processing of one of the State's most important pieces of evidence (the gray pickup truck), but that he had not been actively involved in every aspect of the investigation. In addition, he stated that, in the past, the district attorney's office had often consulted him about trial strategy in cases in which he had played a supervisory role. Following Fields's testimony, the public defender representing Perkins argued against the motion, stating that although there was a potential conflict if the State ultimately called Fields to testify, Perkins was willing to waive that potential conflict. After the hearing, the trial court entered a written order granting the State's motion to disqualify the public defender's office, stating, in pertinent part:

"This Court finds no evidence of a violation of Rule of Professional Responsibility 1.11. However, the nature of this case and the scrutiny to which it would be subjected upon possible appellate review, warrants this Court to act with extreme caution to avoid any appearance of impropriety or appearance of a conflict of interest. The Court noted this exercise of caution is to protect both the rights of the State and the defendant. The Court further finds that substitution of counsel at this stage of the proceedings produces no injury to Mr. Perkins's defense."

[(Doc. 10, Vol. 1 at 71-72.)]

*Perkins*, 808 So. 2d at 1059-60. The Court of Criminal Appeals held:

Fields's testimony at the hearing on the State's motion to recuse revealed that he was involved in the investigation of Mrs. Gilliam's murder in a supervisory capacity and that he was privy to sensitive information concerning the case. In addition, Fields was a potential witness for the State based on his involvement in the processing of the gray pickup truck. This created not only an "appearance of impropriety," as the trial court stated, but a real potential for conflict. Contrary to Perkins's contention, merely because this potential conflict did not burgeon into an actual conflict of interest (Fields was, in fact, not called as a witness for the State), does not lessen the duty of the trial court to exercise caution, especially in a case where the most severe of all penalties might be imposed.

*Id*. at 1060. The court found "a clear potential for conflict in this case," for the PDO and the State based on "Fields's employment with the office representing Perkins, after his involvement in the investigation of Mrs. Gilliam's death, combined with the possibility that he may have been called as a witness for the State at Perkins's trial."

*Id*. at 1061. Therefore, it found "no abuse of discretion on the part of the trial court

in exercising its own scrutiny to ensure a fair trial to both sides in a case" by disqualifying the [PDO], *id*. and "no abuse of discretion in the trial court's rejection of Perkins's offer to waive the potential conflict," *id*.

Perkins contends that "[t]he state court's decision [affirming the trial court's disqualification of the PDO] is contrary to or involves an unreasonable application of clearly established federal law, 28 U.S.C. § 2254(d)(1), and is based on an unreasonable determination of the facts in light of the evidence in the record, 28 U.S.C. § 2254(d)(2)." (Doc. 1 ¶ 81.) Specifically he contends that the decision of the Court of Criminal Appeals, which was based on a finding of a ***clear*** potential for conflict rather than a ***serious*** potential for conflict, is contrary to Supreme Court precedent. (Doc. 1 ¶¶ 84-85 [citing, *inter alia*, *Wheat*, 486 U.S. at 162-64](emphasis added).) He contends that the Alabama court's decision represents an unreasonable application of Supreme Court precedent because the risk that the public defender "would have been prevented from doing anything if Fields had been called to testify for the State," which Perkins describes as the "touchstone of a conflict," is nonexistent. (*Id*. ¶ 86 [citing, *inter alia, Holloway v. Arkansas*, 435 U.S. 475, 489-90 (1978)].) And, Perkins contends, the Alabama court's decision, that a potential conflict of interest existed, "was based on an objectively unreasonable determination of the facts," because "[t]he record clearly establishes that Fields's only relationship

48

to the [investigation of his] case was supervising the processing of a truck." (*Id*. ¶ 87.)

Generally, Supreme Court precedent establishes that –

the Sixth Amendment grants a defendant "a fair opportunity to secure counsel of his own choice." *Powell* [*v. Alabama*], [287 U.S. 45,] 53 [(1932)], 53 S. Ct. 55; see [*United States v.*] *Gonzalez-Lopez*, [548 U.S. 140,] 150, 126 S. Ct. 2557 (describing "these myriad aspects of representation"). This "fair opportunity" for the defendant to secure counsel of choice has limits. A defendant has no right, for example, to an attorney who is not a member of the bar, or who has a conflict of interest due to a relationship with an opposing party. *See Wheat v. United States*, 486 U.S. 153, 159, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988). And an indigent defendant, while entitled to adequate representation, has no right to have the Government pay for his preferred representational choice. See *Caplin & Drysdale*[, *Chartered v. United States*], 491 U.S. [617,] 624, 109 S. Ct. 2646 [(1989)].

*Luis v. United States*, 136 S. Ct. 1083, 1089 (2016). "The [trial court] must recognize a presumption in favor of petitioner's counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court." *Wheat*, 486 U.S. at 164.

Supreme Court precedents do not clearly establish a constitutional right to continued representation of appointed attorneys, *see United States v. Parker*, 469 F.3d 57, 61 (2d Cir. 2006)(Sotomayor, J.), or continued representation when a potential

conflict arises because of a side-switching, non-attorney employee without a waiver of the conflict by both sides.[10] Although Fields may have performed limited hands-on work on the investigation of Mrs. Gilliam's murder, he was present as a supervisor during the processing of an important piece of evidence, the truck; he was privy to sensitive information regarding the investigation and other investigations by virtue of his position as second in command;[11] and the record contains no indication that any

_____

[10]*See* Ala. Ethics Op. No. 2002-01 (2002) (a non-attorney employee who changes firms must be held to the same standards as a lawyer in determining whether a conflict of interest exists); *see also Williams v. Trans World Airlines, Inc.*, 588 F. Supp. 1037, 1044 (W.D. Mo. 1984)("Non-lawyer personnel are widely used by lawyers to assist in rendering legal services. Paralegals, investigators, and secretaries must have ready access to client confidences in order to assist their attorney employers. If information provided by a client in confidence to an attorney for the purpose of obtaining legal advice could be used against the client because a member of the attorney's non-lawyer support staff left the attorney's employment, it would have a devastating effect both on the free flow of information between client and attorney and on the cost and quality of the legal services rendered by an attorney. Every departing secretary, investigator, or paralegal would be free to impart confidential information to the opposition without effective restraint. The only practical way to assure that this will not happen and to preserve public trust in the scrupulous administration of justice is to subject these 'agents' of lawyers to the same disability lawyers have when they leave legal employment with confidential information.").

[11]During the hearing before the trial court, Fields testified as follows to questioning by the prosecutor:

Q . . . Now during August of 1990 involving this and other cases, would it be fair to say that you had privilege to sensitive information about this investigation and other investigations?

effort was made to isolate Fields from the PDO's representation of Perkins or to

maintain the confidential information possessed by Fields.   Under the particular facts

of this case[12] and in light of the lack of controlling Supreme Court precedent

_____

       A  Yes, sir.

       Q   And  were  you  [privy]  to  certain  sensitive  information
concerning this specific investigation –

       A  I would say, yes.

       . . .

       Q  And now in this specific case, you have directed investigators
to some extent; is that correct?

       A  To some extent, yes.

       Q  And in this specific case, you have discussed the case [with the
prosecutors]; is that fair to say?

       A  I don't recall.  I could have.

       Q  . . .  It would  not  have  been  uncommon  for  you  in  your
supervisory  role  to  have  a  conversation  with  the  District  Attorney's
Office in investigating –

       A  It would not be uncommon.

(Doc. 10, Vol. 2, Tab 5 at 10-11.)


    [12]The court has considered "the testimony and evidence presented to the [trial]
judge *at the time of the hearing* concerning the conflict of interests."  *United States
v. Alred*, 144 F.3d 1405, 1412 (11th Cir. 1998)(emphasis added).

addressing a similar fact situation, the court finds that deference to the decision of the Alabama Court of Criminal Appeals is warranted.

## CONCLUSION

The state court's factual findings are supported by the record and must be given deference by this court. Perkins has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. He has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner that was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Alabama Court of Criminal Appeals unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Perkins is not entitled to habeas relief on this ground.

## C.  FAILURE TO GRANT A CHANGE OF VENUE

Perkins alleges that "[t]he state trial court violated [his] right to an impartial jury by forcing him to be tried in a community that had been saturated with publicity and [that] feared [him]." (Doc. 1 ¶ 91.) According to Perkins, "75 percent of veniremembers admitted to having been exposed to substantial pretrial publicity about the crime [and] [s]even  members of [his] jury admitted to being exposed to

pretrial publicity by radio, television, newspapers, or word of mouth." (*Id*. ¶ 99.) He contends, "The publicity had three interconnected aspects that constitute a departure from ordinary, objective news coverage," (*id*. ¶ 93):

> "First, much of the publicity reflected or provoked the community's particularized fear of being harmed by Perkins in their homes; members of the community were depicted as victims of terrorism." (*Id*. ¶ 94.)

> "Second, the publicity linked Perkins to broader issues of public policy, politicizing his case. Perkins was on parole at the time of the alleged crimes, and people blamed the Alabama Board of Pardons and Paroles for failing to protect the public." (*Id*. ¶ 96.)

> "Third, the coverage encouraged readers victimized by fear of Perkins to identify with Cathy Gilliam and her surviving husband and children. The narrative — which mirrored the prosecution's trial theme — was that Perkins was a rapist and Cathy Gilliam died to protect her daughter and to avoid being raped." (*Id*. ¶ 97.)

"This combination of factors created a risk that jurors would view their role as empowered victims taking the protection of their community into their own hands instead of serving their constitutionally mandated role as skeptical buffer between Perkins and the power of the government to imprison and execute him." (*Id*. ¶ 106.)

In his Petition, Perkins argues that the state court erred in failing to examine the totality of the circumstances to find "implied juror bias." (*Id*. ¶ 105). He contends that the state-court decision is "contrary to or an unreasonable application of clearly established federal law because the court failed to determine whether jurors

were impliedly biased based on the 'totality of circumstances,' [and] [i]nstead, . . . based its finding that jurors were not impliedly biased solely on 'the media materials presented to the trial court.'" (*Id*. ¶ 108 [citing *Murphy*, 421 U.S. at 799; quoting *Perkins*, 808 So. 2d at 1069].) He alleges (1) "the state court examined the transcript of voir dire only to determine whether jurors were actually biased in fact, not to determine whether a presumption of prejudice arose based on the totality of the circumstances," and (2) "the state court completely failed to consider as part of the totality of the circumstances the statements of public officials about the crime, the victimization of the community, the emotional narrative of the prosecution's case, or the extensive and inherently prejudicial collateral-act evidence that the prosecution put before the jury, much of it keyed to media reports." (*Id*.) Also, "Assuming that the state court properly considered the totality of the circumstances," Perkins contends that "its conclusion that there was no implied bias[,] and thus no presumed prejudice[,] . . . involve[s] an unreasonable application of clearly established federal law." (*Id*. [citing, *inter alia*, *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 258 (2007)].) Finally, he argues, "The state court decision [that the media coverage was relatively objective is] an unreasonable determination of the facts in light of the evidence in the record," because (1) "[m]ost of the articles adopted the perspective of actual victims, . . . potential victims, . . . and law enforcement officers," and (2)

54

an article published the day before trial "described the community's steadfast belief that Perkins was guilty, its refusal to forgive, and its overwhelming support for sentencing him to death." (*Id.* ¶ 109.)

On direct appeal, the Alabama Court of Criminal Appeals held:

We acknowledge that Perkins's case received extensive publicity in Tuscaloosa County. However, "'in order to obtain a change of venue, it must be shown that pre-trial publicity surrounding the case was inherently prejudicial.'" *Oryang* [*v. State*], [642 So. 2d 979] 983 [(Ala. Crim. App. 1993)], quoting *Holladay v. State*, 549 So. 2d 122, 125 (Ala. Cr. App. 1988), aff'd, 549 So. 2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S. Ct. 575, 107 L. Ed. 2d 569 (1989). We recognize that the "presumptive prejudice" standard is "'rarely' applicable, and is reserved for only 'extreme situations.'" *Hunt* [*v. State*], 642 So. 2d [999,] 1043 [(Ala. Crim. App. 1993)], quoting *Coleman v. Kemp*, 778 F.2d 1487, 1537 (11th Cir. 1985), cert. denied, 476 U.S. 1164, 106 S. Ct. 2289, 90 L. Ed. 2d 730 (1986). We also recognize that Perkins's burden – to show that pretrial publicity so saturated the community as to deny him a fair trial – is a very heavy burden. *See Hunt*, supra at 1043. "'Prejudicial' publicity usually must consist of much more than stating the charge and reporting on the pretrial and trial processes. 'Publicity' and 'prejudice' are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial." [*Id.*]

We do not find that the pretrial publicity in this case so "pervasively saturated" the community as to render the court proceedings nothing more than a "hollow formality." *Oryang*, supra, at 983. Nor do we find that the publicity was so inherently prejudicial as to create a presumption of prejudice. To justify a change of venue, the publicity must be both extensive and sensational in nature. "If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice." *United States v. Angiulo*, 897 F.2d 1169, 1181 (1st Cir.), cert. denied, 498 U.S. 845, 111

S. Ct. 130, 112 L. Ed. 2d 98 (1990). We have examined the media materials presented to the trial court, and we find that most of the reports were factual and relatively objective rather than accusatory, inflammatory, or sensational. Perkins has failed to prove that the media reports so inflamed or saturated the community as to create an emotional tide against him. Thus, he has not shown that the pretrial publicity in this case was so inherently or presumptively prejudicial as to constitute one of those "extreme situations" that warrant a presumption of prejudice.

In addition, we find no evidence of bias on the part of prospective jurors so pervasive as to indicate actual prejudice. On appeal, Perkins offers us nothing more than the assertion that the majority of the prospective jurors on the venire had heard about the case and that 25 of the 88 prospective jurors had been excused for cause based on their exposure to pretrial publicity. However, as the Alabama Supreme Court stated in *Ex parte Grayson*, 479 So. 2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S. Ct. 189, 88 L. Ed. 2d 157 (1985):

> ["As the Supreme Court explained in *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S. Ct. 1639, 1642-43, 6 L. Ed. 2d 751 (1961):]
>
>> "'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. . . .'
>
> "The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. *Murphy v. Florida*, 421 U.S. 794, 799-800, 95 S. Ct. 2031, 2035-2036, 44 L. Ed. 2d 589 (1975). Thus, '[t]he proper manner for ascertaining whether adverse publicity may

> have biased the prospective jurors is through the voir dire examination.' *Anderson v. State*, 362 So. 2d 1296, 1299 (Ala. Crim. App. 1978)."

479 So. 2d at 80.  " ' "The relevant question is not whether the community remembered the case, but whether the jurors at [the accused's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton v. Yount*, 467 U.S. 1025, 1035, 104 S. Ct. 2885, 2891, 81 L. Ed. 2d 847 (1984).' " *Siebert v. State*, 562 So. 2d 586, 589 (Ala. Cr. App. 1989), aff'd, 562 So. 2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S. Ct. 398, 112 L. Ed. 2d 408 (1990), quoting *Fortenberry v. State*, 545 So. 2d 129 (Ala. Cr. App. 1988), aff'd, 545 So. 2d 145 (Ala. 1989), cert. denied, 495 U.S. 911, 110 S. Ct. 1937, 109 L. Ed. 2d 300 (1990).  The jury venire in this case was extensively and thoroughly examined in an individual, sequestered setting regarding each prospective juror's knowledge about the case. While the majority of prospective jurors were aware of the abduction and murder of Mrs. Gilliam, and of the manhunt by law enforcement officials to capture Perkins following the murder, opinions of less than one-third (25 of 88) of the venire were actually tainted by pretrial publicity.  See *Russell v. State*, 739 So. 2d 58 (Ala. Cr. App. 1999).

Perkins has failed to show either that the community was saturated with pretrial publicity or that actual prejudice existed among the jurors at his trial.  The media coverage was not so sensational and inflammatory as to create a presumption of prejudice.  The record contains no indication that any juror who sat on Perkins's jury had a fixed opinion of Perkins's guilt or that the verdict was not impartially rendered on the evidence presented at trial.  Accordingly, we find that the trial court did not abuse its discretion in denying Perkins's motion for a change of venue.

*Perkins,* 808 So. 2d 1068-70.

In his Petition, Perkins challenges the state court's finding regarding a presumption of prejudice; he does not challenge the court finding that his jury was not actually prejudiced by pretrial publicity. Generally –

> [The Supreme] Court has established that a refusal to grant a motion for change of venue may constitute a violation of due process. See *Groppi v. Wisconsin*, 400 U.S. 505, 91 S. Ct. 490, 27 L. Ed. 2d 571 (1971); *Rideau v. Louisiana*, 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963); *Irvin v. Dowd*, [366 U.S. 717, 722, 81 S. Ct. 1639, 1642, 6 L. Ed. 2d 751 (1961)]. A defendant seeking to establish such a violation must demonstrate ***either*** that his trial resulted in "***identifiable prejudice***" or that it gave rise to a ***presumption of prejudice*** because it involved "such a probability that prejudice will result that it is deemed inherently lacking in due process." *Estes v. Texas*, 381 U.S. 532, 542-543, 85 S. Ct. 1628, 1632-1633, 14 L. Ed. 2d 543 (1965). In deciding whether such a presumption of prejudice is warranted, courts must examine "any indications in the totality of circumstances that petitioner's trial was not fundamentally fair." *Murphy v. Florida*, 421 U.S. 794, 799, 95 S. Ct. 2031, 2036, 44 L. Ed. 2d 589 (1975).

*Brecheen v. Oklahoma*, 485 U.S. 909, 910 (1988)(Marshall, J., dissenting from denial of cert.)(emphasis added).

"A presumption of prejudice, [Supreme Court] decisions indicate, attends only the extreme case." *Skilling v. United States*, 561 U.S. 358, 379-81 (2010)(citing, *inter alia*, *Sheppard v. Maxwell*, 384 U.S. 333, 354-55, 358 (1966), *Estes*, 381 U.S. at 536-38, *Rideau*, 373 U.S. at 725-27); *see also Mills v. Singletary*, 63 F.3d 999, 1010 (11th Cir. 1995)("[T]he principle of presumed prejudice is rarely applicable and reserved for extreme situations.")(internal quotations and citations omitted).

"[P]retrial publicity even pervasive, adverse publicity does not inevitably lead to an unfair trial." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976), *quoted in Skilling*, 561 U.S. at 384. And, "A high level of publicity is not necessarily inconsistent with the ability of the defendant to obtain a fair trial where the publicity has been largely factual in nature *or* where it abated some time prior to trial." *Gannett Co. v. DePasquale*, 443 U.S. 368, 443 (1979)(Blackmun, J., concurring in part and dissenting in part)(citing *Murphy*, 421 U.S. at 802; *Beck v. Washington*, 369 U.S. 541, 542-45, 557-58 (1962); *Stroble v. California*, 343 U.S. 181, 191-94 (1952))(internal citations omitted; emphasis added). "[T]he Supreme Court has ruled that we cannot presume prejudice in the absence of a 'trial atmosphere . . . utterly corrupted by press coverage.'" *United States v. Campa*, 459 F.3d 1121, 1144 and n.198 (11th Cir. 2006)(quoting *Dobbert v. Florida*, 432 U.S. 282, 303 (1977)(quoting *Murphy*, 421 U.S. at 798)). "[T]he 'quantum' of the publicity does not, standing alone, create a presumption that a defendant was denied a fair trial by an impartial jury. . . . [T]he nature of the publicity and whether it is the sort that could be laid aside by jurors, rather than its volume, is the crucial factor to be considered." *Davis v. Jones*, 441 F. Supp. 2d 1138, 1167-68 (M.D. Ala. 2006)(internal citations and quotations omitted), *aff'd*, 506 F.3d 1325 (11th Cir. 2007).

Although the nature of the murder, the character and criminal history of Perkins, and the subsequent manhunt received a great deal of media coverage in August 1990, nothing in the record indicates that media coverage created "bedlam" or a "carnival atmosphere" at the time of the trial in April 1994. *See Skilling*, 561 U.S. at 380 (quoting *Sheppard v. Maxwell*, 384 U.S. 333, 355 (1966)).[13] The articles are primarily factual, focused on the kidnaping and murder of Mrs. Gilliam, Perkins's criminal history, the ensuing manhunt, and the sentiment in the community during August 1990. Media coverage after this time was limited and each member of the venire was questioned about their exposure to news coverage.

In addition to the volume and the content of the media coverage, another factor the court must consider in the totality of the circumstances is the timing of the adverse

---

[13]The Supreme Court noted:

> [I]n *Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966), news reporters extensively covered the story of Sam Sheppard, who was accused of bludgeoning his pregnant wife to death. "[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom," thrusting jurors "into the role of celebrities." *Id.*, at 353, 355, 86 S. Ct. 1507. Pretrial media coverage, which we characterized as "months [of] virulent publicity about Sheppard and the murder," did not alone deny due process, we noted. *Id.*, at 354, 86 S. Ct. 1507. But Sheppard's case involved more than heated reporting pretrial: We upset the murder conviction because a "carnival atmosphere" pervaded the trial, *id.*, at 358, 86 S. Ct. 1507.

*Skilling*, 561 U.S. at 380.

pretrial publicity. In this case, the majority of the media stories included in the record occurred at the time of the crime and the subsequent manhunt in August 1990. Two articles were published in the Tuscaloosa newspaper the Sunday before jury selection began in April 1994 – "a time when prejudicial publicity was greatly diminished . . . ." *See Patton v. Yount*, 467 U.S. 1025, 1032 (1984); see also *Skilling*, 561 U.S. at 383 (noting "the decibel level of media attention diminished somewhat in the [four] years" between Enron's bankruptcy and Skilling's trial). "That time soothes and eases [public sentiment] is a perfectly natural phenomenon, familiar to all." *Patton*, 467 U.S. at 1034-35. These articles and word-of-mouth discussions occurring at or near the time of jury selection do not reveal a "barrage of inflammatory publicity immediately prior to trial, amounting to a huge . . . wave of public passion." *Id*. at 1033 (internal citations and quotations omitted). "[T]he passage of time . . . can be a highly relevant fact. In the circumstances of this case, . . . it clearly rebuts any presumption of partiality or prejudice that [may have] existed at the time of [the crime and the subsequent manhunt]." *See id*. at 1035.

Another factor the court should consider is "the credibility of prospective jurors who indicate during voir dire that they could be impartial despite having been exposed to pretrial publicity about the case." *United States v. Lehder-Rivas*, 955 F.2d 1510, 1524 (11th Cir. 1992). This court has considered the extensive voir dire in this

case and finds that the majority of prospective jurors had not closely followed the media coverage of this case. And, the twelve jurors and two alternates selected to serve on the jury appear to have "credibly asserted that they could remain impartial." *Id*. at 1525. No evidence from these venire members indicates otherwise.

Therefore, the court finds "the totality of the circumstances provides no basis for concluding that 'the community was . . . so inflamed and biased [ ] as to create a presumption of prejudice that a fair and impartial jury panel could not be impaneled.'" *Id*. (quoting *United States v. De La Vega*, 913 F.2d 861, 865 (1990)). The court finds no error in the state court's judgment that the majority of the articles were objective. "[E]xtensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair." *Dobbert*, 432 U.S. at 303. Moreover, the opinions and feelings of crime victims and community members are "facts" and articles reporting such facts are objective reports – unlike editorials or opinion pieces.

Based on the circumstances of this case, including the entire record of the voir dire of the venire, the newspaper articles submitted with the appeal record, and the transcripts of the hearings on Perkins's motion for change of venue, the court finds Perkins has not demonstrated that the decision of the Alabama Court of Criminal

Appeals was contrary to or an unreasonable application of Supreme Court precedent or that its decision was an unreasonable determination of the facts.

For all the foregoing reasons, this claim is without merit and is due to be denied.

## CONCLUSION

The state court's factual findings are supported by the record and must be given deference by this court. Perkins has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner that was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Alabama Court of Criminal Appeals unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Perkins is not entitled to habeas relief on this ground.

## D. ADMISSION OF COLLATERAL-ACT EVIDENCE DENIED PERKINS A FAIR TRIAL AND RELIABLE SENTENCE

Perkins contends that his "Fourteenth Amendment right to a fair trial and Eighth Amendment right to a reliable determination of sentence" were violated by the trial court's admission of collateral-act evidence of two rapes, which occurred in the two weeks before he killed Mrs. Gilliam; the facts surrounding the incident at Darlene

Hall's house, the theft of the gray truck, which contained the murder weapon, and the trial court's *sua sponte* failure to give a limiting instruction. (Doc. 1 ¶ 111.) He alleges:

> 112. In order to find Roy Perkins guilty of capital murder, the jury had to find that Perkins intended to physically injure or sexually abuse Cathy Gilliam at the time of the abduction. The most direct evidence suggesting that Perkins specifically intended to rape Cathy Gilliam came through testimony of her daughter Candace, who testified by stipulation that Cathy Gilliam yelled the word "rapist" as she was being led away from her home. [(Doc. 10, Vol. 11, Tab 19 at 1755.)] However, the prosecution lacked any physical evidence of a sexual assault, and both Cathy Gilliam, [(*id.*, Vol. 12 at 2029)], and the medical examiner who performed Gilliam's autopsy, [(*id.*, Vol. 13 at 2153)], stated that Gilliam had not been raped.

> 113. To bolster its claim that Perkins specifically intended to rape and kill Cathy Gilliam, the prosecution argued that it was entitled to present collateral-act evidence showing that Perkins had abducted and raped two other women in the weeks before the abduction of Cathy Gilliam. [(*See, e.g., id.*, Vol. 11, Tab 16 at 1705, 1709.)] Defense counsel argued that the collateral-act evidence was inadmissible because (1) the probative value of the evidence was low in light of substantial differences between the other crimes and the crime involving Cathy Gilliam, [(*see, e.g., id.* at 1700, 1708, 1710, 1715)], and (2) the prejudicial effect of the evidence substantially outweighed the probative value of the other crimes, [(*see, e.g., id.* at 1714)], particularly in light of the extensive pretrial media coverage depicting Perkins as a rapist, [(*id.* at 1706-07)]. Defense counsel moved repeatedly to limit admission of the collateral-act evidence, [(*see, e.g., id.*, Vol. 1 at 177-78; *id.*, Vol. 11, Tab 16 at 1696; *id.*, Vol. 15 at 2500)], but their motions were repeatedly denied by the trial court, [(*see, e.g., id.*, Vol. 1 at 191; *id.*, Vol. 11, Tab 17 at 1715; *id.*, Vol. 15 at 2508)]. As a result, half of the prosecution's 39 witnesses testified about Perkins's other alleged crimes

or acts. The testimony and physical evidence about the collateral acts, particularly two alleged rapes, pervaded the trial.

114. The admission of collateral-act evidence to prove a disputed issue does not necessarily render a trial fundamentally unfair. *See Estelle v. McGuire*, 502 U.S. 62, 67-70 (1991). Intent was a disputed issue at Perkins's trial because there was no evidence that Cathy Gilliam had been sexually abused.[14] Most of the collateral-act evidence was admitted to address that issue; the prosecution's theory was that because Perkins had raped two other women he had abducted, he must have intended to rape Cathy Gilliam. (*See*, *e.g.*, doc. 10, Vol. 11, Tab 16 at 1705.)] However, the evidence actually presented went far beyond serving that narrow purpose, frequently involving graphic testimony irrelevant to the question of intent.

---

[14]Perkins's intent was not disputed simply because the evidence showed that Mrs. Gilliam had not been sexually abused. Perkins argued that he did not intend to harm Mrs. Gilliam at all and that her shooting had been an accident. He also relied on evidence that he had taken Mrs. Gilliam for help after he shot her as evidence he did not intend her harm. Nevertheless, regardless of the evidence, or lack thereof, in support of his intent not to harm Mrs. Gilliam, Perkins, by pleading "not guilty" to the crimes requiring proof of a specific intent, "put[ ] the prosecution to its proof as to all elements of the crime charged," including intent. *See Mathews v. United States*, 485 U.S. 58, 65 (1988)(citing, *inter alia*, Fed. R. Crim. P. 11).

> Once criminal defendants enter pleas of not guilty, the Fifth and Sixth Amendments to the Constitution entitle them to at least two trial-related rights. First, the Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged. Second, the simple plea of not guilty puts the prosecution to its proof as to all elements of the crime charged.

*United States v. Hardin*, 139 F.3d 813, 815 (11th Cir. 1998)(quoting *United States v. Gaudin*, 515 U.S. 506, 511 (1995); and *Estelle v. McGuire*, 502 U.S. 62, 69-70 (1991))(internal quotations and citation omitted).

115.  The collateral-act evidence is summarized in 12 reported pages of the opinion of the Alabama Court of Criminal Appeals. *Perkins v. State*, 808 So. 2d 1041, 1080-92 (Ala. Crim. App. 1999).  It included needlessly lurid testimony from alleged victims [D.W.] and [B.P.], much of it calculated to make Perkins appear repulsive.  [(*See, e.g.*, doc. 10, Vol. 12 at 1862-1911.)]  There was also irrelevant testimony about the practices involved in post-rape medical examinations.  Various personnel affiliated with law enforcement agencies testified about investigating the rapes and securing rape evidence.  From the Alabama Department of Forensic Science, a serologist testified about performing  DNA type matching on samples in the rape kits, [(*id.*, Vol. 14 at 2247-69, 2289-2301)], while a trace-evidence examiner testified about collecting hair and fiber samples from rape kits, [(*id.* at 2301-08)].

116.  In addition to the rape evidence, the prosecution presented other collateral-act evidence.  Darlene Hall described an episode involving a man she identified as Perkins attempting to use her telephone shortly before Cathy Gilliam was abducted, [(*id.*, Vol. 11, Tab 19 at 1756-81)], supplemented by testimony of law enforcement personnel.  [(*See, e.g., id.*, Vol. 12 at 1978-84.)]  And further statements and testimony suggested that Perkins was a thief.  [(*Id.*, Vol. 11, Tab 17 at 1727-28; *id.*, Vol. 13 at 2061.)]

117.  The prosecution argued from the collateral act evidence at length during the guilt phase.  In spite of the defense's repeatedly expressed concerns about the effects that the collateral-act evidence would have on jurors' ability to  rationally consider the evidence, the prosecution exploited that evidence not to  establish intent, but to vilify Perkins based on immaterial and occasionally fraudulent details.  The prosecution argued that Perkins "sexually assaulted [D.W.] in almost every orifice she had."  (*Id.*, Vol. 15, Tab 21 at 2628.)]  It said, impersonating Perkins, "Gee, whitakers, [D.W.], after it's all over with, I've assaulted you in every orifice, just about other than your nose and your ear, but I  didn't mean to do it, please forgive me."  [(*Id.* at 2630.)]  It emphasized that Perkins  had allegedly sexually assaulted "his own

cousin."[15] [(*Id*. at 2629.)] It argued that "we know" that Perkins treated women "like sex slaves." [(*Id*., Vol. 16, Tab 23 at 2667.)] And it characterized Perkins's encounter with Darlene Hall as a "date attempt" that he "struck out on," arguing that Hall was a third intended rape victim. [(*Id*., Vol. 15, Tab 21 at 2629.)][16]

118. The collateral-act evidence and inflammatory arguments made by the prosecution compounded the effects of prejudicial information that had already saturated the community and reached most jurors. Perkins had been reviled as a rapist in the local media, [(*id*., Vol. 24, Tab 43 at 52-93)]; even the Governor of Alabama had decried him as a rapist, [(*id*., Vol. 4 at 238)], and there had been death threats against him and his counsel, [(*id*. at 238-39)].

119. Though it knew that the collateral-act evidence had pervaded the proceedings as well as the greater community, the trial court gave no limiting instruction prior to the jury's guilt phase deliberations concerning how the jury should use the collateral-act evidence.

120. After Perkins was convicted, a penalty-phase trial was held before the jury. The prosecution incorporated all of the previous collateral-act evidence into the penalty phase. [(*Id*., Vol. 17, Tab 28 at

---

[15]B.P. is Perkins's cousin.

[16]The court notes that it considers the prosecutor's arguments to be improper and would have sustained any objection at trial. However, the issue for this court is not whether it agrees with the Alabama courts' decisions on Perkins's issues. "The question under AEDPA [the Antiterrorism and Effective Death Penalty Act] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "The state court decision must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016)(internal citations and quotations omitted).

2776.)]  As during the prior phase, the trial court gave no instruction limiting what inferences the jury could draw from the evidence.

. . .

135.  Evidence of a criminal defendant's bad character has traditionally been held inadmissible because it may "weigh too much with the jury" and "so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Michelson v. United States*, 335 U.S. 469, 476 (1948).  The risk of harm attendant to character evidence is even greater where the prosecution makes "pronounced and persistent" improper arguments that call attention to the most prejudicial details. *Cf. Berger v. United States*, 295 U.S. 78, 89 (1935) ("[A prosecutor's] improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.").  And the risk of harm is at its height where a trial court fails to give a cautionary instruction. *Cf. Caldwell v. Mississippi*, 472 U.S. 320, 338-39 (1985) (holding prosecutor's improper argument unconstitutional where trial court "failed to correct the prosecutor's remarks").

136.  Here, the prosecution's case against Perkins was weak in several respects.  At the guilt phase, the principal evidence supporting the intent elements – intent to rape and intent to kill – was that Cathy Gilliam had yelled "rapist," that Perkins had allegedly raped two women, and that Perkins had stipulated that he caused Gilliam's death. Yet substantial evidence showed that Perkins intended neither to rape nor to kill Gilliam, including the statements of the victim, the actions of Perkins following the shooting, and the changed circumstances between the time of the collateral rapes and the time of the abduction of Gilliam. By portraying Perkins as a bad person, the prosecution encouraged the jury to convict him of capital murder based on irrational reactions instead of the quality or strength of the evidence.  At the penalty phase, the prosecution relied on all of the guilt phase evidence, and argued that it was Perkins's "behavior we're looking at," [(doc. 10, Vol. 18, Tab 34

at 2979)], and that Perkins had "no concept of human decency," [(*id.*, Vol. 18 at 2967)].

137. By needlessly presenting the jury with a host of bad conduct allegedly committed by Perkins, and then intensifying the details in their arguments, the prosecution invited jurors to convict Perkins and sentence him to death based on distaste for the State's portrayal of who Perkins was rather than a rational response to the relevant evidence about the crime and Perkins's degree of culpability. *See Ege v. Yukins*, 485 F.3d 364, 377 (6th Cir. 2007)("If the prosecution felt that the [prejudicial] evidence was so important, it does not take much of a cognitive leap to believe that the jury viewed it as important as well."). Without a limiting instruction from the trial court to guide the jury's response to the prosecution's evidence and arguments, the violation of Perkins's Eighth and Fourteenth Amendment rights had a substantial and injurious influence on the jury's verdict. Therefore, Perkins is entitled to relief.

(Doc. 1 ¶¶ 112-20; 135-37 [footnotes added].)

### 1. Overlooked Claims or Presumed Ruling on the Merits

Perkins contends that the Alabama Court of Criminal Appeals "failed to address [his] claim[s] that the unlimited admission of the [collateral-act] evidence" violated his right to due process under the Fourteenth Amendment and his right to a reliable sentence under the Eighth Amendment. (*Id.* ¶ 122.) Therefore, this court "should review [his] claim[s] de novo because [they were] overlooked by the Alabama Court of Criminal Appeals." (*Id.* ¶ 123.)

With regard to his claim that collateral-acts evidence was improperly admitted, the Alabama Court of Criminal Appeals held that admission of this evidence was not

error – "plain or otherwise," and it defined "plain error" as "error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." *Perkins*, 808 So. 2d at 1084-85, 1088, 1092, 1093 (quoting *Ex parte Trawick,* 698 So. 2d 162, 167 (Ala. 1997)). The Alabama Supreme Court has noted that "a review under the plain error rule, which guarantees a defendant a fundamental right to fairness, is tantamount to a due process review." *Pace v. State*, 714 So. 2d 332, 337 (Ala. 1997)(quoting *Ex parte Myers*, 699 So. 2d 1285, 1296-98 n.4 (Ala. 1997)); *see also Thornburg v. Mullin*, 422 F.3d 1113, 1125 (10th Cir. 2005)("We see no practical distinction between the formulations of plain error in *Thornburg* [*v. State*, 985 P.2d 1234, 1242 (Okla. Crim. App. 1999),] and *Cleary* [*v. State*, 942 P.2d 736, 752-53 (Okla. Crim. App. 1997),] and the federal due-process test, which requires reversal when error 'so infused the trial with unfairness as to deny due process of law,' *Estelle* [*v. McGuire*], 502 U.S. [62,] 75 [(1991)]. Because the [Oklahoma Court of Criminal Appeals] applied the same test we apply to determine whether there has been a due-process violation, we must defer to its ruling unless it 'unreasonably appli[ed]' that test. 28 U.S.C. § 2254(d).").

Nevertheless, the court does not decide whether the Alabama court decided Perkins's federal constitutional claims on the merits by deciding that the evidentiary

rulings were not plain error, because it finds no error based on a de novo review of

these claims.

> Even if the state court used an incorrect legal standard, [the court] need not determine whether AEDPA's deferential standard of review, 28 U.S.C. § 2254(d), applies in this situation. Cf. *Williams v. Taylor*, 529 U.S. 362, 397-398, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). That is because, even if AEDPA deference does not apply, [petitioner] cannot show prejudice under *de novo* review, the more favorable standard of review for [petitioner]. Courts cannot grant writs of habeas corpus under § 2254 by engaging only in *de novo* review when it is unclear whether AEDPA deference applies, § 2254(d). In those situations, courts must resolve whether AEDPA deference applies, because if it does, a habeas petitioner may not be entitled to a writ of habeas corpus under § 2254(d). Courts can, however, deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review, see § 2254(a).

*Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

## 2. Admission of Evidence of Prior Acts and Perkins's Right to Due Process

Perkins claims

125. The United States Supreme Court has made clear that state evidentiary rulings must be fundamentally fair to comport with the Due Process Clause. *See*, *e.g.*, *Rochin v. California*, 342 U.S. 165, 168-74 (1952). Accordingly, prosecution tactics to make the evidence against a defendant appear more damaging than it actually is can render a trial fundamentally unfair. *See*, *e.g.*, *Napue v. Illinois*, 360 U.S. 264, 169 (1959)("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."); *Townsend v. Burke*, 334 U.S. 736,

740-41 (1948)(holding defendant was denied due process where he was "sentenced on the basis of assumptions concerning his criminal record which were materially untrue"); *cf. Berger v. United States*, 295 U.S. 78, 85 (1935)(reversing conviction where prosecutor's remarks were "calculated to mislead the jury"). *See generally Wellons v. Hall*, 558 U.S. 220, 220 (2010)(per curiam)("From beginning to end, judicial proceedings conducted for the purpose of deciding whether a defendant shall be put to death must be conducted with dignity and respect.").

126.   Collateral-act evidence "is generally recognized to have potentiality for prejudice" and "is usually excluded" except where the "possibility of prejudice is believed to be outweighed by the validity of the State's purpose in permitting introduction of the evidence." *Spencer v. Texas*, 385 U.S. 554, 560-61 (1967).   Where a state proves a legitimate purpose for presenting collateral-act evidence, "defendants' interests are protected by limiting instructions." *Id.* at 561.

127.   Though collateral-act evidence is often admissible for limited purposes, a state violates a defendant's rights where "erroneous admission of evidence makes a petitioner's trial 'so fundamentally unfair that the conviction was obtained in violation of the due process clause of the fourteenth amendment.'" *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1355 n.8 (11th Cir. 2005)(quoting *Thigpen v. Thigpen*, 926 F.2d 1003, 1012 (11th Cir. 1991)); *see also Dobbs v. Kemp*, 790 F.2d 1499, 1504 (11th Cir. 1986)(recognizing state court evidentiary rulings may render trial fundamentally unfair).   Factors that courts consider in determining whether admission of evidence renders a trial fundamentally unfair include whether "the evidence is close," the "manner in which the complained of evidence was presented," whether "the evidence was highly persuasive," whether the evidence "was used in closing argument," and "whether the defense was able to effectively counter" the evidence. *Maurer v. Dep't of Corr.*, 32 F.3d 1286, 1289 (8th Cir. 1994).   The ultimate question is whether the erroneous admission of evidence robbed the trial of "the dignity due a rational process." *See Houston v. Estelle*, 569 F.2d 372, 383 (5th Cir. 1978).

128. Here, the pervasive testimony about collateral acts denied Perkins's right to due process of law because the "extraneous considerations render[ed] improbable or impossible an impartial judgment as to guilt." *See Menzies v. Procunier*, 743 F.2d 281, 289 (5th Cir. 1984). The permissible use for the two collateral rapes was to show that they occurred, not how they occurred in ways different from the crime at issue or how they were investigated. Therefore, the legitimate purpose for admitting the collateral evidence did not require emphasizing the details.

129. Nevertheless, the prosecution presented the rapes in painstaking detail, scattering references to them throughout the trial and emphasizing the most inflammatory aspects. The prosecution used the irrelevant details throughout its opening statement and closing arguments. The trial court did not even issue a limiting instruction.

130. In addition to the rape testimony, testimony about the alleged encounter between Darlene Hall and Perkins, as well as testimony suggesting that Perkins was a thief, heightened the risk that jurors would find Perkins guilty because they thought he was a bad person who needed to be punished, not because the relevant evidence proved him guilty of capital murder beyond a reasonable doubt. "It is clear that the cumulative effect of the conduct of the state was to arouse prejudice" and that the jury was "inflamed by marginally relevant and irrelevant evidence that was highly prejudicial." *Cf. Walker v. Engle*, 703 F.2d 959, 968-69 (6th Cir. 1983). This fundamental unfairness infected both the guilt phase and the penalty phase. Perkins's conviction and sentence should be vacated. *See id.* at 969 ("When a trial court permits the constitutional protections to be overridden by zealous prosecutors without interjecting restraining or curative measures, the federal courts must be alert to act as the district court did here.").

(Doc. 1 ¶¶ 125-30.)

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court

is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)(citing 28 U.S.C. § 2241 and *Rose v. Hodges,* 423 U.S. 19, 21 (1975))(footnote omitted). "In our system of justice, [a] fair trial for persons charged with criminal offenses is secured by the Sixth Amendment, which guarantees to defendants the right to counsel, compulsory process to obtain defense witnesses, and the opportunity to cross-examine witnesses for the prosecution." *Perry v. New Hampshire*, 565 U.S. 228, 231-32 (2012). "Those safeguards apart, ***admission of evidence in state trials is ordinarily governed by state law, and the reliability of relevant testimony typically falls within the province of the jury to determine***." *Id*. at 232 (emphasis added). Therefore, ***only*** when the state court's ruling with regard to the admission of evidence is alleged to have deprived the petitioner of his right to due process will a federal habeas court consider whether that error was of such magnitude that it denied petitioner's right to a fundamentally fair trial in violation of the due process clause. *See Alderman v. Zant*, 22 F.3d 1541, 1555 (11th Cir. 1994)(citing, *inter alia*, *Lisenba v. California*, 314 U.S. 219, 228 (1941)). "As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it [the court] must find that ***the absence of that fairness fatally infected the trial***; the acts complained of must be of

such quality as necessarily prevents a fair trial." *Lisenba*, 314 U.S. at 236-37 (emphasis added).

> The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process. Mr. Justice Black, writing for the Court in *In re Oliver*, 333 U.S. 257, 273, 68 S. Ct. 499, 507, 92 L. Ed. 682 (1948), identified these rights as among the minimum essentials of a fair trial:
>
>> 'A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense – a right to his day in court – are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel.'

*Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). "But apart from trials conducted in violation of express constitutional mandates, a constitutionally unfair trial takes place only where the barriers and safeguards are so relaxed or forgotten that the proceeding is more a spectacle or trial by ordeal than a disciplined contest." *United States v. Augenblick*, 393 U.S. 348, 356 (1969)(citing *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963); and *Brown v. Mississippi*, 297 U.S. 278, 285 (1936))(internal citations omitted).

Perkins claims that the admission of collateral-act evidence denied him due process pursuant to the Fourteenth Amendment and a reliable sentence under the Eighth Amendment. He argues:

131. Under the Eighth Amendment, relief is further warranted due to the danger that Perkins's sentence of death is unreliable. The Eighth Amendment "gives rise to a special 'need for reliability in the determination that death is the appropriate punishment' in any capital case." *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988)(quoting *Gardner v. Florida*, 430 U.S. 349, 393-64 (1977)). The United States Supreme Court has repeatedly cautioned that "[c]apital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" *Roper v. Simmons*, 543 U.S. 551, 568 (2005) (quoting *Atkins v. Virginia*, 536 U.S. 304, 319 (2002)). Circumstances that present an undue risk of unreliable or arbitrary imposition of the death penalty — meaning death sentences for those who lack extreme culpability — violate the Eighth Amendment's proscription against cruel and unusual punishment. *See*, *e.g.*, *id*.

132. Admission of irrelevant, inflammatory evidence during the penalty phase of a capital trial is a practice that presents an undue risk of arbitrariness. *Booth v. Maryland*, 482 U.S. 496, 508-09 (1987), *overruled on other grounds by Payne v. Tennessee*, 501 U.S. 808, 829 n.2 (1991).[17] In *Booth v. Maryland*, a prosecutor presented evidence that

---

[17]The decision in *Payne v. Tennessee* overruled the decision in *Booth* that victim impact evidence was inadmissible during sentencing; it held:

[I]f the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence

members of the victim's family believed the crime was vicious and did not think that the person who did it could be rehabilitated. *Id.* at 508. The United States Supreme Court held that "admission of these emotionally charged opinions as to what conclusions the jury should draw from the evidence clearly is inconsistent with the reasoned decisionmaking we require in capital cases." *Id.* 508-09. The Supreme Court explained that the evidence was impermissible because it could "serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant." *Id.* at 508.

133. As in *Booth*, there is an intolerable risk here that Perkins was sentenced to death without a rational finding that he was among "the most deserving of execution." *Atkins*, 536 U.S. at 319. Because it misled jurors into believing that all of the collateral-act evidence was relevant to punishment, the prosecution's incorporation of the inflammatory collateral-act evidence into the penalty phase violated the principle that the capital sentencing process "should facilitate the responsible and reliable exercise of sentencing discretion." *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985). Admission of prejudicial, irrelevant evidence without adequate safeguards violates the Eighth Amendment. *See*, *e.g.*, *Johnson*, 486 U.S. at 590; *Booth*, 482 U.S. at 508; *cf. Romano v. Oklahoma*, 512 U.S. 1, 9 (1994) (holding no Eighth Amendment violation where jury was correctly instructed).

(Doc. 1 ¶¶ 131-33 [footnote added].)

―――――――――――――

differently than other relevant evidence is treated.

*Payne v. Tennessee*, 501 U.S. 808, 827 (1991). Any reading of *Booth* that the State must limit certain types of relevant evidence in a capital case has thus been abrogated. As Justice O'Connor wrote in her concurring opinion, "The Eighth Amendment does not prohibit a State from choosing to admit evidence concerning a murder victim's personal characteristics or the impact of the crime on the victim's family and community." *Id*. at 833.

However, "As [the Supreme Court] held in *Romano v. Oklahoma*, 512 U.S. 1, 114 S. Ct. 2004, 129 L. Ed. 2d 1 (1994), it is not the role of the Eighth Amendment to establish a special 'federal code of evidence' governing 'the admissibility of evidence at capital sentencing proceedings.'" *Kansas v. Carr*, 136 S. Ct. 633, 644 (2016)(quoting *Romano*, 512 U.S. at 11-12). "Rather, it is the Due Process Clause that wards off the introduction of 'unduly prejudicial'[18] evidence that would render the trial fundamentally unfair." *Id*. (quoting *Payne v. Tennessee*, 501 U.S. 808, 825 (1991); citing *Brown v. Sanders*, 546 U.S. 212, 220-21 (2006))(footnote added; internal quotations omitted). Therefore, Perkins may not challenge the admission of collateral-act evidence at his sentencing proceeding under the Eighth Amendment. "The test prescribed by *Romano* for a constitutional violation attributable to evidence improperly admitted at a capital-sentencing proceeding is whether the evidence 'so infected the sentencing proceeding with unfairness as to render the jury's imposition

---

[18]"Evidence is ***unduly prejudicial*** when it threatens the fundamental goals of accuracy and fairness of the trial by misleading the jury or by influencing the jury to decide the case upon an improper basis." *State v. DeSantis*, 456 N.W.2d 600, 608 (Wisc. 1990)(emphasis added). Therefore, "unduly prejudicial" is similar in meaning to the term "unfairly prejudicial," which "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997); *see also* Fed. R. Evid. 403, Advisory Committee Notes ("'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.").

of the death penalty a denial of due process.'" *Id*. at 644-45 (quoting *Romano*, 512 U.S. at 12).

The issue for this court is whether the admission of the collateral-act evidence – admitted during either the guilt phase, the sentencing phase, or both – violated Perkins's right to due process by so infecting his proceedings with unfairness as to deny him a fundamentally fair trial.

### a. Evidence of the Rapes of D.W. and B.P.

On direct appeal, the Alabama Court of Criminal Appeals held as follows:

First, Perkins contends that the trial court erred by allowing the State to present the testimony of several witnesses that tended to show that he had raped two women, B.P. and D.W., on August 1, 1990, and August 6, 1990, respectively.

. . .

Before trial, Perkins filed a motion in limine seeking to prevent the State from introducing evidence of any collateral crimes committed by Perkins, including the rape of B.P. and the alleged rape of D.W. The trial court denied the motion without stating a reason. At trial, Perkins's counsel objected to the testimony of B.P., Gaddy, Dr. Seigel, Nurse Herren, Simpson, D.W., Hudson, Dr. Ashley, Nurse Perkins, Stough, and Rollan, regarding the alleged rapes. The objections were overruled, and the trial court admitted the testimony, again without stating a reason.

On appeal, Perkins contends that evidence of the alleged rapes was inadmissible because, he says, it was not probative of any issue in the case, it did not fall within any of the exceptions to the exclusionary rule, and it was offered solely to show his bad character or his propensity to commit criminal acts. Moreover, he maintains that, even

if the evidence was probative of an issue in the case and did fall within one of the exceptions to the exclusionary rule, its prejudicial effect far outweighed its probative value, and, he says, the detail with which the State proved the alleged prior rapes "exceeded all permissible bounds of relevancy."  (Perkins's brief to this court, pp. 11–12.)

. . .

. . .  "'The decision whether to allow or not to allow evidence of collateral crimes or acts as part of the State's case-in-chief rests within the sound discretion of the trial judge.'" *Akin v. State,* 698 So. 2d 228, 234 (Ala. Cr. App. 1996), cert. denied, 698 So. 2d 238 (Ala.1997), quoting *Blanco v. State,* 515 So. 2d 115, 120 (Ala. Cr. App. 1987).

In *Bradley v. State,* 577 So. 2d 541 (Ala. Cr. App. 1990), this court stated:

> "We have recognized that the list of traditionally recognized exceptions is not exhaustive and fixed. See *Nicks v. State,* 521 So. 2d [1018] at 1025 [ (Ala. Cr. App 1987), aff'd, 521 So. 2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S. Ct. 2916, 101 L. Ed. 2d 948 (1988) ]. 'It must ever be borne in mind that the state may prove the accused's commission of another crime if such other crime is relevant for any purpose other than that of showing his guilt through the medium of bad character.' C. Gamble, *McElroy's Alabama Evidence* § 69.0(1) (3d ed. 1977) (quoting Mr. Justice McElroy, 2nd ed.)
>
> > "'In all instances, the question is whether the proposed evidence is primarily to prove the commission of another disconnected crime, or whether it is material to some issue in the case. If it is material and logically relevant to an issue in the case, whether to prove an element of the crime, or to controvert a material contention of defendant, it is not inadmissible because in making the proof the

commission of an independent disconnected crime is an inseparable feature of it.'

"*Snead v. State,* 243 Ala. 23, 24, 8 So. 2d 269, 270 (1942). However, even though evidence of collateral crimes or acts may be relevant to an issue other than the defendant's character, it should be excluded if 'it would serve comparatively little or no purpose except to arouse the passion, prejudice, or sympathy of the jury,' *Spellman v. State,* 473 So. 2d 618, 621 (Ala. Cr. App. 1985), or put another way, 'unless its probative value is "substantially outweighed by its undue prejudice,"' *United States v. Stubbins,* 877 F.2d 42, 43 (11th Cir.), cert. denied, 493 U.S. 940, 110 S. Ct. 340, 107 L. Ed. 2d 328 (1989) (quoting *United States v. Beechum,* 582 F.2d 898 (5th Cir.1978) (en banc), cert. denied, 440 U.S. 920, 99 S. Ct. 1244, 59 L. Ed. 2d 472(1979)).

". . . .

"Rather than uphold the trial court by straining to neatly fit the evidence of the three prior incidents into the narrow confines of the traditionally recognized categories, we have chosen to review the court's ruling by determining whether the evidence was 'material and logically relevant' to an issue or issues in the case."

577 So. 2d at 547-48.

In this case, the evidence of the alleged collateral rapes was material and logically relevant to show Perkins's intent and motive in committing the charged crime. See *Knight v. State,* 675 So. 2d 487, 499 (Ala. Cr. App. 1995), cert. denied, 675 So. 2d 502 (Ala.1996). "'If an accused is charged with a crime that requires a prerequisite intent, . . . then prior or subsequent criminal acts are admissible to establish that he had the necessary intent when he committed the instant crime.'" *Hinton v. State,* 632 So. 2d 1345, 1347-48 (Ala. Cr. App. 1993), cert. denied,

632 So. 2d 1350 (Ala. 1994), quoting *Jones v. State,* 439 So. 2d 1308, 1310 (Ala. Cr. App. 1983) (emphasis in *Hinton* omitted). In addition, "evidence tending to establish motive is always admissible." *Jordan v. State,* 629 So. 2d 738, 741 (Ala. Cr. App. 1993), cert. denied, 511 U.S. 1112, 114 S. Ct. 2112, 128 L. Ed. 2d 671 (1994). "'It is permissible in *every criminal case* to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.'" *Bradley,* 577 So. 2d at 549, quoting *Bowden v. State,* 538 So. 2d 1226, 1235 (Ala. 1988) (emphasis in *Bowden* ).

To prove the capital-murder charge, the State was required to show that Perkins intentionally murdered Mrs. Gilliam during the course of a kidnapping in the first degree. Section 13A-6-43(a)(4), Ala. Code 1975, defines kidnapping in the first degree as "abduct[ing] another person with intent to . . . [i]nflict physical injury upon him, or to violate or abuse him sexually." At trial, the defense theory was that Perkins did not intend to physically harm or to sexually abuse Mrs. Gilliam when he abducted her, nor did he intend to kill Mrs. Gilliam. During opening and closing statements, Perkins's counsel argued that Perkins was guilty of murder, but was not guilty of capital murder. Specifically, Perkins's counsel argued to the jury that Perkins did not intend to physically harm or to sexually abuse Mrs. Gilliam when he abducted her, but that he was merely looking for food and money when Mrs. Gilliam surprised him by coming outside. According to the defense theory, when Mrs. Gilliam saw Perkins, she panicked, and Perkins instinctively grabbed her and took her to the gray truck. Perkins's counsel further argued that a struggle ensued in the truck, that the gun went off accidentally, and that Perkins then took Mrs. Gilliam to Maudeen Hood's house for help. Throughout opening and closing arguments, Perkins's counsel repeatedly emphasized that there was no evidence that Perkins intended to physically harm or to sexually abuse Mrs. Gilliam or to kill her. Because Perkins's motive and intent in abducting Mrs. Gilliam were called into question, evidence of the alleged prior rapes was relevant to contradict Perkins's version of events and to prove that Perkins's intent, when he abducted Mrs. Gilliam, was "to inflict physical injury upon or to violate or abuse [Mrs. Gilliam] sexually," an essential element of the charged crime. The testimony regarding the alleged rapes was

admissible because it was probative of matters in issue other than Perkins's bad character or his propensity to commit criminal acts.

> Furthermore, contrary to Perkins's contention otherwise, because evidence of the alleged prior rapes was clearly admissible, the State was entitled to prove the details of the circumstances surrounding the alleged rapes. "If evidence of the accused's commission of another crime is admissible, the state may prove in meticulous detail the manner in which the accused committed such other crime." *Bush v. State,* 695 So. 2d 70, 85 (Ala. Cr. App. 1995), aff'd, 695 So. 2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S. Ct. 418, 139 L. Ed. 2d 320 (1997). Finally, we find that the probative value of the collateral-crimes evidence clearly outweighed its prejudicial effect, particularly in view of Perkins's theory of defense at trial. Accordingly, the trial court did not abuse its discretion by admitting testimony regarding the two rapes allegedly committed by Perkins in the two weeks preceding Mrs. Gilliam's abduction and murder.

*Perkins*, 808 So. 2d at 1080-85.

Under the circumstances, the court finds that the trial court did not abuse its substantial discretion in admitting the evidence of the two rapes occurring just days before Perkins's abduction and murder of Mrs. Gilliam. The evidence of two sexual assault crimes occurring shortly before the abduction of Mrs. Gilliam was relevant proof that Perkins intended to sexually assault Mrs. Gilliam when he abducted her. The fact that the State proved the two rapes in "meticulous detail" was not error under Alabama law. Nothing in the record suggests this evidence was false or misleading. Moreover, Perkins had an unimpeded opportunity to challenge the evidence.

Therefore, the court finds that the admission of the evidence of the rapes of B.P. and D.W. did not violate Perkins's right to due process.

### b. Incident at Darlene Hall's House

Perkins also challenges collateral-act evidence consisting of "Darlene Hall describ[ing] an episode involving a man she identified as Perkins attempting to use her telephone shortly before Cathy Gilliam was abducted, supplemented by testimony of law enforcement personnel." (Doc. 1 ¶ 116 [citing doc. 10, Vol. 11, Tab 19 at 1756-81; *id.*, Vol. 12 at 1978-84].)

The Alabama Court of Criminal Appeals held:

> . . . Perkins contends that the trial court erred by allowing the testimony of Darlene Hall because, he says, her testimony was inadmissible evidence of collateral crimes.
>
> . . .
>
> . . . Here, Perkins did not object to Hall's testimony, nor did he obtain the express acquiescence of the trial court that an objection would be unnecessary. Therefore, this issue may be reviewed only for plain error. Rule 45A, Ala. R. App. P.
>
> Darlene Hall testified that on August 9, 1990, at approximately 3:50 p.m. (just minutes before Mrs. Gilliam was abducted), Perkins arrived at her house in a blue-gray pickup truck and honked the horn. Hall stated that she opened her front door and Perkins asked her if her husband was home. Hall replied that he was not. Perkins then told Hall that he needed to come in and use her telephone to call a tow truck because, he said, his truck was stuck in a field behind her house. Hall told Perkins that he could not come in, but that she would call a wrecker

for him.  Perkins then gave Hall a telephone number to call, but before Hall could go back inside her house, Perkins told Hall that he was not sure if the number he had given her was the right number, and he told her to wait while he looked in his glove compartment for the number. Hall told Perkins not to bother looking, that she would try the number he had given her.  Hall then went inside her house, locked the door, and retrieved a gun from her bedroom closet.  When Hall came back to her front door, Perkins was looking through her front window.  At that point, Hall told her daughter – who had been present throughout the entire incident – that she was going to shoot Perkins.  Perkins stated, "I think I'll go somewhere else," and then quickly left. [(Doc. 10, Vol. 11, 19 at 1764.)]  Hall stated that she had recognized Perkins when he first arrived because she had been reading the newspaper, which contained a photograph of Perkins.  Hall also stated that she went to the Hood residence later that evening, after hearing about a shooting, and gave a statement to the police regarding the incident with Perkins.  Hall testified that she did not see a gun or a knife in Perkins's possession when Perkins was at her home.

Perkins contends that Hall's testimony amounted to evidence of an inadmissible collateral bad act, which, he says, did not fit into any exception to the exclusionary rule.   In addition, he maintains that, even if Hall's testimony was admissible under an exception to the exclusionary rule, its prejudicial effect far outweighed its probative value; therefore, he argues its admission was error.

Assuming Perkins's alleged conduct at Hall's house constituted a "bad act," we find that Hall's testimony regarding Perkins's actions only minutes before Mrs. Gilliam's abduction was admissible to show part of the continuous transaction leading up the charged crime.  . . .

. . .

"'In a prosecution for unlawful homicide it is "permissible to show all that transpired at the time of the difficulty and everything leading up to and explanatory of the tragedy." *Moulton v. State,* 19 Ala. App. 446, 450, 98

So. 709, cert. denied, 210 Ala. 656, 98 So. 715 (1923). Testimony is admissible if it "tend(s) to prove the surrounding facts and circumstances leading up to and relating to the homicide." *Hill v. State,* 25 Ala. App. 264, 265, 144 So. 582 (1932). "Evidence of connected acts leading up to and explanatory of killing, throwing light on action, animus, or intent of accused, is admissible, though not res gestae." *Smallwood v. State,* 26 Ala. App. 360, 361, 159 So. 699 (1935). See also *Palmer v. State,* 401 So. 2d 266, 269-70 (Ala. Crim. App.), cert. denied, *Ex parte Palmer,* 401 So. 2d 270 (Ala.1981).'"

*Read v. State,* 686 So. 2d 563, 566 (Ala. Cr. App. 1996), quoting *Smith v. State,* 447 So. 2d 1327, 1330 (Ala. Cr. App. 1983), aff'd, 447 So. 2d 1334 (Ala.1984).

In this case, Perkins's attempt to gain entry into Hall's home and the kidnapping of Mrs. Gilliam occurred within minutes of each other and were part of one continuous criminal transaction. Therefore, the trial court did not abuse its discretion in admitting Hall's testimony.

Moreover, we find that Hall's testimony was also admissible to show Perkins's intent. As stated previously, evidence of collateral crimes and acts is admissible if it is material and logically relevant to an issue in the case, and is not offered for the purpose of showing the accused's bad character. Section 13A-6-43(a)(4), Ala. Code 1975, states that "[a] person commits the crime of kidnapping in the first degree if he abducts another person with intent to . . . inflict physical injury upon him, or to violate or abuse him sexually." Section 13A-6-40(2), Ala. Code 1975, defines "abduct," in pertinent part, as "restrain[ing] a person with intent to prevent his liberation." Thus, to establish the crime of kidnapping in the first degree, the State must prove the intent to inflict physical injury or to sexually abuse, *and* the intent to prevent liberation. We stated above that testimony that Perkins had allegedly raped two women was relevant to show his intent to sexually abuse Mrs. Gilliam when he kidnapped her. Here, Hall's testimony would allow a logical

inference that Perkins intended to abduct Mrs. Gilliam, i.e., to prevent her liberation.

Because Hall's testimony was not probative only to show Perkins's bad character or to show that Perkins acted in conformity with that bad character, it was properly admitted into evidence. Moreover, the probative value of the testimony clearly outweighed its prejudicial effect. Accordingly, there was no error, plain or otherwise, in the trial court's admission of the testimony.

*Perkins*, 808 So. 2d at 1085-88 (emphasis in original).

The court finds the trial court did not abuse its discretion in allowing Mrs. Hall's testimony regarding her encounter with Perkins minutes before he abducted Mrs. Gilliam. At trial, Perkins argued that he did not intend to abduct Mrs. Gilliam, but that he had abducted her only after she had surprised him when she came outside as he was looking around her trailer. His attempt to gain entry to Mrs. Hall's home and his leaving only after she said, aloud, that she was going to shoot him, would support a reasonable inference that he intended to abduct Mrs. Gilliam and that he carried a weapon to better his chances of successfully doing so. The evidence was relevant to show that Perkins intended to abduct Mrs. Gilliam because he had a weapon after he had failed to abduct Mrs. Hall because he was unarmed.

Perkins does not allege that Mrs. Hall's testimony was false or misleading. As it was relevant, not only to prove the circumstances immediately preceding his abduction of Mrs. Gilliam, but also to challenge his assertion that he did not intend

to abduct Mrs. Gilliam, the court finds Perkins's right to due process was not violated by admission of Hall's testimony.

### c.  The Gray Truck and the .357 Magnum Handgun

Perkins challenges as improper collateral-act evidence "statements and testimony [that] suggested that [he] was a thief." (Doc. 1 ¶ 116 [citing doc. 10, Vol. 11, Tab 17 at 1727-28; *id.*, Vol. 13 at 2061].)  With regard to this evidence, the Alabama Court of Criminal Appeals held:

> Last, Perkins contends that the trial court erred by permitting testimony from three witnesses, Harry Montgomery, James Hudson, Jr., and Roy Sanderson, regarding the gray pickup truck that Perkins was driving on the day of Mrs. Gilliam's abduction.  Specifically, he contends that Montgomery, Hudson, and Sanderson all testified that the truck, which belonged to James Hudson, Sr., was stolen, and that at the time it was stolen, inside it were a .357 Magnum pistol and a high-powered rifle.  He maintains that this evidence was not relevant "for any proper purpose" and that its prejudicial effect far outweighed its probative value. (Perkins's brief to this court, p. 23.)  Because Perkins either failed to object to the complained-of testimony or did not receive an adverse ruling on any objection, this claim may be reviewed only for plain error.  Rule 45A, Ala. R. App. P.

> Included in Perkins's pretrial motion in limine seeking to prevent the State from introducing evidence of any collateral crimes or acts was a request that the State be prevented from introducing any testimony regarding the fact that approximately two to three days before he abducted and killed Mrs. Gilliam, Perkins had stolen the gray pickup truck, and that when he stole it, both a .357 Magnum and a high-powered rifle were inside the truck.  While arguing against the motion, the State presented to the trial court the following facts:  Two to three days before Perkins abducted and killed Mrs. Gilliam, he stole the gray

pickup truck from the home of James Albert Hudson, Jr., who was keeping the truck for its owner, Hudson's father, James Albert Hudson, Sr. At the time of the theft, Hudson had a .357 Magnum pistol and a high-powered rifle in the truck. In addition, there were no bullet holes in the truck while it was in Hudson's possession, and Hudson could not recall that anyone had bled while in the truck. As stated above, Perkins's motion in limine was denied.

During opening arguments, the prosecutor told the jury that the evidence would show that the gray pickup truck that Perkins was seen driving "had originally come from the home of James A. Hudson, Jr." [(Doc. 10, Vol. 11, Tab 17 at 1727)], and that the truck contained a .357 Magnum pistol and a high-powered rifle while it was in Hudson's possession. The prosecutor also told the jury that, when the gray pickup truck was found, the .357 Magnum pistol and the high-powered rifle were missing, but were later found near Perkins's mother's and grandmother's houses in the Berry area. Perkins did not object to these statements by the prosecutor.

The record reveals that, in contrast to the prosecutor's opening statements and his proffer to the trial court during the pretrial hearing on the motion in limine, the State did not present any evidence to the jury that the truck, or the weapons inside the truck were stolen by Perkins. Rather, the State presented only the following testimony at trial regarding the truck and the weapons: Harry Montgomery, chief deputy of the Tuscaloosa County Sheriff's Department, testified that, pursuant to the investigation of the gray pickup truck, he discovered that the truck "belong[ed]" to a man named James Albert Hudson, Sr. [(*Id.*, Vol. 12 at 1962.)] Perkins did not object to this testimony. After Montgomery's testimony, Roy Sanderson, a state trooper, testified that he was conducting personal business in the Berry area near Perkins's mother's and grandmother's houses on August 12, 1990, when he noticed a high-powered rifle under one of the houses. Perkins objected to Sanderson's testimony, but a review of the record reveals that the trial court did not rule on the objection; rather, the State agreed to cease its questioning of Sanderson and to put on no further evidence regarding the rifle. This concession was made by the State after Perkins offered to make the

following stipulation of facts, which was read to the jury by the trial court:

> "The defendant caused the death of Cathy Gilliam with a .357 magnum pistol. That's number one. Number two, the Defendant, Mr. Roy Perkins, was in the 1979 Chevrolet gray pickup truck shown in State's Exhibit number 23. Number three, Cathy Gilliam's blood was found in the 1979 gray Chevrolet pickup truck shown in State's Exhibit number 23."

[(*Id.*, Vol. 13 at 2087.)] During discussions regarding the stipulation, Perkins refused to stipulate that he killed Mrs. Gilliam while she was in the gray pickup truck, or that the bullet holes found in the truck after the murder were not there two to three days before the murder. Perkins claimed that such evidence was irrelevant. The State agreed to the stipulation, but stated its intention to present the testimony of James Hudson, Jr., that there were no bullet holes in the truck two to three days before Mrs. Gilliam's abduction. Immediately following the stipulation, the State presented Hudson's testimony. Hudson testified that he was very familiar with the gray pickup truck and that he had last seen the truck two to three days before Mrs. Gilliam's abduction. He stated that when he last saw the truck, there were no bullet holes in it. Hudson did not testify that he was in possession of the truck, or that the truck had been stolen. Perkins did not object to Hudson's testimony.

Perkins contends on appeal that the State's evidence that Perkins stole the gray pickup truck, the .357 Magnum pistol, and the high-powered rifle was inadmissible evidence of collateral crimes. Because it is clear from the record that no evidence was actually introduced at trial that Perkins stole the truck from Hudson, or that Perkins did not have permission to drive the truck, or that the truck even contained a .357 Magnum pistol or a high-powered rifle while it was in Perkins's possession, Perkins's argument on appeal is moot. Apparently, Perkins's argument is based on the prosecutor's statements to the trial court during the pretrial hearing on Perkins's motion in limine about the origins of the truck and the weapons, rather than on the evidence that

was actually introduced at trial. ***As the evidence that was actually presented to the jury did not reveal a collateral crime, we find no error, plain or otherwise, in its admission.***

Moreover, even if the evidence that the State intended to introduce at trial, but did not – i.e., that Perkins stole the truck, along with the .357 Magnum pistol and the high-powered rifle inside the truck – had been introduced, there would have been no error. As stated above, although Perkins stipulated that he caused Mrs. Gilliam's death with a .357 Magnum pistol, he refused to stipulate that Mrs. Gilliam was shot while she was inside the truck. The State was entitled to prove the circumstances of Mrs. Gilliam's death, including the location of her shooting. Such evidence was highly relevant to a material element of the State's case. Furthermore, because such evidence would have been admissible had the State chosen to introduce it, the fact that the prosecutor referred to such evidence during his opening statement – before he agreed not to proceed with the evidence – was not error, plain or otherwise.

*Perkins*, 808 So. 2d at 1090-93 (emphasis added).

The court finds that the record does not support Perkins's claim that the evidence of the gray truck and the .357 suggested he was a thief. Moreover, even if the trial court admitted evidence that Perkins had stolen the truck, which contained the murder weapon, such evidence was not false or misleading. Certainly, nothing about this evidence violated Perkins's right to due process.

### 3. Failure to Give Limiting Instruction

Perkins contends that the trial court's failure to give a jury instruction limiting the jury's use of the collateral-act evidence violated his right to a fair trial and a reliable sentence. The Alabama Court of Criminal Appeals held:

> Finally, Perkins contends that even if all of the collateral-crimes evidence addressed above was admissible, the trial court's failure to give an instruction to the jurors explaining the limited purpose for which the evidence could be considered constituted reversible error. Because Perkins did not request a limiting instruction, we may review this claim only for plain error. Rule 45A, Ala. R. App. P.

> We recognize that "[w]here evidence is admissible on a certain point only, the trial court should advise the jury to consider it on that point alone." *King v. State*, 521 So. 2d 1360, 1362 (Ala. Cr. App. 1987). However, "[w]hen such evidence is admitted against an appellant, it is the sole responsibility of the appellant to request the court to instruct the jury as to the limited and proper purpose for which such evidence is admitted. If the appellant failed to request such an instruction, she may be considered to have waived the right to the protective instruction." *Miller v. State*, 405 So. 2d 41, 47 (Ala. Cr. App. 1981). See also *Minor* [*v. State*], 780 So. 2d 707[, 771-73 (Ala. Crim. App. 1999), rev'd 780 So. 2d 796 (Ala. 2000)]; *Varner v. State*, 497 So. 2d 1135 (Ala. Cr. App. 1986); *Weaver v. State*, 466 So. 2d 1037 (Ala. Cr. App. 1985); *Robinson v. State*, 361 So. 2d 379 (Ala. Cr. App.), *cert. denied*, 361 So. 2d 383 (Ala. 1978).

> Perkins failed to request a limiting instruction regarding the collateral crimes evidence, even after being repeatedly told by the prosecutor that the State would not object to such an instruction. Thus, "[b]ased on established precedent [set forth above] we conclude that the trial court's failure to instruct the jury that evidence of [Perkins's collateral crimes] could be used only for the limited purpose of [showing

his intent] was not plain error. Plain error is "error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." *Ex parte Trawick*, 698 So. 2d 162, 167 (Ala. 1997), cert. denied, 522 U.S. 1000, 118 S. Ct. 568, 139 L. Ed. 2d 408 (1997). Here, the error was not so "egregious" that it "has or probably has substantially prejudiced" Perkins. *Trawick*, 698 So. 2d at 167.

*Perkins*, 808 So. 2d at 1092-93.

In order to determine whether the omission of a limiting instruction violated

Perkins's constitutional right to due process, the court must consider whether the lack

of such an instruction "infected the entire trial [so] that the resulting conviction [and

sentence] violated due process." *Henderson v. Kibbe*, 431 U.S. 145, 156-57 (1977).

The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process", *Cupp v. Naughten*, 414 U.S. [141], at 147, 94 S. Ct. [396], at 400, 38 L. Ed. 2d 368 [(1973)], not merely whether "the instruction is undesirable, erroneous, or even 'universally condemned,'" *id*., at 146, 94 S. Ct., at 400.

In this case, the [petitioner's] burden is especially heavy because no erroneous instruction was given . . . . An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.

*Kibbe*, 431 U.S. at 154-55. In a case addressing a federal defendant's claim that the lack of a limiting instruction, when no such instruction was requested, violated his right to due process, the Eleventh Circuit held:

> In determining whether the statement requires reversal because no limiting instruction was in fact given, we must first decide at whose door we lay the failure to give the instruction. If the court committed plain error in failing to recognize the need for the limiting instruction *sua sponte*, we must reverse. *See* Fed. R. Crim. P. 52(b); Fed. R. Evid. 103(d). However, if [petitioner] was required to request the instruction, his failure to do so caused its absence. *See id*. at 103(a). Since for strategic reasons counsel may have chosen not to request an instruction, we would be reluctant to determine as a matter of law that counsel's strategic choice gave rise to a due process violation.

*United States v. Peaden*, 727 F.2d 1493, 1501 (11th Cir. 1984).

In this case, the failure of the trial court to sua sponte instruct the jury that it could not consider the collateral-acts evidence – the two rapes, the incident at Mrs. Hall's house, and the theft of the gray truck, which contained a .357 magnum handgun – as evidence that Perkins had the propensity to commit violent and/or criminal acts did not result in a fundamentally unfair trial. As set forth above, evidence of the rapes of B.P. and D.W., including the details, was admitted as relevant evidence of Perkins's intent and motive when he abducted Mrs. Gilliam. Evidence of the incident at Mrs. Hall's house was relevant and admissible to prove

Perkins's actions immediately preceding his abduction and murder of Mrs. Gilliam,[19] as well as his intent and motive. And, evidence that Perkins had stolen the gray truck and the murder weapon was not before the jury, but the jury did hear that Perkins was driving the gray truck, the gray truck had contained the murder weapon, Mrs. Gilliam's blood and bullet holes were evident in the truck when it was found after her murder, and the blood and bullet holes had not been in the truck in the days preceding Mrs. Gilliam's abduction and murder. In light of the relevancy of this evidence in proving Perkins's actions on the day of the murder of Mrs. Gilliam, as well as his intent and motive, the failure to give a limiting instruction – an instruction telling the jury they could not consider this evidence to find that Perkins should be convicted because he was a bad person or had the propensity to commit violent and/or criminal acts but that they could consider the evidence to decide why Perkins abducted Mrs. Gilliam and what he intended to do to her when he abducted her – did not result in a fundamentally unfair trial.

---

[19]The Alabama Supreme Court has held that "a limiting instruction is not required when evidence of other crimes or prior bad acts is properly admitted as part of the res gestae of the crime with which the defendant is charged." *Johnson v. State*, 120 So. 3d 1119, 1129-30 (Ala. 2006)(citing *People v. Coney*, 98 P.3d 930 (Colo. Ct. App. 2004); *State v. Long*, 801 A.2d 221, 242 (N.J. 2002); *Camacho v. State*, 864 S.W.2d 524, 535 (Tex. Crim. App. 1993).

Based on the foregoing, the court finds that neither the admission of the collateral-act evidence nor the failure to sua sponte give a limiting instruction violated Perkins's due process rights at either the guilt or sentencing phase of his trial. Therefore this ground for habeas relief will be denied.

## CONCLUSION

The court finds that Perkins has failed to demonstrate the admission of collateral-acts evidence and the failure of the trial court to give the jury a limiting instruction violated his right to due process. Therefore, Perkins is not entitled to habeas relief on this ground.

## E. SUFFICIENCY OF THE EVIDENCE

Perkins argues that Alabama violated his rights under the Due Process Clause of the Fourteenth Amendment because "the record evidence does not support a capital murder conviction because no rational juror could have found beyond a reasonable doubt that Perkins formed the specific intent to kill Cathy Gilliam." (Doc. 1 ¶ 138 [citing *Jackson v. Virginia*, 443 U.S. 307, 324 (1979)].) He points to the following direct and circumstantial evidence in support of his contention that "[a]ny rational juror would have held grave doubts about Perkins's intent," (*id*. ¶¶ 140-42):

> 141. . . . The direct evidence consisted of two items that could not support a finding of intent to kill. First, Cathy Gilliam said after she was shot that "[Perkins] said, he didn't mean to do it." [(Doc. 10, Vol.

12 at 1945.)]  Second, Perkins said "I didn't mean to do it" and "I didn't mean to hurt her" when Officer Baxter Pate encountered him a few days later.  [(*Id.*, Vol. 13 at 2107.)]

142.  The circumstantial evidence bearing on intent to kill consisted of four items.  First, Perkins stipulated at trial that he had caused Cathy Gilliam's death  with a firearm.  [(*Id.* at 2085-88.)]  Second, Cathy Gilliam stated that the man who shot  her "took her – brought her – there" to Maudeen Hood's home, where she received emergency medical treatment.  [(*Id.*, Vol. 12 at 1943.)]  Third, three shots had been fired apart from the one that hit Gilliam, consisting of two bullet holes in the truck's ceiling  and windshield, [(*id.*, Vol. 14 at 2385-87)], and one gunshot wound to Perkins's right knee, [(*id.*, Vol. 12 at 1948-54)].  Fourth, there was no gunpowder stippling on Cathy Gilliam's body, which indicated that she had been shot from a distance of more than 18 inches.  [(*Id.*, Vol. 13 at 2123-24.)]

(Doc. 1 ¶¶ 141-42.)  Perkins argues that the state court violated his right to due process by finding the evidence was sufficient to support the jury's verdict; as noted above, he argues, "Any juror would have held grave doubt about [his] intent."  (*Id.* ¶ 140.)

The Supreme Court has established the following standard for reviewing a state-court determination of the sufficiency of evidence on habeas review:

The opinion of the Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), makes clear that it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.  What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with

the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable." *Renico v. Lett*, 559 U.S. [766, 773,] 130 S. Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010) (internal quotation marks omitted).

Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

*Cavazos v. Smith*, 565 U.S. 1, 2 (2011)(per curiam).

In Alabama, "To sustain a conviction under § 13A-5-40(a)(1), Ala. Code 1975, for the capital offense of murder during a kidnapping, the State must prove beyond a reasonable doubt: (1) a kidnapping in the first degree, as defined by § 13A-6-43(a),[20] or an attempt thereof; (2) an intentional murder, as defined by § 13A-6-2(a)(1);[21] and (3) that the murder was committed 'during' the course of the 'kidnapping or attempted kidnapping.'" *Butler v. State*, 781 So. 2d 994, 997 (Ala. Crim. App. 2000)(footnotes added). "The question whether a defendant intentionally

---

[20]Perkins was charged with the first degree kidnapping of Mrs. Gilliam in violation of § 13A-6-43(a)(1), which states: "(a) A person commits the crime of kidnapping in the first degree if he abducts another person with intent to . . . (4) Inflict physical injury upon him, or to violate or abuse him sexually . . . ." Ala. Code § 13A-6-43(a)(4).

[21]Pursuant to § 13A-6-2(a)(1), "A person commits the crime of murder if he or she does any of the following: (1) With intent to cause the death of another person, he or she causes the death of that person or of another person." Ala. Code § 13A-6-2(a)(1).

caused the death of another person is a question of fact for the jury," and "Intent may be inferred from the use of a deadly weapon or from other attendant circumstances." *Ex parte Carroll*, 627 So. 2d 874, 878 (Ala. 1993)(internal citations omitted). Moreover, "a statement by a defendant," including pretrial statements, "if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt, particularly when the elements to be proved for a conviction include highly subjective elements like the defendant's intent or knowledge." *United States v. Shabazz*, 887 F.3d 1204, 1220 (11th Cir. 2018)(quoting *United States v. Brown*, 53 F.3d 312, 314, 315 (11th Cir. 1995)(internal quotations omitted); *United States v. Alejandro*, 118 F.3d 1518, 1521 (11th Cir. 1997)("The jury could . . . properly consider appellant's false exculpatory statements upon his arrest as substantive evidence of his guilty intent." (citing *United States v. Eley*, 723 F.2d 1522, 1525 (11th Cir.1984))).

The Alabama Court of Criminal Appeals set forth the following evidence as sufficient to establish Perkins's guilt of the offense of capital murder during a kidnapping:

> . . . Here, Candace Gilliam testified that she saw a man take her mother from her home at gunpoint. Perkins admitted that he caused Mrs. Gilliam's death with a .357 magnum pistol. This evidence supported an inference that Perkins intended to kill Mrs. Gilliam.
>
> In addition, the State's evidence tended to show that Mrs. Gilliam was not shot during a struggle, as Perkins contended, but instead was

shot from at least 18 inches away. When Mrs. Gilliam arrived at the Hood residence, approximately one hour after she had been abducted from her home, she had a gunshot wound to her chest, but no hole in her shirt, thus indicating that she was not wearing her shirt, or that her shirt had been unbuttoned, when she was shot. Dr. Warner testified that he found no gunpowder residue around Mrs. Gilliam's wound, which, he said, would indicate that the shot was fired from at least 18 inches away, if Mrs. Gilliam was not wearing a shirt at the time she was shot. From this evidence, the jury could have drawn a fair inference that the fatal shot was fired from at least 18 inches away, thus disproving Perkins's claim that the gun accidentally went off during a close-quarters struggle in the gray pickup truck. Viewing this evidence in the light most favorable to the State, we find that it was sufficient to support a reasonable inference that Perkins intended to kill Mrs. Gilliam.

Perkins contends, however, that because his version of events – that the gun accidentally discharged during a struggle – is also supported by the evidence, the State could not prove a prima facie case of capital murder. The evidence supports the theory that a struggle occurred between Perkins and Mrs. Gilliam in the gray pickup truck, but such evidence in no way reduces or negates the sufficiency of the State's evidence tending to show that Perkins intended to kill Mrs. Gilliam. The State's theory of the case, which was very similar to the defense's theory, was that Mrs. Gilliam struggled against Perkins's sexual advances, that Perkins became angry, and that, with the intent to kill, he shot Mrs. Gilliam. The defense's theory was that Mrs. Gilliam and Perkins struggled, and that the gun accidentally discharged. The fact that the defense's version of events conflicted with the State's version did not render the State's evidence insufficient; any conflict in the evidence was a matter of weight and credibility to be resolved by the jury. . . .

*Perkins*, 808 So. 2d at 1112-13 (footnote omitted).

Perkins argues that the evidence was insufficient to support a finding that he

intended to kill Mrs. Gilliam because (1) he told Mrs. Gilliam and the arresting

officer that he did not mean to kill Mrs. Gilliam, and (2) he took Mrs. Gilliam to Mrs. Hood's house. Clearly, a rational factfinder could reject Perkins's statements and actions *after* fatally shooting Mrs. Gilliam as irrelevant to his intentions at the time he shot her. "[T]he question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve." *Connolly v. State*, 500 So. 2d 57, 63 (Ala. Crim. App. 1985)(citing *Crowe v. State*, 435 So. 2d 1371, 1379 (Ala. Cr. App. 1983)), *aff'd* 500 So. 2d 68 (Ala. 1986). Actions and/or expressions of remorse after the murder does not compel a finding, as a matter of law, that the killing was unintentional. Certainly, the jury could have considered Perkins's actions following the fatal shooting of Mrs. Gilliam as demonstrating his lack of intent, but it was not required to accept his argument that his actions proved that he did not intend to kill Mrs. Gilliam at the time he shot her. Under Alabama law, the fact that he shot her after kidnaping her under circumstances that would allow a finding that he intentionally pulled the trigger is sufficient to support the jury verdict of capital murder.

Therefore, the court finds Perkins is not entitled to relief based on his argument that there was insufficient evidence to convict him of the capital murder of Mrs. Gilliam.

## CONCLUSION

The state court's factual findings are supported by the record and must be given deference by this court. Perkins has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner that was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Alabama Court of Criminal Appeals unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Perkins is not entitled to habeas relief on this ground.

## F. CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

### 1. Standard of Review

The Supreme Court's "benchmark" for judging any claim that trial counsel provided ineffective assistance is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The Court's opinion in *Strickland* established a two-pronged standard for judging, under the Sixth Amendment, the effectiveness of attorneys who represent criminal defendants at trial:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687; *see Williams v. Taylor*, 529 U.S. 362, 390 (2000); *Grayson v. Thompson*, 257 F.3d 1194, 1215 (11th Cir. 2001). The two parts of the *Strickland* standard are conjunctive; a petitioner bears the burden of proving ***both*** "deficient performance" ***and*** "prejudice" by "a preponderance of competent evidence." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000)(*en banc*). However, a court is not required to address both aspects of the *Strickland* standard when a habeas petitioner makes an insufficient showing on one of the two prongs. *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000)("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.").

### a. The Performance Prong

"The burden of persuasion is on the petitioner to prove by a preponderance of the evidence that counsel's performance was unreasonable." *Stewart v. Secretary, Department of Corrections*, 476 F.3d 1193, 1209 (11th Cir. 2007)(citing *Chandler*, 218 F.3d at 1313). To satisfy the performance prong of the *Strickland* test, a petitioner must prove that counsel made errors so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. The standard for gauging attorney performance is "reasonableness under prevailing professional norms." *Id*. at 688; *see Williams v. Taylor*, 529 U.S. 362, 390-91 (2000); *Darden v. Wainwright*, 477 U.S. 168, 184 (1986); *Chandler*, 218 F.3d at 1313. "The test of reasonableness is not whether counsel could have done something more or different," but whether counsel's performance "fell within the broad range of reasonable assistance at trial." *Stewart*, 476 F.3d at 1209 (citing *Chandler*, 218 F.3d at 1313). "Furthermore, [the court] must recognize that omissions are inevitable. But, the issue is not what is possible or what is prudent or appropriate, but only what is constitutionally compelled." *Id.* (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987))(internal quotations omitted). The Sixth Amendment does not guarantee a defendant the very best counsel or the most skilled attorney, but only counsel that performs within reasonable professional norms. "The test has nothing to do with

what the best lawyers would have done. Nor is the test even what most good lawyers would have done. [The court] ask[s] only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992).

The reasonableness of counsel's performance is judged from the perspective of the attorney at the time of the alleged error and in light of all the circumstances. *See*, *e.g.*, *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001)(giving lawyers "the benefit of the doubt for 'heat of the battle' tactical decisions"); *Mills v. Singletary*, 161 F.3d 1273, 1285-86 (11th Cir. 1998)(noting that *Strickland* performance review is a "deferential review of all of the circumstances from the perspective of counsel at the time of the alleged errors").

> Under this standard, there are no "absolute rules" dictating what reasonable performance is or what line of defense must be asserted. [*Chandler*, 218 F.3d] at 1317. Indeed, as we have recognized, "[a]bsolute rules would interfere with counsel's independence – which is also constitutionally protected — and would restrict the wide latitude counsel have in making tactical decisions." *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001).

*Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005). "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the

presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. (internal quotations and citation omitted); *see also Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)(holding that, "[w]hen reviewing whether an attorney is ineffective, courts should always presume strongly that counsel's performance was reasonable and adequate" (internal quotations omitted)). "Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Id*. at 693.

"Based on this strong presumption of competent assistance, the petitioner's burden of persuasion is a heavy one: 'petitioner must establish that no competent counsel would have taken the action that his counsel did take.'" *Stewart*, 476 F.3d at 1209 (quoting *Chandler*, 218 F.3d at 1315). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers*, 13 F.3d at 386.

### b. The Prejudice Prong

"A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high." *Van Poyck v. Florida Department of Corrections*, 290 F.3d 1318, 1322 (11th Cir. 2002). "It is not enough for the [habeas petitioner] to show that the errors had some conceivable effect on the outcome of the

proceeding." *Strickland*, 466 U.S. at 693; *see also Harrington*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable."). Instead, to prove prejudice, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see Williams*, 529 U.S. at 391. In the context of the death sentence itself, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Stewart*, 476 F.3d at 1209 (quoting *Strickland*, 466 U.S. at 695).

In order to satisfy this high standard, a petitioner must present competent evidence proving "that trial counsel's deficient performance deprived him of 'a trial whose result is reliable.'" *Brown v. Jones*, 255 F.3d 1272, 1278 (11th Cir. 2001)(quoting *Strickland*, 466 U.S. at 687). In other words, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001)(quoting *Eddmonds v. Peters*, 93 F.3d 1307, 1313 (7th Cir. 1996)(quoting *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986)))(internal quotation marks omitted).

### c. Deference Accorded State Court's Decisions

When the state court has adjudicated a petitioner's ineffectiveness claims on the merits, the findings of historical facts made in the course of evaluating that claim are subject to a presumption of correctness under 28 U.S.C. § 2254(d)(2) and (e)(1). *See Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001). To overcome the state court's finding of fact, the petitioner must show that those findings were unreasonable in light of the evidence before the state court and carry his burden of proving the facts by clear and convincing evidence. Deference to a state court's resolution of a claim of ineffective assistance involves a double layer of reasonableness. Under the AEDPA, the federal habeas court may grant relief on such a claim only if the state court determination involved an "unreasonable application" of *Strickland* to the facts of the case. As noted, *Strickland* requires an assessment of whether counsel's conduct was professionally unreasonable and whether such conduct resulted in actual prejudice. The assessment of the reasonableness of the state court determination and the assessment of the alleged attorney error cannot be conflated into one. *See Harrington*, 562 U.S. at 101-02. Thus, habeas relief on a claim of ineffective assistance of counsel can be granted with respect to a claim decided on the merits by the state court only if the habeas court determines that it was "objectively unreasonable" for the state court to find that counsel's conduct was not

"professionally unreasonable" or did not result in actual prejudice. The *Harrington*

Court explained,

> "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. [356], [371], 130 S. Ct. 1473, 1485, 176 L. Ed. 2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S. Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S. Ct. 2052; see also *Bell v. Cone*, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S. Ct. 2052.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S. Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles [v. Mirzayance]*, 556 U.S.[111, 123], 129 S. Ct. [1411], 1420 [(2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at [123], 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question

is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105; *see also Premo v. Moore*, 562 U.S. 115, 123 (2011).

With these standards in mind, the court turns to Perkins's allegations of ineffective assistance of counsel.

## 2. Failure to Strike Juror V.H.

Perkins contends that trial counsel were ineffective because they failed to remove a biased juror, juror V.H. (*See* doc. 1 ¶ 154.) He alleges:

> 155. In Rule 32 proceedings, Perkins's trial counsel described the prosecution's theme as follows: "The State's theory of the case, it was obvious, was to portray [Perkins] as a sexual predator completely." [(Doc. 10, Vol. 64 at 418.)] The prosecution had informed the defense before trial that it would present evidence of past rapes to show that Perkins intended to rape the victim, Cathy Gilliam. [(*See*, *e.g.*, *id.*, Vol. 24, Tab 43 at 23-31 (prosecutor's memorandum of law in support of admitting collateral-rape evidence); *see also id.*, Vol. 4 at 261 (trial court denying defense's motion to exclude collateral-rape evidence); *id.*, Vol. 64 at 429-30 (defense counsel stating he was aware that collateral-rapes would be used).)] Trial counsel also knew that Perkins had been portrayed in the media as a serial rapist out on parole. [(*Id.*, Vol. 4 at 238-43.)] That media coverage, combined with evidence of rapes of two women, rape of a 14-year-old child, and attempted rapes of several others, would make it especially difficult for jurors to maintain their objectivity.

> 156. In voir dire, prospective jurors were asked whether their lives had been affected by crime. [(*Id.*, Vol. 6 at 642.)] Veniremember [V.H.] answered that her life had been affected, but she preferred not to explain details. [(*Id.*)]

157. Later, [V.H.] approached the bench. She stated, "What I declined to say out there is that, okay, I have been raped once when I was twelve years old." [(*Id*. at 718.)] [V.H.] went on to explain that her daughters were also rape survivors, and that one daughter, like [V.H.], had been raped by a cousin:

> [A]fter I got grown and had kids of my own, . . . my oldest daughter . . . was raped. And then my next older daughter, she was raped.
>
> I was raped by my mother's sister's son. We didn't press charges because I felt that was too embarrassing . . . .
>
> And with my older daughter, I did press charges. She was raped in my backyard. She was coming home, and this guy pulled her in the utility room and raped her. And my next oldest daughter . . . [was raped by] my oldest sister's oldest son . . . . She did not tell me about it. She had lived with this since she was about eleven years old. Well he started molesting her up until age fifteen . . . .

[(*Id*. at 718-19.)] [V.H.] stated that she had not gotten counseling for herself or her children, and said that the experiences remained on her mind:

> And my kids didn't want the public to know about that. Then I called Indian Rivers [Mental Health Center]. They [were] telling me from the experience of my life and I never really got it out of my mind . . . .

[(*Id*. at 719-20.)] [V.H.] added that someone had tried "to get my children and me to go have counseling." [(*Id*. at 720.)]

158. When [V.H.] finished describing how her life had been affected by rape, defense counsel asked two questions:

THE COURT: Let me have the [attorneys] ask you some questions. Anyone have any questions?

MR. STEVERSON: You've had some very serious things happen to you, Ms. [V.H.]. Now the fact that these things have happened to you, would that cause you to not be able to be fair and impartial in this case?

[V.H.]: Not intentionally. I wouldn't intentionally misjudge someone because what had happened to me in my life because I feel like everyone should have the benefit of the doubt and then judge someone according to how you feel with your mind and within your heart. And then let God lead the way, whatever [my] decision may be.

MR. STEVERSON: So you think you could be fair and impartial despite these things that have happened to you?

[V.H.]: Yes.

[THE STATE]: We have no questions.

[(*Id.* at 720-21.)] At that point, the court had not informed [V.H.] that Perkins's case had anything to do with rape. [(*See id.*, Vol. 5 at 571-72 (the trial court's synopsis of the crime to prospective jurors).)] No further questions were asked of [V.H.] about this matter.

159. In addition to what [V.H.] said about her experience as a rape survivor, defense counsel had four other sources of knowledge about her. The first source consisted of [V.H.]'s responses to questions about her perspective on the rights of victims and criminal defendants. [(*Id.*, Vol. 6 at 634-74.)] She agreed with the proposition that an innocent defendant would testify and say that he is innocent instead of remaining silent. [(*Id.* at 673.)] [V.H.] explained, "If I was the Defendant, I feel like if I didn't do the crime, I don't think I should sit there and just let the DA or whoever, you know, say I did." [(*Id.*)]] [V.H.] also believed that crime victims have too few rights, [(*id.* at 636,

638)], that defendants charged with crimes are treated too leniently, [(*id.* at 640)], and that Perkins must have done something wrong or else he would not be on trial, [(*id.* at 646)].[22]  The only other prospective juror who agreed with these four propositions was [J.B.], who was excluded for cause in response to a motion made by the defense.[23]  [(*Id.*, Vol.2,

---

[22]During voir dire, defense counsel asked, "Now, how many of you believe that Mr. Perkins must have done something or he wouldn't be on trial?"  (Doc. 10, Vol. 6 at 646.)  V.H., along with 29 other prospective jurors answered affirmatively.  (*Id.* at 646-48.)  After some confusion and discussion, counsel asked if there was "[a]nybody . . . who cannot look at Mr. Perkins . . . and say:  Mr. Perkins, I believe that you are presumed innocent, and I believe you're innocent until the State comes forth with evidence to prove beyond a reasonable doubt to me that you're guilty?" (*Id.* at 657.)  Two prospective jurors, not including V.H., responded that they would not be able to presume Perkins was innocent.  (*Id.* at 658-60.)

[23]Defense counsel moved to exclude J.B. for cause based on his statements that what he learned about the case from media sources might have "some impact subconsciously" on his ability to decide the case only on what he learned in the courtroom.  (Doc. 10, Vol. 7 at 832-33.)  During jury selection, J.B. answered as follows:

> [Prosecutor]:  . . .  [I]f the Court instructed you . . . to put everything you've seen and read out of your mind and consider only what came from that witness stand and then in the form of exhibits, you could do that; couldn't you?

> [J.B.]:  I would do my best to do that, yes.

> [Prosecutor]:  Could you – Would it be fair to say that you could do that?

> [J.B.]:  I say like anything else, I'd try very hard to do that.  I wouldn't consciously –

> [Prosecutor]:  Yes, sir.

. . .

[Defense Counsel]: . . . [T]ell me what you remember from what you've read.

[J.B.]: I would say this, when you say you remember, I would say the things that impacted me, that I really recall; and basically, the fact that the paper said that he was a convicted rapist. And certain things hit me. And that's one of the things that I remember.

. . .

[J.B.]: The only thing I recall from back when it happened . . . something about the manhunt aspect of it. And that's about all. . . .

. . .

[Defense Counsel]: Anything else impact you?

[J.B.]: And I thought it said something about life sentence – I didn't really dig into it too deeply. Like I say, certain things I remember and others I didn't.

. . .

[Defense Counsel]: Would it be fair to say that because you read several articles and most recently read two yesterday that it would be very hard for you to put that completely out of your mind. And if there was something in those articles that didn't come out in this courtroom, would be hard for you to forget about them?

[J.B.]: . . . Just to be perfectly frank, as much as you try to do it, it would still somewhere be in your subconscious –

[Defense Counsel]: For instance, if [there] wasn't any evidence in this case that he was serving a life sentence and there wasn't any

Tab 2 at 295.)]

160.  The second source of knowledge consisted of [V.H.]'s responses to questions about the death penalty, a punishment that she supported.  In one-word responses to leading questions, [V.H.] agreed that she would have no problems following capital sentencing law, that she could listen to aggravating as well as mitigating evidence if Perkins were found guilty of capital murder, and that she could leave her "opinions about the death penalty outside [the] door."  [(*Id.*, Vol. 9 at 1326.)]  She also said that she approved of the death penalty "to some point" and that "if the *person was brutally violent*, I feel that [the] death penalty should be in effect."  [(*Id.* at 1340 (emphasis added).)]  She did not believe that death or imprisonment would deter crime.  [(*Id.* at 1341.)]  She said that "just like everyone else" she would "weigh all the evidence" before deciding on punishment.[24]  [(*Id.* at 1342.)]

---

evidence in this case about the manhunt, you would find it real hard to put those out of your mind, wouldn't you?

[J.B.]:  Basically.

(*Id.* 833-37.)  The defense's motion to strike J.B. for cause, which the State did not oppose, was granted.  (*Id.*, Vol. 2 at 295.)

[24]The transcript attributes this statement to V.H.; however, this appears to be a scrivener's error.  (*See* doc. 10, Vol. 9 at 1340-42.)  The transcript states:

MR. SMITH:  . . .  [V.H.], what do you think about the death penalty?

[V.H.]  Well I think it should be in effect to some point.  And the reason why I say that, it depends on what kind of crime that had been committed and if the person was brutally violent, I feel that the death penalty should be in effect.  And then I also believe that someone should be put away for life without the possibility of parole.

. . .

115

161. The third source of knowledge consisted of [V.H.]'s responses to questions about pretrial publicity. [V.H.] gave neutral

---

MR. SMITH: . . . [D]o you feel like the fact that someone was sentenced to death that that would keep somebody else from committing a crime?

[V.H.]: No.

. . .

MR. SMITH: Okay. Ms. [D.H.], have you had any discussions about the death penalty before today –

[D.H.]: Not much.

MR. SMITH: Okay. Of course, you realize that this is the time that you have to think about it because you could find yourself sitting on the jury that if you got to that point and the State proved their case beyond a reasonable doubt that you'd have to consider that.

[D.H.]: Yes, sir.

MR. SMITH: So tell me what your feelings are?

(*Id*. at 1340-42.) At this point, the transcript identifies the prospective juror that is answering as V.H., when it appears that D.H. is still responding to counsel's questions. At this point V.H./D.H. states:

Well, just like everyone else, I believe in some cases, it's right for the death penalty. In others, I believe that life without parole is good also. I would have to weigh all the evidence. And I would weigh from his childhood, and I would weigh other circumstances, you know. But I believe we have to weigh out, everybody, and then come up with a decision.

(*Id*. at 1342.)

116

responses to leading questions, indicating that she believed that she could be impartial regardless of what she had heard about the crime. [(*Id*. at 1393-94.)] She said that she only knew what she read in the newspaper, which was "very little, no more than he [was] suppose[d] to have [done] this to this woman." [(*Id*. at 1395.)] She also said that she had not been following the story recently. [(*Id*. at 1395-96.)] Her views were substantially identical to those of many other qualified jurors, who also had been exposed to publicity but believed that they could remain impartial.

162.    The fourth source of knowledge consisted of [V.H.]'s responses in a juror questionnaire. [(*Id*., Vol. 22 at 419-24.)] [V.H.]'s responses there were, like her responses during voir dire, unremarkable relative to those of other jurors and provided little or no meaningful insight into her experiences, attitude, or beliefs.

163.    Knowing that the prosecution's case would involve allegations that Perkins had raped or intended to rape several women, including his cousin and a 14-year-old girl, defense counsel did not challenge [V.H.] for cause, and they did not use a peremptory strike to exclude her. [V.H.] sat on Perkins's jury.

(*Id*. ¶¶ 155-63 [footnotes added].) He alleged counsel's performance was deficient

and that prejudice should be presumed because of V.H.'s actual and implied bias.

(*See id*. ¶¶ 167, 189-93, 195-96.)

The Rule 32 court found –

This claim was raised on appeal and rejected by the appellate court(s). It cannot form the basis of an ineffective assistance of counsel claim. Even if it could be re-litigated, the claim fails as there is no proof that trial counsel were ineffective nor that any challenge to the juror[ ] in question would have been sustained by the trial judge.

(Doc. 10, Vol. 56, Tab 63 at 4493.)

The Alabama Court of Criminal Appeals rejected Perkins's ineffective-assistance claim on appeal from the Rule 32 Order; it held:

> This Court notes that the portion of the circuit court's order holding that this claim was raised on direct appeal is erroneous. On direct appeal, this Court specifically addressed Perkins's claim that the trial court erred in denying 14 of Perkins's challenges for cause. This Court found no error in the court's failure to remove those 14 jurors for cause. *Perkins*, 808 So. 2d at 1073-75. Only one juror who is challenged in this postconviction proceeding, N.W., was also challenged on direct appeal for a different reason than the reason raised in this proceeding. Nonetheless, the circuit court gave alternative grounds for denying relief on these claims. Moreover, this Court may affirm a lower court's ruling on a postconviction petition if it is correct for any reason. *See McNabb v. State*, 991 So. 2d 313, 333 (Ala. Crim. App. 2007).

> When reviewing claims of ineffective assistance of counsel related to counsel's performance during voir dire examination, this Court gives great deference to the counsel's decisions.

> > "Counsel is . . . accorded particular deference when conducting *voir dire*. An attorney's actions during *voir dire* are considered to be matters of trial strategy. *Nguyen v. Reynolds*, 131 F.3d 1340, 1349 (10th Cir. 1997)(citing *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995)). A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness. *Id*."

> *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001).

> "[W]here a postconviction motion alleges that trial counsel was ineffective for failing to raise or preserve a cause challenge, the defendant must demonstrate that a juror was ***actually*** biased." *Carratelli v. State,* 961 So. 2d 312, 324 (Fla. 2007). "Because [the

appellant's] claim of ineffective assistance of counsel is founded upon a claim that counsel failed to strike a biased juror, [the appellant] must show that the juror was ***actually*** biased against him." *Miller v. Francis,* 269 F.3d 609, 616 (6th Cir. 2001)(citing *Hughes v. United States,* 258 F.3d 453, 458 (6th Cir. 2001)). "[The appellant's] claim of ineffective assistance of counsel is grounded in the claim that counsel failed to strike a biased juror. To maintain a claim that a biased juror prejudiced him, however, [the appellant] must show that the juror was ***actually*** biased against him." *Goeders v. Hundley,* 59 F.3d 73, 75 (8th Cir. 1995) (citing *Smith v. Phillips,* 455 U.S. 209, 215, 102 S. Ct. 940, 71 L. Ed.2d 78 (1981)). "***[T]o show attorney error and prejudice in defense counsel's failure to use peremptory strikes for [biased] veniremen, it is necessary for [the appellant] to show that the veniremen did indeed harbor actual bias against [the appellant]***." *Parker v. Turpin,* 60 F. Supp. 2d 1332, 1362 (N.D. Ga. 1999). "Few decisions at trial are as subjective or prone to individual attorney strategy as juror *voir dire,* where decisions are often made on intangible factors." *Miller,* 269 F.3d at 620.

> "Because a defendant must demonstrate prejudice in a [post-conviction] proceeding, post-conviction relief based on a lawyer's incompetence with regard to the composition of the jury is reserved for a narrow class of cases where prejudice is apparent from the record, where a biased juror actually served on the jury."

*Jenkins v. State,* 824 So. 2d 977, 982 (Fla. App. 2002).

. . .

. . . Perkins argues that counsel was ineffective for failing to challenge for cause or use one of his peremptory strikes to remove juror V.H. V.H. said during voir dire examination that she had been raped by her first cousin when she was 12 years old and that she had two daughters who had been raped. V.H. was extensively questioned and indicated that she could be impartial and base her decision on the evidence presented. At the [R. 32] evidentiary hearing, Steverson

testified that he did not remember why they did not move to strike V.H., but added that when striking a jury it "depends on who else [is] on the jury" and who "may be better or worse choices." ([Doc. 10, Vol. 63 at] 249.) Smith testified that he could not remember why they did not strike V.H. but that "striking a jury is a weighing process, that you look at the positives and the negatives . . . . And sometimes you have people that you wouldn't really want on there, but you don't – you don't end up striking them for other reasons." ([*Id*., Vol. 64 at] 441-42.)

This Court has examined the voir dire examination of the prospective jurors. The voir dire was extensive and consisted mainly of questions regarding the publicity surrounding the case and the prospective jurors' views on capital punishment. V.H. responded that she did not believe that the death penalty was a deterrent to crime, that she believed that a sentence of life in prison was warranted in some cases, that she would have to weigh all the evidence in regard to punishment, and that voting whether a defendant lived or died was a very grave responsibility. ([*Id*., Vol. 9 at] 1342.)

The Utah Court of Appeals discussed, in depth, the law related to ineffective assistance of counsel for failing to strike a prospective juror:

> "We are unaware of, and defendant has not brought to our attention, any rule that automatically disqualifies prospective jurors who have been, or have friends or relatives who have been, victims of crimes similar to those at issue in the case where they might sit as jurors. Furthermore, cases in various state and federal jurisdictions demonstrate that when trial counsel allows the seating of jurors, who upon initial voir dire inquiry appear biased, courts deny the ineffective assistance claim unless counsel's actions could not conceivably constitute legitimate trial tactics. *See*, *e.g.*, *Singleton v. Lockhart*, 871 F.2d 1395, 1399-1400 (8th Cir. 1989)(in capital murder case, relative of a murder victim was not actually biased and counsel's failure to challenge him was tactical); *Houston v. Nelson*, 404 F. Supp. 1108, 1116 (C.D. Cal.

1975)(in pre-*Strickland* [*v. Washington*, 466 U.S. 668 (1984),] case, where juror expressed 'a particularly strong feeling against' kidnapping, but gave assurances of ability to consider evidence fairly, counsel's decision not to challenge was legitimate trial tactic); *Ogle v. State*, 807 S.W.2d 538, 541-42 (Mo. App. 1991)(where juror in rape case said he '[p]robably would' be able to set aside sister-in-law's rape, decision not to challenge did not constitute ineffective assistance); *Childers v. State*, 764 P.2d 900, 904 (Okla. Crim. App. 1988)(no ineffective assistance where unchallenged juror in rape case said she could set aside the fact a friend's daughter was raped and murdered, even though she was afraid same could happen to her daughter). *Cf. State v. Terry*, 601 So. 2d 161, 163-64 (Ala. Crim. App. 1992)(where counsel testified at post-conviction hearing that he did not know how to strike jurors and juror who said she would side with the State remained unchallenged, defendant received ineffective assistance); *Presley v. State*, 750 S.W.2d 602, 604-608 (Mo. App. [1988])(assistance ineffective where juror said he and family were crime victims and he would be partial, but counsel thought he said impartial, and failed to challenge), cert. denied, 488 U.S. 975, 109 S. Ct. 514, 102 L. Ed. 2d 549 (1988).

"Because we 'will not second-guess a trial attorney's legitimate use of judgment as to trial tactics or strategy,' *State v. Pascual*, 804 P.2d 553, 556 (Utah App. 1991) (quoting *State v. Wight*, 765 P.2d 12, 15 (Utah App. 1988)), we hold that counsel's performance did not fall below an objective standard of reasonableness. Consequently, defendant fails to 'overcome the strong presumption that trial counsel rendered adequate assistance and exercised reasonable professional judgment.' *State v. Bullock*, 791 P.2d 155, 159–60 (Utah 1989), cert. denied, 497 U.S. 1024, 110 S. Ct. 3270, 111 L. Ed. 2d 780 (1990)."

*State v. Tennyson*, 850 P.2d 461, 469-70 (Utah Ct. App. 1993).

Our research shows that other jurisdictions have found counsel's performance deficient only after counsel failed to strike a juror who unequivocally stated that he or she was biased against the defendant and the juror was not rehabilitated.

> "In *Virgil* [*v. Dretke*, 446 F.3d 598 (5th Cir. 2006)], the defendant was convicted by a jury that included two jurors, Roger Sumlin and Thomas Sims, who had expressly stated that they would be unable to be fair and impartial.  We held that counsel's failure to challenge for cause or peremptorily after Sumlin and Sims had offered unchallenged statements of bias constituted deficient performance under *Strickland* [*v. Washington*, 466 U.S. 668 (1984) ]."

*Biagas v. Valentine*, 265 Fed. App'x 166, 171-72 (5th Cir. 2008)(not selected for publication in the *Federal Reporter*)(footnotes omitted). *See Seigfried v. Greer*, 372 Fed. App'x 536, 541 (5th Cir. 2010)(not selected for publication in the *Federal Reporter*)("Because we have concluded that Juror 2 did not demonstrate actual bias, however, trial counsel's failure to raise a for-cause challenge does not constitute error."); *Hughes*, 258 F.3d at 462 ("When a venireperson expressly admits bias on voir dire, without a court response to follow-up, for counsel not to respond in turn is simply a failure 'to exercise the customary skill and diligence that a reasonably competent attorney would provide.' [*Johnson v. Armontrout*, 961 F.2d 748, 754 (8th Cir. 1992) ].").

> "In *People v. Begay*, 377 Ill. App. 3d 417, 316 Ill. Dec. 574, 879 N.E.2d 962 (2007), the defendant challenged his trial attorney's failure to seek removal of a juror for cause. During voir dire, the juror stated that her mother had been assaulted at knifepoint during a robbery.  When the trial court asked the juror whether that experience would affect her ability to be fair and impartial, the juror said it would. The court then stated, 'All right. So you wouldn't be fair,

either?' The juror replied, 'No.' *Id*. at 423, 316 Ill. Dec. 574, 879 N.E.2d 962. In rejecting the defendant's argument that her counsel's performance was deficient under *Strickland* [*v. Washington*, 466 U.S. 668 (1984) ], the appellate court theorized that defense counsel could have believed that the juror would sympathize with the defendant, who claimed that when the offenses occurred, she was being attacked by a knife-wielding aggressor."

*People v. Manning*, 241 Ill. 2d 319, 336, 350 Ill. Dec. 262, 272, 948 N.E.2d 542, 552 (2011).

In this case, V.H. did not unequivocally state that she could not be impartial. Nor did V.H. testify at the postconviction evidentiary hearing about any perceived bias against Perkins. The record clearly shows that counsel was aware of V.H.'s history and that during voir dire counsel instead chose to concentrate on questions related to prejudicial pretrial publicity and the jurors' views in support of capital punishment. Given that counsel stipulated that Perkins caused the victim's death, counsel chose to focus on the penalty phase. During voir dire, V.H. indicated that she knew that sentencing Perkins would be a grave responsibility and that she did not believe that the death penalty was a deterrent. It is reasonable to conclude that counsel believed that this juror would be more favorable to a sentence of life in prison. Based on the record in this case, this Court agrees with the circuit court's conclusion that Perkins failed to meet his burden of establishing that counsel was ineffective for not striking V.H. Specifically, he failed to show that counsel's decision not to strike V.H. was anything other than a strategic decision.

"[Defendants'] trial counsel did not simply 'go through the motions' in voir dire. He sought a change of venue, was successful in having potential jurors dismissed before voir dire based on their responses to the questionnaires, challenged jurors for cause during voir dire, and exercised five peremptory challenges. These strategic decisions were made based on his goal to educate the jury and choose a

> fair, impartial jury which would not be influenced by the publicity surrounding the case or by racial prejudice. This is not an unreasonable goal in choosing a jury, and trial counsel's strategy in reaching that goal was not objectively unreasonable."

*Garcia v. State*, 678 N.W.2d 568, 573 (N.D. 2004).

> Perkins failed to satisfy the *Strickland* test in regard to V.H.; therefore, relief was correctly denied on this claim.

*Perkins v. State*, 144 So. 3d 457, 472-75 (Ala. Crim. App. 2012)(emphasis added; footnote omitted).

In order to establish that his trial counsel were constitutionally ineffective for failing to strike V.H., Perkins must prove deficient performance – no reasonable attorney would have seated V.H. – and prejudice – "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The Alabama court found that seating V.H. was not deficient performance based on V.H.'s answers to questions during voir dire and counsel's focus on the penalty phase of the trial, and, because Perkins did not show V.H. was actually biased, he had not established *Strickland* prejudice.

Perkins contends that V.H. was actually biased, (doc. 1 ¶¶ 170-74), and that she was impliedly biased, (*id*. ¶¶ 176-81). He also contends that counsel's failure to remove a biased juror should be presumed prejudicial. (*Id*. ¶ 195.)

The court notes that V.H. did not indicate during voir dire that she was biased. Also, nothing was presented during post-conviction proceedings that she had been actually biased against Perkins during deliberations. Therefore, the court finds the Alabama court's factual determination that defense counsel was not on notice that V.H. was actually biased was not unreasonable.

Perkins contends that V.H., due to the circumstance of her being a victim of rape by a relative and her daughters being victims of rape, was impliedly biased against him. "The bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias ***conclusively presumed as matter of law***," – "a bias attributable in law to the prospective juror regardless of actual partiality." *United States v. Wood*, 299 U.S. 123, 133-34 (1936)(emphasis added). Bias of a juror is implied in "some ***extreme*** situations," including "a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Smith v. Phillips*, 455 U.S. 209, 222 (1982)(O'Connor, J., concurring; emphasis added). However, "being a victim of criminal acts did not disqualify [V.H.] from serving" based on implied bias. *See United States v. Lopez*, 445 Fed. Appx. 190, 193 (11th Cir. 2011)(citing *United States v. Tegzes*, 715 F.2d 505, 507 (11th Cir. 1983)). "[A] rape victim as a matter of law [is not] incapable of

125

being impartial in the trial of an accused rapist." *Gonzales v. Thomas*, 99 F.3d 978, 989 (10th Cir. 1996). "To hold that no rape victim could ever be an impartial juror in a rape trial would, we think, insult not only all rape victims but also our entire jury system, which is built upon the assumption that jurors will honestly try 'to live up to the sanctity of [their] oath.'" *Id*. at 989-90 (quoting *Dennis v. United States*, 339 U.S. 162, 171 (1950)); *see also Owen v. Fla. Dep't of Corr.*, 686 F.3d 1181, 1197-98 (11th Cir. 2012);[25] *Fields v. Brown*, 503 F.3d 755, 774 and n.12 (9th Cir.

_____

[25]In *Owen*, a case in which the petitioner claimed his counsel was ineffective for failing to strike a juror whose daughter had been raped during a home invasion, the Eleventh Circuit held:

> As to the performance prong, Owen contends that no reasonable defense attorney would have permitted Knowles to sit on the jury because her daughter's rape in the home invasion was so traumatic and so similar to the facts of the Slattery murder that Knowles could never consider Owen's insanity defense and mitigation case in an unbiased way. Owen, however, ignores Knowles's many other voir dire responses. For example, Knowles repeatedly insisted she could put the incident aside in deciding Owen's case. Defense counsel Haughwout questioned Knowles about the incident at length several times and candidly told Knowles she was "concern[ed]" about whether the incident would affect Knowles's view of the evidence and her decisionmaking. Knowles never equivocated on whether she could judge the evidence fairly. Knowles repeatedly assured trial counsel that she could put aside her own experience and decide the case fairly, on its own merits. Moreover, the home invasion crime occurred two years earlier and the perpetrator was caught and sentenced to 18 years' imprisonment, a sentence with which Knowles "was pleased."

> Importantly too, Knowles gave many responses in voir dire that

126

2007)("Being the spouse of a rape victim is not, in and of itself, such an 'extreme' or 'extraordinary' situation that it should automatically disqualify one from serving on a jury in a case that involves rape.")(citing, *inter alia*, *Jones v. Cooper*, 311 F.3d 306,

---

suggested she might be a very favorable juror from the defense perspective. Regarding the death penalty, Knowles said she did not believe it should be imposed automatically; she would want to hear the entire case before deciding on a penalty recommendation; and she could weigh the evidence and recommend life, if appropriate, even in a horrible case. Regarding an insanity defense, Knowles agreed that someone could be so mentally ill that he does not know what he is doing. Knowles "would listen" and "weigh the evidence" on insanity. Knowles said that the possibility a defendant judged insane could be released in the future while still dangerous (a possibility that other potential jurors said concerned them) would not weigh on her mind while she was deciding the insanity issue.

In sum, Knowles answered all counsel's questions in a manner indicative of an unbiased juror. Indeed, Knowles's responses to the voir dire questions about critical issues such as the burden of proof, the non-automatic nature of the death penalty, the ability to be objective, and the ability to consider an insanity defense — exactly what Owen sought to prove — strongly suggested Knowles would be a capable juror. Owen had experienced defense counsel, who are "strongly presumed to have . . . made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690, 104 S. CT. at 2066. Based on these facts, Owen's trial counsel could have reasonably chosen not to strike Knowles from the jury. Thus, Owen has not shown deficient performance by his trial counsel in not striking Knowles and, therefore, Owen has not shown the Florida Supreme Court decision as to Knowles was unreasonable, much less contrary to clearly established federal law.

*Owen*, 686 F.3d at 1197-98.

312-13 (4th Cir. 2002)("The mere fact that the juror's relatives had a history of arrests and jury trials certainly does not reach the high standard needed for the implication of bias."); *United States v. Torres*, 128 F.3d 38, 46 (2d Cir. 1997)(Just as we have refused to carve out an overly broad category of presumed bias based on occupational or status relationships, so we also decline to hold as a general matter that, where a juror has engaged in conduct similar to that of the defendant at trial, the trial judge *must* presume bias. Such cases are unlikely to present the "extreme situations" that call for mandatory removal. The exclusion of Juror No. 7 was, therefore, not compulsory.")(emphasis in original; footnote omitted)).

As noted by the Court of Criminal Appeals, "The voir dire was extensive," and, in particular, "V.H. responded that she did not believe that the death penalty was a deterrent to crime, that she believed that a sentence of life in prison was warranted in some cases, that she would have to weigh all the evidence in regard to punishment,[26] and that voting whether a defendant lived or died was a very grave responsibility." *See Perkins*, 144 So. 3d at 473 (footnote added). The fact that V.H. had personal experience as a rape victim and that members of her family were rape victims, when considered together with her answers during voir dire, does not demonstrate that trial

---

[26]See footnote 24, *supra*. Juror V.H. may not have been the juror who stated that she "would have to weigh all the evidence." (*See* doc. 10, Vol. 9 at 1342.) However the trial transcript does attribute this statement to V.H. (*Id*.)

counsel knew or should have known she was biased, actually or implicitly, against Perkins. Given this information, and considering trial counsel's statements they exercised their strikes based on a weighing of their choices among prospective jurors, *see Perkins*, 144 So. 3d at 473 (quoting trial counsel as stating, "when striking a jury it 'depends on who else [is] on the jury' and who 'may be better or worse choices,'" and "'striking a jury is a weighing process, that you look at the positives and the negatives [and] you have people that you wouldn't really want on there, but you don't . . . end up striking them for other reasons'")(citations omitted), the court finds that the Alabama court's determination, that trial counsel's performance was not deficient because a reasonable attorney could have chosen not to challenge for cause or to use a peremptory challenge to exclude juror V.H., was not unreasonable and/or contrary to *Strickland*.

Therefore, Perkins's ineffective-assistance claim based on counsel's failure to exclude V.H. from the panel will be denied.

Assuming that Perkins had established that his counsel's performance was deficient, the court finds that Perkins has not established *Strickland* prejudice.

Perkins contends that the Alabama court did not address the prejudice prong on *Strickland*. The court disagrees. The Court of Criminal Appeals held that Perkins had not established that V.H. was actually biased against him in order to establish

prejudice. *See Perkins*, 144 So. 3d at 472 ("The appellant's claim of ineffective assistance of counsel is grounded in the claim that counsel failed to strike a biased juror. To maintain a claim that a biased juror prejudiced him, however, the appellant must show that the juror was actually biased against him. To show attorney error and prejudice in defense counsel's failure to use peremptory strikes for biased veniremen, it is necessary for the appellant to show that the veniremen did indeed harbor actual bias against the appellant.")(quoting *Goeders v. Hundley*, 59 F.3d 73, 75 (8th Cir. 1995); *Parker v. Turpin*, 60 F. Supp. 2d 1332, 1362 (N.D. Ga. 1999))(internal citations and quotations omitted); *id*. at 75(noting the lack of evidence that V.H. was actually biased). The United States Supreme Court has not decided whether a habeas petitioner must prove *actual* bias of a juror to established prejudice sufficient to support an ineffective assistance of counsel claim based on the seating of a particular juror. Therefore, the Alabama court's decision requiring Perkins to show actual bias to prove *Strickland* prejudice is not contrary to any Supreme Court precedent.

Also, even if a petitioner could establish prejudice based on the implied bias of a juror, the petitioner is still required to establish that, in fact, a biased juror sat on his jury. "To 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,' [the petitioner] must show that at least one juror was biased; if no juror were biased, then

130

there is no 'reasonable probability that . . . the result of the proceeding would have been different.'" *Owen*, 686 F.3d at 1201 (quoting *Strickland*, 466 U.S. at 694)(emphasis added); *see Brown v. Jones*, 255 F.3d at 1280 (holding petitioner alleging ineffective assistance based on counsel's failure to ask reverse *Witherspoon* questions during voir dire had failed to show *Strickland* prejudice because he had "failed to adduce any evidence that any juror was biased in favor of the death penalty"); *see*, *e.g.*, *Villanueva v. Stephens*, 555 Fed. Appx. 300, 306 (5th Cir. 2014)("[U]nder *Strickland*, a petitioner alleging deficient performance during jury selection must identify 'any particular juror [who] was ***in fact*** prejudiced' and must establish that had counsel's questioning focused on a specific area of bias, the bias would have been found." (quoting *Neville v. Dretke*, 423 F.3d 474, 483 (5th Cir. 2005)))(emphasis added); *Davis v. Woodford*, 384 F.3d 628, 643 (9th Cir. 2004)("Establishing *Strickland* prejudice in the context of juror selection requires a showing that, as a result of trial counsel's failure to exercise peremptory challenges, the jury panel contained at least one juror who was biased." (citing *United States v. Quintero-Barraza*, 78 F.3d 1344, 1349 (9th Cir. 1995))).  Other than alleging a personal history that is significant for rape, Perkins has not demonstrated that V.H. was biased against him – either actually or implicitly.

Therefore, Perkins is not entitled to relief based on this ineffective-assistance claim. He has not shown that trial counsel were constitutionally ineffective for failing to strike V.H.

## CONCLUSION

The state court's factual findings are supported by the record and must be given deference by this court. Perkins has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or that it applied law contrary to established United States Supreme Court precedent or in a manner that was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Alabama Court of Criminal Appeals unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Perkins is not entitled to habeas relief on this ground.

### 3. Failure to Request a Limiting Instruction

Perkins contends that his counsel was ineffective because they failed to request jury instructions limiting the jury's consideration of "the extensive collateral-act evidence presented by the State." (Doc. 1 ¶ 198.) He alleges:

> 199. At the guilt phase of Perkins's trial, the State presented evidence, over repeated defense objections, that Perkins had committed two rapes in the weeks leading up to the abduction and killing of Cathy Gilliam. . . .

200.  In closing arguments, defense counsel emphasized that the State was seeking [to] use the collateral evidence for the impermissible use of proving that  Perkins had bad character – and therefore he must have possessed the intent[ ] required for capital murder, including the intent to kill Cathy Gilliam.  Counsel argued: "[T]hey want to try him, again, on [the collateral cases] because they want  you to see what a bad person he is."  [(Doc. 10, Vol. 15, Tab 22 at 2634.)]  Counsel then argued:

> You're not asked to find him guilty of what he did to [D.W.]  You're not asked to find him guilty of what he did to [B.P.]  Those cases are over.  . . .  You're asked to find him  guilty of capital murder.  All the elements that that involves, the intent to kill and the intent to commit sexual assault on her.

[(*Id.*)]  Counsel continued, "The State has come in here and they've proved to you that Roy Perkins committed other offenses, that Roy Perkins is a bad man, that Roy Perkins is serving a ninety-nine year sentence but not, not that he committed capital murder on this incident on Cathy Gilliam."  [(*Id.*, Vol. 16 at 2645.)]  Finally, counsel  argued, "They bring [the collateral evidence] to try to make you upset and angry with Roy Perkins because they can't show you by the evidence that he did this."  [(*Id.* at 2656.)]

201.    Although Perkins's counsel had tried to exclude the collateral-act evidence prior to and during trial and argued that the State was misusing it, they failed to request that the court instruct the jury as to the limited purpose of the evidence.  As a result, the jury's consideration of the evidence at the guilt phase was unrestricted.  In addition, because the prosecution incorporated all of its evidence from the guilt phase at the penalty phase, [(*Id.*, Vol. 16, Tab 23 at 2676-77)], the jury's consideration of the collateral-act evidence was unrestricted at the penalty phase as well.

202.  In his Rule 32 proceedings in state court, Perkins argued that his counsel were ineffective for failing to request a limiting instruction.

Both attorneys testified at the Rule 32 hearing that they did not have a strategic reason not to request a limiting instruction. [(*See id.*, Vol. 63 at 200 (Steverson); *id.*, Vol. 64 at 424-25 (Smith).)]

203. The Alabama Court of Criminal Appeals held that counsel were not ineffective. It reasoned as follows:

> The trial record shows that counsel was aware that he had a right to a limiting instruction on the use of the collateral-act evidence – if he requested one. [(*Id.*, Vol. 11, at 1705.)] This issue was discussed several times during Perkins's trial. Steverson testified at the evidentiary hearing that, although he was unsure, he thought they "made a decision not to ask for a limiting instruction." ([*Id.*, Vol. 63 at] 233.) Counsel did indicate that in hindsight, he thought he should have requested the limiting instruction.

> During closing argument defense counsel argued that the State failed to prove that Perkins had the intent to commit capital murder. Counsel argued that the only evidence presented by the State was that Perkins had been charged with two other rapes, that the State had dismissed one of those charges, and that the jury should not convict Perkins based on an unrelated conviction. It appears that counsel made a strategic decision not to request a limiting instruction on the use of the collateral-act evidence – an instruction that would have emphasized that Perkins's collateral bad acts were admissible to prove his intent.

> . . .

> Here, in closing arguments, counsel used the prior bad act evidence to "bolster [Perkins's] defense." *See Commonwealth v. Delong*, 60 Mass. App. Ct. 122, 131, 799 N.E.2d 1267, 1276 (2003). This Court agrees with the circuit court that Perkins failed to meet his burden of

establishing that counsel was ineffective under *Strickland*. The record supports the circuit court's conclusion that counsel made a strategic decision not to request a limiting instruction; therefore, the circuit court did not abuse its discretion by denying relief.

*Perkins v. State*, [144 So. 3d at 478, 480].

204.    The state court's decision constitutes an unreasonable determination of the facts in light of the evidence in the record, *see* 28 U.S.C. 2254(d)(2), and an unreasonable application of *Strickland*, *see* 28 U.S.C. 2254(d)(1).

205.    The state court's factual error is objectively unreasonable. The court asserted that counsel Steverson "testified at the evidentiary hearing that, although he was unsure, he thought they 'made a decision not to ask for a limiting instruction.' (R. 233.)" *Perkins*, [144 So. 3d at 478. The state court then asserted that "[i]t appears that counsel made a strategic decision not to request a limiting instruction on the use of the collateral-act evidence – an instruction that would have emphasized that Perkins's collateral bad acts were admissible to prove his intent." *Id.* Those findings are based on a mistaken and unreasonable interpretation of the record.

206.    When Steverson stated, "I think we made a decision not to ask for a limiting instruction," he was not referring to an instruction regarding the guilt-phase collateral evidence. He was instead referring to a prosecutor's comment at a different time in Perkins's trial. He testified as follows regarding the instruction at issue in this claim:

Q:    . . . [D]o you actually remember . . . arguing to the court not to  allow the admission of the two [collateral] rapes?

A:    Yes.

135

Q:    Okay. Why did you want to prevent admission of the two alleged rapes . . . ?

A:    Because that certainly was going to enhance Mr. Perkins'[s] – the conviction of Mr. Perkins. It was going to inflame the jury.

. . .

Q:    [When the 404(b) evidence was first presented to the jury through witnesses and exhibits,] you did not request a limiting instruction from the Court regarding how the jury was to use and consider the 404(b) evidence. Did you understand at the time that if you requested an instruction that you were entitled to one?

A:    That I was entitled to one?

Q:    Yes.

A:    Yes.

Q:    . . . [D]o you recall having a strategic or tactical reason for not asking for a limiting instruction on the 404(b) rape evidence when this evidence was first introduced?

A:    No, I don't.

. . .

Q:    [Before the case was submitted to the jury for guilt phase deliberations,] you also did not request a limiting instruction regarding all the 404(b) evidence. At that time, do you recall having any strategic or tactical reason for not asking for an appropriate limiting instruction on the rape evidence . . . ?

A:     No, I don't recall.

Q:     . . . [T]he assistant district attorney[] moved all the evidence from the guilt phase into the penalty phase. Do you recall at that point any strategic or tactical reason you may have had for not asking for a limiting instruction about how the jury was to use that 404(b) rape evidence . . . ?

A:     No.

[(Doc. 10, Vol. 63 at 198-201.)]   Thus, Steverson did not testify regarding *this* matter that he "made a decision not to ask for a limiting instruction." *Perkins*, [144 So. 3d at 478].  He testified that he did not remember any decision-making process or any reason not to ask for the instruction.

207.   The testimony quoted by the state court came when Steverson was being questioned on a separate issue.  While on the witness stand, Steverson had been given pages 2943 through 2950 of the trial transcript.  [(*See* doc. 10, Vol. 63 at 232.)]

208.   In the exchange transcribed on those pages, defense counsel moved for a mistrial at the close of the penalty phase.  They did so based on the prosecution's comment in its penalty phase opening statement that the alleged victim in Perkins's prior second-degree rape case, which had been offered to establish an aggravating circumstance, [(*id*., Vol. 2, Tab 3 at 348)], was a "mentally deficient fourteen year old," [(*id*., Vol. 17, Tab 28 at 2776)].  The prosecution responded that a mistrial would be inappropriate in part because defense counsel had not even asked for a "limiting instruction[]" regarding the prosecution's comment.  [(*Id*., Tab 31 at 2944.)]  By "limiting instruction[]," the prosecution meant "curative instruction," which the trial court quickly clarified.  [(*Id*. at 2945.)]

209.   When Steverson reviewed those pages at the Rule 32 hearing and addressed that exchange, he said, "Now, I have to go back,

because when I look at the transcript . . . even when the judge talks about a limiting instruction, I think we made a decision not to ask for a limiting instruction." [(*Id.*, Vol. 63 at 233.)] Read in context, that statement unquestionably concerned a curative instruction regarding the prosecution's improper comment about the second-degree rape case—which occurred during the prosecution's *penalty phase* opening statement. Steverson's quoted testimony had nothing to do with a limiting instruction regarding the collateral evidence presented at the guilt phase.

210. By concluding that counsel made a strategic decision not to request a limiting instruction concerning collateral evidence based on testimony about a different subject, the state court made an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2).

211. The state court's ruling that Perkins's counsel were not deficient is also an unreasonable application of *Strickland* because counsel could not have made a reasonable strategic decision not to request a limiting instruction given the circumstances. *See* 28 U.S.C. § 2254(d)(1).

212. Since long before Perkins's trial, Alabama law has recognized the extreme dangers of collateral-act evidence. As Alabama's courts stated repeatedly in the 1980s and early 1990s:

> [The general rule excluding collateral-act evidence] is simply an application of the character rule which forbids the state to prove the accused's bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.

*Ex parte Arthur*, 472 So. 2d 665, 668 (Ala. 1985) (quoting Charles W. Gamble, *McElroy's Alabama Evidence* § 69.01(1) (3d ed. 1977)); *see also*, *e.g.*, *Ex parte Smith*, 581 So. 2d 531 (Ala. 1991) (same quote and

reversing conviction); *Ex parte Cofer*, 440 So. 2d 1121, 1123 (Ala. 1983) (same quote and reversing conviction). The reality that collateral-act evidence "has almost an irreversible impact upon the minds of the jurors" is reflected not only in Alabama case law, but also in the most widely used evidence treatise in Alabama. *See* Gamble, *supra*, at § 69.01(1).

213. Because Alabama law permits collateral-act evidence in certain circumstances, it provides an important safeguard – limiting instructions – to reduce the dangers described above. When a party is permitted to present collateral-act evidence, the opposing party is entitled to an instruction to the jury stating that the collateral-act evidence is relevant only for a specific purpose and is not relevant for other purposes, such as to show that the defendant has bad character. *See King v. State*, 521 So. 2d 1360 (Ala. Crim. App. 1987). Limiting instructions are considered effective in Alabama, as jurors are presumed to follow them. *See Johnson v. State*, 612 So. 2d 1288, 1299 (Ala. Crim. App. 1992)("The law presumes that jurors follow their instructions."); *First Bank of Childersburg v. Florey*, 676 So. 2d 324, 331(Ala. Civ. App. 1996)(holding that a limiting instruction cured an error in the admission of collateral evidence). Like the dangers of collateral-act evidence, the availability of limiting instructions was well known among Alabama attorneys at the time of Perkins's trial. In fact, the State conceded at trial that Perkins was entitled to a limiting instruction if his counsel requested one. [(*See* doc. 10, Vol. 11, Tab 16 at 1704-05.)]

214. In light of the dangers of collateral-act evidence, the availability of limiting instructions, and counsel's approach to the collateral-act evidence, counsel could not have made a reasonable strategic decision not to seek a limiting instruction in this case. A limiting instruction would have supported the defense's position. Counsel argued that the jurors should not find that Perkins committed capital murder simply because they thought he was a "bad person," [(*id.*, Vol. 145, Tab 22 at 2634)]; a limiting instruction would have supported that argument. Counsel argued that the jurors should not find that Perkins committed capital murder because they had an emotional

response to the collateral acts, [(*id.*, Vol. 16 at 2656)]; a limiting instruction would have supported that as well. The fact that counsel sought to diffuse the collateral act evidence in a way that would have been supported by a limiting instruction from the court demonstrates that any decision not to seek a limiting instruction would have been objectively unreasonable. *See Wiggins v. Smith*, 539 U.S. 510, 536 (2003)(holding under AEDPA that counsel's failure to pursue a certain line of investigation was unreasonable because counsel had "had every reason" to pursue that line of investigation given their strategy); *Williams v. Allen*, 542 F.3d 1326, 1340 (11th Cir. 2008)("Given that counsel's sentencing case focused on establishing that Williams had a troubled background, they had every incentive to develop the strongest mitigation case possible."). The fact that counsel also did not request a limiting instruction at the penalty phase only further demonstrates that counsel's failure was unreasonable.

215. For all the reasons set forth above, Perkins's counsel performed deficiently, and the state court's decision to the contrary was an unreasonable application of *Strickland*. Because the state court did not address prejudice, this Court must conduct de novo review of that issue. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim de novo . . . .").

216. Counsel's failure to request a limiting instruction was prejudicial for the precise reason courts view collateral evidence as so dangerous – it had "an irreversible impact upon the minds of the jurors." *Ex parte Arthur*, 472 So. 2d at 668. This was not a case in which the collateral evidence was fleeting or impassive; the collateral evidence dominated Perkins's trial in a dramatic and emotional way. The victims provided graphic descriptions of the collateral rapes, and investigators and medical personnel testified extensively about physical evidence and rape kits. As defense counsel stated, "[i]t was almost like we were trying those cases," not the capital murder case. [(Doc. 10, Vol. 64 at 422.)]

217.    In cases like this one, where collateral evidence overwhelmed the trial and defense counsel failed to request a limiting instruction to prevent jurors from misusing that evidence, courts have found prejudice under *Strickland*. The defining feature of these cases is that the collateral evidence was extensive and emotional. *See Commonwealth v. Billa*, 555 A.2d 835, 843 (Pa. 1989) (granting a new trial where counsel failed to request a limiting instruction concerning collateral evidence that was "extensive and inflammatory"); *Ex parte Aguilar*, No. AP-75526, 2007 WL 3208751, at *14 (Tex. Crim. App. Oct. 31, 2007) ("[I]n most cases, counsel's failure to request limiting instructions might not constitute ineffective assistance. In the present case, however, it was tantamount to ignoring the proverbial 800-pound gorilla in the room."). Given the dominant role of the collateral-act evidence in Perkins's trial, the lack of guidance provided to the jury about the limited purpose of the evidence prejudiced Perkins. A limiting instruction would have ensured that the inherently prejudicial collateral evidence did not overpower the jury, altering the whole picture of the evidence and creating a reasonable probability of a different result. Counsel's deficient performance was prejudicial under *Strickland*. Therefore, Perkins is entitled to relief under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

(*Id*. ¶¶ 199-217 [emphasis in original].)

The Rule 32 court held:

Trial counsel made a strategic decision not to request a limiting instruction regarding the introduction of collateral bad act evidence. The closing arguments of Mr. Smith and Mr. Steverson fully explained the burden of proof and the limited use of the prior conviction, and made use of the evidence in a manner they reasonably thought could be of value to the Petitioner. There is no evidence a limiting instruction from the court would have impacted the jury decision in any manner.

(Doc. 10, Vol. 56, Tab 135 at 4493.)   The Alabama Court of Criminal Appeals affirmed the decision. *Perkins*, 144 So. 3d at 478-80.

As set forth above, a petitioner seeking to vacate his conviction based on ineffective trial counsel must prove both that counsel's performance was deficient and that their deficient performance prejudiced the petitioner. *Chandler*, 218 F.3d at 1313. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687.

> Under § 2254(d)'s "unreasonable application" clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied *Strickland* incorrectly. Rather, it is the habeas applicant's burden to show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner. An "*unreasonable* application of federal law is different from an *incorrect* application of federal law."

*Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002).

As to Perkins's claim that his trial counsel were ineffective for failing to ask for a limiting instruction, the court finds the Alabama court's decision, that Perkins's counsel were not constitutionally ineffective, was reasonable.

The court applies a presumption that trial counsel's conduct "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id*.

"[T]he decision not to request a limiting instruction is solidly within the accepted range of strategic tactics[27] employed by trial lawyers in the mitigation of damning evidence. If the lawyer cannot stop the evidence from being admitted, it is perfectly rational to decide not to draw further attention to it by requesting a motion for limiting instruction." *United States v. Gregory*, 74 F.3d 819, 823 (7th Cir. 1996)(citing *Biggerstaff v. Clark*, 999 F.2d 1153, 1155 (7th Cir. 1993)). Citing to testimony that Stevens could not recall a strategic reason for not asking for a limiting instruction, Perkins argues that the state court's factual determination that the failure to ask for a limiting instruction was a strategic decision was unreasonable. The court disagrees.

The decision not to request a limiting instruction is "presumed" to be sound trial strategy. *See Burt v. Titlow*, 571 U.S. 12, 23 (2013)("It should go without saying

---

[27]"[A] strategic decision is a 'conscious, reasonably informed decision made by an attorney with an eye to benefitting his client.'" *Cox v. Donnelly*, 387 F.3d 193, 198 (2d Cir. 2004)(quoting *Pavel v. Hollins*, 261 F.3d 210, 218 (2d Cir. 2001)).

that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'")(quoting *Strickland*, 466 U.S. at 689). As the Eleventh Circuit has noted:

> The relevant question under *Strickland*'s performance prong, which calls for an objective inquiry, is whether any reasonable lawyer could have elected not to object for strategic or tactical reasons, even if the actual defense counsel was not subjectively motivated by those reasons. *See Chandler v. United States*, 218 F.3d 1305, 1315 & n.16 (11th Cir. 2000) (en banc)(explaining that "[t]he reasonableness of a counsel's performance is an objective inquiry," which asks "whether some reasonable lawyer could have conducted the trial in that manner" and requires a petitioner to show that "no competent counsel would have taken the action that his counsel did take"); *accord Harrington v. Richter*, [562] U.S. [86, 110], 131 S. Ct. 770, 790, 178 L. Ed. 2d 624 (2011)("*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.").

*Castillo v. Fla., Sec'y of Dept. of Corrections*, 722 F.3d 1281, 1285 n.2(11th Cir. 2013). Therefore, "[a]lthough courts may not indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions." *Harrington*, 562 U.S. at 109 (citing *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003)).

Counsel's testimony, that they do not remember what their strategy was, does not overcome this presumption – especially in light of counsel's testimony that they knew they were entitled to a limiting instruction if requested.

> . . . [I]n habeas proceedings, unlike direct appeals, the petitioner bears the burden of establishing his right to relief; [petitioner] must prove the facts necessary to demonstrate his counsel's performance was constitutionally defective. *See Jones v. Walker*, . . ., 540 F.3d 1277, [1292]-93; *Romine* [*v. Head*], 253 F.3d [1349,] 1357 [(11th Cir. 2001)]. Because of this burden, when the evidence is unclear or counsel cannot recall specifics about his actions due to the passage of time and faded memory, we presume counsel performed reasonably and exercised reasonable professional judgment. *Romine*, 253 F.3d at 1357-58; *Williams v. Head*, 185 F.3d 1223, 1227 (11th Cir. 1999).

*Blankenship v. Hall*, 542 F.3d 1253, 1274 (11th Cir. 2008). "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption of effective representation. Therefore, 'where the record is incomplete or unclear about counsel's actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.'" *Grayson v. Thompson*, 257 F.3d 1194, 1218 (11th Cir. 2001)(quoting *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir.2000)(quoting *Williams v. Head*, 185 F.3d 1223, 1228 (11th Cir.1999)))(internal quotations omitted). "The mere absence of the instruction neither overcomes this presumption nor satisfies [petitioner's] burden to show deficient performance."

*Thomas v. Vannoy*, 651 Fed. Appx. 298, 303 (5th Cir. 2016)(citing *Burt*, 571 U.S. 12, 22-23 (2013))(footnote omitted).

Moreover, the decision not to request a limiting instruction is generally a reasonable strategic decision because such an instruction –

> effectively informs the jury, right before deliberations, about the most damning inference they could draw from [the limited purpose evidence. As Judge Easterbrook has explained: "You can't instruct 'Do not draw inference *X*' without informing the jurors that *X* is one possible conclusion from the evidence. To tell jurors not to do something is to ensure they will do it, at least for a while. . . . [R]easonable persons may differ about whether the good such an instruction does with a thoughtful juror will outweigh the harm it can do by fastening attention on a link that may have been overlooked or forgotten." *United States v. Myers*, 917 F.2d 1008, 1010-11 (7th Cir. 1990).

*Vannoy*, 651 Fed. Appx. at 303; *see also United States v. Gregory*, 74 F.3d 819, 823 (7th Cir. 1996)("Indeed, the decision not to request a limiting instruction is solidly within the accepted range of strategic tactics employed by trial lawyers in the mitigation of damning evidence. If the lawyer cannot stop the evidence from being admitted, it is perfectly rational to decide not to draw further attention to it by requesting a motion for limiting instruction."); *Williams v. Armontrout*, 912 F.2d 924, 934 (8th Cir. 1990)("the decision not to request [a limiting instruction on the other crimes evidence] was a reasonable, strategic choice designed to avoid highlighting [defendant's] other undesirable activities").

This court finds that the state court's determination with regard to the performance prong of this ineffective assistance claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Therefore, Perkins's claim for relief based on counsel's failure to request a limiting instruction will be denied.

Also, in this case, the failure to request a limiting instruction did not prejudice Perkins. Because the evidence of the rapes of D.W. and B.P. were admissible to prove motive and intent necessary to prove kidnapping in the first degree, a limiting instruction telling the jury that they could not use the evidence to prove propensity would have made little or no difference in the outcome of Perkins's trial and/or sentence.

Generally, a limiting instruction that is given when evidence is admitted for a specific purpose follows this format: First, the jury is told that the evidence was admitted for a particular and limited purpose and that it can be considered by the jury for that purpose – as proof of the specific element, such as motive or intent. Second, the jury is told the purpose it cannot consider that evidence to prove – such as whether defendant committed the crime alleged in the indictment. *See* 1 Ala. Pattern Jury Instr. Civ. 15.08 (3d ed.)("Some of the evidence in this case is admitted for a

limited purpose.  The evidence (describe the evidence) is admitted only for (describe the purpose).  You cannot consider it (describe what it cannot be used for).  You will consider this evidence with the rest of the evidence, but only for the purpose it was admitted."); *see also* 1A Fed. Jury Prac. & Instr. § 17:08 (6th ed.);[28] Pattern Crim. Jury

---

[28]The following federal pattern limiting instruction is to be used when Rule 404(b) evidence offered is to prove knowledge or intent:

> Evidence that an act was done or that an offense was committed by Defendant _____ at some other time is not, of course, any evidence or proof whatever that, at another time, the defendant performed a similar act or committed a similar offense, including the offense charged in [Count _____ of] this indictment.

> Evidence of a similar act or offense may not be considered by the jury in determining whether Defendant _____ actually performed the physical acts charged in this indictment.  Nor may such evidence be considered for any other purpose whatever, unless the jury first finds beyond a reasonable doubt from other evidence in the case, standing alone, that Defendant _____ physically did the act charged in [Count _____ of] this indictment.

> If the jury should find beyond a reasonable doubt from other evidence in the case that Defendant _____ did the act or acts alleged in the particular count under consideration, the jury may then consider evidence as to an alleged earlier act of a like nature in determining the state of mind or intent with which Defendant _____ actually did the act or acts charged in the particular count.

> The defendant is not on trial for any acts or crimes not alleged in the indictment.  Nor may a defendant be convicted of the crime[s] charged even if you were to find that [he] [she] committed other crimes – even crimes similar to the one charged in this indictment.

Instr. 11th Cir. S4.1 (2016)("During the trial, you heard evidence of acts allegedly done by the Defendant on other occasions that may be similar to acts with which the Defendant is currently charged. You must not consider any of this evidence to decide whether the Defendant engaged in the activity alleged in the indictment. This evidence is admitted and may be considered by you for the limited purpose of assisting you in determining whether [the Defendant had the state of mind or intent necessary to commit the crime charged in the indictment] [the Defendant had a motive or the opportunity to commit the acts charged in the indictment] . . . .").

In this case, the evidence was not disputed that Perkins had abducted Mrs. Gilliam; however, his intent and motive for taking Mrs. Gilliam was disputed. Evidence that Perkins had abducted and raped two women in the days preceding the abduction of Mrs. Gilliam was offered to prove why he had abducted Mrs. Gilliam and what he intended to do with her when he abducted her. Therefore, a limiting instruction would have informed the jury that they could consider the evidence that Perkins had kidnapped and raped two women just days before he took Mrs. Gilliam to prove he intended to rape or sexually abuse Mrs. Gilliam. Because the evidence was admitted for this substantive purpose, the jury would be specifically instructed, in essence, that they could consider the evidence of the rapes of D.W. and B.P. for the purpose of proving that Perkins intended to do the same thing to Mrs. Gilliam and

that was his reason for taking her. *See*, *e.g.*, *United States v. McNeal*, 591 Fed. Appx. 760, 764 (11th Cir. 2014)(Jury instructed "that, if other evidence convinced them beyond a reasonable doubt that [defendant] had committed the charged acts [of drug possession with intent to distribute], they could consider the prior [drug trafficking] convictions for intent, motive, opportunity, plan, preparation, or identity, or to determine whether the acts were committed accidentally."). As for the second part of the limiting instruction, the jury would be told that they could ***not*** consider the evidence for the purpose of finding Perkins was a bad person and/or that they should punish him for his raping D.W. and B.P. *See*, *e.g.*, *id*. (Jury instructed "not to use the prior convictions to determine whether [defendant] committed the charged acts."). Under the circumstances of this case, this distinction between evidence of intent and evidence of propensity does not seem so great as to support a finding by this court that, had it been instructed on the difference, the jury might possibly have returned a different verdict or sentence.

The state court found no such possibility of a different result. This court finds that the state court's determination with regard to the prejudice prong of this ineffective assistance claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for

150

fairminded disagreement." *Harrington*, 562 U.S. at 103. Therefore, Perkins's claim for relief based on counsel's failure to request a limiting instruction will be denied.

## CONCLUSION

The state court's factual findings are supported by the record and must be given deference by this court. Perkins has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner that was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Alabama Court of Criminal Appeals unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Perkins is not entitled to habeas relief on this ground.

### 4. Failure to Investigate and Present Available Mitigating Evidence

In his Petition, Perkins contends that his "trial counsel were ineffective for failing to investigate and present available mitigating evidence in a reasonable manner." (Doc. 1 ¶ 245.) In support of this claim, he alleges:

> 246. Perkins's trial counsel called three witnesses at the penalty phase of the capital trial: Kathleen Snow, Perkins's paternal aunt; Ed Owens, a social worker; and Dr. John Goff, a clinical psychologist.

> 247. Snow testified that Mr. Perkins grew up in a poor family, [(doc. 10, Vol. 17, Tab 31 at 2807)], and received little parental support, [(*id*. at 2797-98)]. She also testified that Perkins's stepfather, Junior

Trawick, sexually abused Perkins's sister, [(*id*. at 2798-99)], and that Perkins told her that when he was seven, he was sexually abused, [(*id*. at 2820-21)]. However, that testimony was undermined on cross-examination because Snow had no firsthand knowledge of the horrors that Perkins experienced and witnessed as a child. Asked if she went to Perkins's childhood home often, Snow replied, "No, sir, not really." [(*Id*. at 2816.)] Asked if Perkins went hungry as a child, Snow replied, "I imagine he did." [(*Id*. at 2808.)] Asked if she witnessed the sexual abuse of Perkins's sister, Snow replied, "No, sir." [(*Id*. at 2817.)] Asked if Perkins witnessed the sexual abuse of his sister, Snow replied, "I couldn't swear that he saw this." [(*Id*. at 2801.)]

248. Owens testified that he attempted to compile a social history of Perkins. [(*Id*. at 2827.)] He explained that he interviewed Perkins and spoke by telephone with Perkins's paternal grandmother and two of Perkins's paternal aunts, including Snow. [(*Id*., Vol. 63 at 303.)] He also reviewed "some medical records [and] records from the court system" that Perkins's trial counsel had provided to him. [(*Id*., Vol. 17, Tab 31 at 2828.)] He testified that Perkins grew up with little parental support, [(*id*. at 2833)]; that there was "pretty extensive alcohol abuse" in Perkins's family, [(*id*. at 2832)]; and that Perkins "alleged . . . violence toward his sister," [(*id*. at 2831)]. But since Owens did not interview any firsthand witnesses to Perkins's childhood home life, he was forced to take the position, with regard to every key fact to which he testified, that he did not have "positive verification that that happened." [(*Id*.)] Owens also provided very little in terms of explaining the significance of Perkins's childhood trauma. Defense counsel asked Owens: "Would [witnessing the sexual abuse of his sister] have an effect on him?" [(*Id*. at 2835.)] Owens replied, "Yes, it would," [(*id*)], but he offered no explanation as to what those effects would have been or why they were relevant to the jury's life and death decision. Finally, Owens provided the jurors with reasons to sentence Perkins to death: he said that Perkins had very little "empathy," "social [conscience]," or "sense of right and wrong." [(*Id*. at 2833.)] Perkins's trial counsel later called those characterizations "killing words."[29] [(*Id*.,

_____

[29]During the Rule 32 hearing, the following exchange occurred between

152

Perkins's trial counsel and his state habeas counsel:

Q  Okay.  Were you – well, were you ultimately satisfied with Mr. Owens performance as a mitigation investigator?

A  No.

Q  Why not?

A  . . . I know he made, at least according to his billing records, a trip to Fayette County and to northern Tuscaloosa County and talked to some family members and I think maybe talked to some family members in Northport of Mr. Perkins.  I think he could have done more along that line and should have done more along that line.  It was – but the main problem was the presentation in the courtroom.  I think the language that he used was not what we expected, and, in fact, may have hurt more than it helped in terms of the penalty phase.

Q  The language that you're referring to in his testimony, is that when Mr. Owens said, yeah, Mr. Perkins had a tough childhood and because of that, you know, he has no empathy, social conscience or morality?

A  Yes, I think he did say that or almost those exact words.  Mr. Perkins did have a horrible childhood, and I don't think maybe he emphasized that enough.  And – but the way he explained what effect that would have wasn't what we were expecting or hoped for.

Q  You had no idea that he was going to say, you know, because of this horrible childhood, you know, the effect that it would have on him is it would make him a person without morality, without empathy and without a social conscience?

A  No.

Q  In your opinion, are those killing words or are those mitigating

153

Vol. 64 at 436.)]

249. Goff testified that Perkins had alcohol dependency and borderline personality disorder. [(*Id.*, Vol. 17, Tab 31 at 2868.)] He stated that although Perkins had a tendency to "blow . . . off" his traumatic childhood, it was "pretty horrible." [(*Id.* at 2876.)] But like Owens, Goff had not spoken with any firsthand witnesses to Perkins's childhood at home besides Perkins. He qualified his discussion of factual matters by stating that certain events "apparently" or "reported[ly]" occurred. [(*Id.* at 2877.)] No additional mitigating evidence was presented on behalf of Perkins at trial.

250. At the Rule 32 evidentiary hearing in state court, Perkins presented evidence concerning his trial counsel's performance as well as mitigating evidence that his trial counsel could have presented but did not.

251. Trial counsel, neither of whom had defended a capital case before, did not conduct the mitigation investigation. Instead, they delegated that responsibility to Owens. [(*Id.*, Vol. 64 at 432-33.)] Owens spent just seventeen hours investigating: two hours interviewing Perkins, three hours interviewing three of Perkins's paternal relatives, four hours reviewing documents, and eight hours, including travel time, seeking additional sources. [(*Id.*, Vol. 61 at 5533 (Owens's fee declaration).)] After sixteen of those seventeen hours, there were still three months until Perkins's trial. But Owens stopped his investigation.

252. Trial counsel provided no supervision for Owens, who was not clear as to what he was supposed to do. Trial counsel knew that Owens, who was not their "first choice for the job," [(*id.*, Vol. 64 at

---

factors?

A. Well, as I said, I think his testimony went – it hurt more than it helped. I think that it's more, as you would say, killing words.

(Doc. 10, Vol. 64 at 434-36.)

433)], had no prior experience conducting a mitigation investigation, [(*id*. at 434)]. Nonetheless, they met with him just twice prior to trial. [(*Id*., Vol. 63 at 293, 308.)] At the first meeting, which was three-and-a-half months before trial, counsel gave Owens "some medical records [and] records from the court system." [(*Id*., Vol. 17, Tab 31 at 2828; *id*., Vol. 63 at P.R. 293.)] Trial counsel did not suggest that Owens obtain any additional documents, [(*id*., Vol. 63 at 293-94)], and they did not provide Owens with any mitigation manuals or guidelines, [(*id*. at 289)]. At the second meeting, which took place three days before the trial began and lasted one hour, Owens provided trial counsel with the first and only version of his report. [(*Id*. at 308-10; *id*., Vol. 60 at 5533.)]

253. At the Rule 32 hearing, trial counsel acknowledged that Owens performed inadequately as a mitigation investigator, [(*id*., Vol. 64 at 434)], stating that Owens "should have done more," [(*id*. at 435)]. However, trial counsel did not ask Owens to do more. They never asked Owens to spend more time looking for witnesses or requesting records, [(*id*., Vol. 63 at 293-94, 305-06)], they never spoke with Owens about his report until he submitted the final version, [(*id*. at 310)], and they never explained to Owens "the theory of mitigation" in the case, [(*id*. at 290)]. Even when Owens asked trial counsel for information, trial counsel failed to respond. [(*Id*. at 308.)] Owens testified at the Rule 32 hearing that he assumed that if there was more to do, trial counsel would have told him to do it, especially since they knew that this was his first mitigation investigation. [(*Id*. at 294-95.)]

254. Goff's experiences were similar to Owens's. He asked trial counsel for assistance repeatedly and received none. At the Rule 32 hearing, he authenticated two letters that he wrote to trial counsel prior to Perkins's capital trial. [(*Id*. at 345-46.)] In the first, he complained about the lack of collateral information that he had received. [(*Id*., Vol. 65 at 175.)] In the second, he complained that given the time constraints imposed by the prison on his visit with Perkins, he might not be able to finish his evaluation. [(*Id*. at 176.)] Counsel did nothing to alleviate Goff's concerns. Goff never received sufficient collateral information, [(id., Vol. 63 at 340)], and as he feared, he did not complete his evaluation of Perkins, [(*id*. at 351-52)]. Asked if he was able to provide

adequate services in this case, Goff replied, "Absolutely not." [(*Id*. at 355.)]

255. As a result of their lack of communication, trial counsel did not know what Owens and Goff intended to say in their testimony prior to calling them. Smith, the attorney who examined Owens at trial, testified at the Rule 32 hearing that he had "no idea" that Owens was going to say that Perkins failed to develop morality, empathy or a social conscience on account of his dysfunctional childhood. [(*Id*., Vol. 64 at 435-36.)] Thus, Smith elicited what he later called "killing words" from his own witness. [(*Id*. at 436.)] For his part, Owens testified at the Rule 32 hearing that he would have been willing to explain how growing up in an environment defined by sexual abuse would have affected a person like Perkins, but trial counsel never asked him to do so. [(*Id*., Vol. 63 at 316.)]

256. Perkins presented, at the Rule 32 hearing, the firsthand, corroborated evidence that his trial counsel failed to present. Perkins's sister, Kathy Hocutt, offered graphic evidence concerning Perkins's childhood life at home. [Footnote 57] Her testimony was not speculative, or qualified with words such as "apparently" or "reportedly." She was a firsthand witness to the events she described. She testified:

> Roy and I grew up surrounded by violence, sexual abuse, alcohol and drug abuse, and poverty. We were beaten. We had knives thrown at us. We were shot at. At times we had to run into the woods to prevent our own step-father from killing us. And from the time Roy was 5 until he was forced to leave home for good at age 11, he heard and saw me being raped by my step-father. I don't think that there was one day when Roy and I were safe, or loved, or taken care of.

[(*Id*., Vol. 60 at 5273-74.)] Hocutt explained that their mother and Junior Trawick, their stepfather, "spen[t] all of the family's money on

alcohol." [(*Id*. at 5274.)] [Footnote 58] She then testified as to the violence that ensued when Trawick drank:

> When he was drunk, Junior . . . would beat Roy all the time, and he beat my mother all the time. And for many years, he raped and beat me on a regular basis. . . .
>
> I remember one night my mother and Junior were both drunk and they started fighting. Junior threw his knife at my mother and it stuck in the wall right above my mother's head. Roy and I were really scared. Another night . . . we saw Junior drag my mother from the living room into their bedroom. Junior kept my mother on the floor and tied her hands to the legs of the bed with a rope. Then Junior started hitting my mother in the face with his fists. . . . After Junior untied my mother, she and Roy and I went and spent the night at Granny's. No one ever talked about what happened, we just sat down and started watching TV. It was like nothing ever happened. . . .
>
> When Junior started getting angry, Roy and I would try to run away . . . into the woods. . . . I remember one time when Roy was five years old that Roy couldn't get away from Junior. I saw Junior beat Roy badly with his belt. Roy had big red stripes on his back where the belt had bruised him and had even drawn blood. It took a long time for the marks to go away. If we did get away from the house . . . most of the time [Junior] shot at Roy and me from the porch as we ran into the woods to hide. It was really scary when he shot at us, and I was afraid he would shoot me or Roy in the back as we were running away from him. . . .
>
> . . . Junior would hit Roy, throw knives at him, and shoot at him.

[(*Id*. at 5274, 5279-82.)] Hocutt also testified about the sexual abuse that occurred when Trawick drank:

> [W]hen Junior was drunk he also raped me. For over ten years when Roy and I were growing up, Junior raped me. He raped me just about every time he got drunk which was most nights. . . .
>
> I remember the first time Junior raped me and I remember seeing Roy watching it happen. . . . I was 8 years old at the time. Roy was 5 years old at that time. Junior, Roy and I were all sleeping in the car . . . . Junior and I were in the front seat and he raped me. I remember Roy. He was in the back seat. He was looking over at me in the front seat. I could see that he was crying. I don't remember if I put up a fight or screamed because I was so young I didn't even know what was happening. I didn't know what sex was.

[(*Id*. at 5282-83.)] Hocutt continued:

> When Junior raped me, it hurt and he made me bleed. I threw away my bloody panties, then stuffed toilet paper inside me to stop the bleeding and put on new panties.
>
> Almost every day, Roy would hear me yelling and screaming as Junior raped me. There was nothing Roy could do to stop Junior from raping me. He was just a little boy. If Roy had ever tried to intervene, Junior would have beaten Roy, threatened to kill him and kicked him out of the house at gunpoint.
>
> . . .
>
> When Roy was about 12 years old, Roy came into the house and he saw Junior on top of me, raping me. My mother was passed out on the sofa in the living room. Roy

left and he called the police on Junior. Roy knew that Junior would be very, very angry, but I think that Roy didn't care anymore what Junior was going to do to him. I think he just wanted Junior to stop raping me.

So Roy called the police. . . . Junior told me that if I told the police what he was doing to me, he would kill my mother. He said he would cut off my mother's head. . . .

. . . The police officers asked me if Junior was abusing me. I told them that Junior was not abusing me. I said there was nothing going on because I was scared and I didn't have anyone to help me understand.

. . . Roy was there when the police came and talked to me. He was really mad when I lied to the police, but he didn't know that Junior told me that he would cut off our mother's head if I told anyone. I never got to explain it to Roy.

[(*Id*. at 5285-87.)]

[Footnote 57:] Hocutt affirmed that she was living in Berry, Alabama, at the time of Perkins's trial, and that if anyone had gone to interview her, she would have told them everything she said in her Rule 32 testimony. [(*Id*. at 5289.)] [Rule 32 court found, "it's established for purposes of this record that Kathy Hocutt says she wouldn't have come to trial. At best, she would have given an affidavit in the case." (*Id*., Vol. 64 at 482.)]

[Footnote 58:] Hocutt explained the drinking: "Every day when I came home from school, Junior would already be drunk. . . . My mother usually drank one case of beer a day. Junior usually drank one bottle of whiskey and a few beers a day." [(*Id*., Vol. 60 at 5275.)]

257. Finally, Hocutt explained the appalling poverty and deprivation in which she and Perkins grew up. She testified: "Many people in Berry, Alabama were poor, but we were the poorest people in town." [(*Id*. at 5276.)] Hocutt did not get a toothbrush until she was in third grade, and she never had clean clothes. [(*Id*. at 5276-77.)] When she and Perkins rode the bus to school, Hocutt testified, the other students "would hold their noses when we walked by and they said we stank." [(*Id*. at 5277.)]

258. Perkins also presented numerous records at the Rule 32 hearing that provided corroborative and objective accounts of his childhood. His school records demonstrate serious academic struggles. *See* [(*id*, Vol. 56 at 4579-85] (elementary school records demonstrating that while Perkins obtained grades of A, B, and C in conduct, he obtained mostly grades of D and F in spelling, language and grammar, social studies, science, and other substantive subjects). Records from the Fayette County Juvenile Court document that his mother lived in "what appears to be extreme poverty," that his childhood home was "little more than a shack," and that "the inside of the home is ill kept with dirty clothes[,] dishes and articles of every sort [strewn] around at random," [(*id*. at 4758)]. The criminal records of his stepfather, Trawick, demonstrate Trawick's violent tendencies. [(*Id*., Vol. 57 at 4723-37.)]

259. In addition, Perkins presented records from the Alabama Department of Corrections. [(*Id*., Vol. 57 at 4778-4800, Vol. 58, Vol. 59 at 5001-53 (medical records); *id*., Vol. 59 at 5054-5200, Vol. 60 at 5201-32 (corrections records).)] Those documents demonstrate that Perkins adjusted positively to life in prison when he was incarcerated prior to the events that led to the capital case. In its reports, the department noted that Perkins had "no history of institutional violence," [(*id*., Vol. 59 at 5083)], was "doing excellent work," [(*id*. at 5113)], and was "cooperative and polite" as an inmate, [(*id*. at 5069)].

260. Perkins also presented expert testimony at the Rule 32 hearing to explain what was never explained at trial: the effects of his traumatic and horrific childhood. Dr. Susan Strickland, a clinical social

worker employed as a sex offender specialist by the Georgia Department of Corrections, testified at the Rule 32 hearing. She explained that children develop their future sexual behavior from "the values and the interaction patterns that are going on around [them]," [(*id.*, Vol. 64 at 518)], and where the patterns around them involve sexual trauma, children "create or choose coping mechanisms that are readily available or are easily attainable within their environment," [(*id.* at 514-15)]. Strickland pointed out that early on, Perkins responded to the abuse he suffered and witnessed by running to the woods. [(*Id.* at 515.)] As he got older, he turned to disassociation through substance abuse, [(*id.* at 515-16)], which along with other risk factors exacerbated his unhealthy sexual development, [(*id.* at 520-25)]. Strickland further explained that while the effects of Perkins's traumatic childhood would manifest themselves with tragic consequences in society, they would not do so in prison. Relying in part on Perkins's prison records, [(*see id.*, Vol. 57 at 4778-4800, Vol. 58, Vol. 59, and Vol. 60 at 5201-32)], she explained that Perkins's behavior in prison was positive, and likely would continue to be positive, because prison provides the structure and constraints he needs, [(*id.*, Vol. 64 at 529-33)].

261. Perkins argued in the Rule 32 proceedings that his counsel were ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), because they failed to investigate and present available mitigating evidence and that failure prejudiced the defense. The Alabama Court of Criminal Appeals provided a description of counsel's investigation and the substantive evidence presented and held that counsel were not ineffective. *Perkins v. State*, [144 So. 3d 457, 484-92] (Ala. Crim. App. Nov. 2, 2012). It stated:

> This Court has thoroughly reviewed both the mitigation evidence presented at Perkins's sentencing hearing and the alleged omitted mitigation evidence and is confident that the omitted mitigation was, in large part, cumulative to the testimony that was presented at Perkins's sentencing hearing and would not have affected the jury's recommendation of death in this case.

Accordingly, this Court cannot say that counsel's actions were deficient or that Perkins suffered any prejudice as a result of counsel's actions. *Id.* at [491].

262. The state court's ruling constitutes an unreasonable application of clearly established federal law, *see* 28 U.S.C. § 2254(d)(1), and an unreasonable determination of the facts, *see* 28 U.S.C. § 2254(d)(2).

(Doc. 1 ¶¶ 246-62 and nn. 57-58 [footnote added; internal footnotes omitted except as noted].)

The Alabama Court of Criminal Appeals held:

In sentencing Perkins to death, the circuit court found the existence of three statutory aggravating circumstances: (1) that the murder was committed during the course of a kidnapping, § 13A-5-49(4), Ala. Code 1975; (2) that the murder was committed while Perkins was under a sentence of imprisonment, § 13A-5-49(1), Ala. Code 1975; and (3) that Perkins had previously been convicted of [a] felony involving the use or threat of violence to another person, § 13A-5-49(2), Ala. Code 1975. As statutory mitigation, the circuit court found that Perkins's capacity to appreciate the criminality of his conduct was substantially impaired, see § 13A-5-51(6), Ala. Code 1975. The circuit court found the following nonstatutory mitigating circumstances to exist:

"(1) that Perkins took Mrs. Gilliam to the Hood residence after shooting her; (2) that Perkins was drinking and taking drugs during the timeframe within which the offense was committed; (3) that Perkins suffers from borderline personality disorder, is of borderline intelligence, and possibly has organic brain dysfunction; (4) that Perkins was under some degree of mental or emotional disturbance, although not an extreme degree; (5) that Perkins had a traumatic childhood and lacked socialization; (6) that

Perkins's IQ is 76; and (7) that Perkins's family was poverty-stricken when he was growing up."

*Perkins*, 808 So. 2d at 1141-42.

This Court has thoroughly reviewed both the mitigation evidence presented at Perkins's sentencing hearing and the alleged omitted mitigation evidence and is confident that the omitted mitigation was, in large part, cumulative to the testimony that was presented at Perkins's sentencing hearing and would not have affected the jury's recommendation of death in this case. *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003).

*Perkins*, 144 So. 3d at 491.

As set forth above, a petitioner seeking to vacate his conviction based on ineffective trial counsel must prove both that counsel's performance was deficient and that the deficient performance prejudiced the petitioner. *Chandler*, 218 F.3d at 1313. "Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687. "Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the [petitioner] cannot meet the prejudice prong, or vice versa." *Holladay*, 209 F.3d at 1248. In this case, Perkins has not shown that he was prejudiced by counsel's alleged errors in investigating and

presenting mitigating evidence; therefore the court pretermits discussion of whether the alleged errors constituted deficient performance under *Strickland*.

"Under *Strickland*, a defendant is prejudiced by his counsel's deficient performance if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Porter v. McCollum*, 558 U.S. 30, 40 (2009)(quoting *Strickland*, 466 U.S. at 694). That is, a petitioner "must show that[,] but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence," and "[t]o assess that probability, [the court] consider[s] the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – and reweigh[s] it against the evidence in aggravation." *Id*. at 41 (quoting *Williams*, 529 U.S. at 397-98)(internal quotations omitted).

Perkins alleges that he was prejudiced by counsel's failure to talk to his sister and to present her testimony during the penalty phase of his trial. At the Rule 32 stage, Perkins filed the affidavit of his sister, Kathy Hocutt. The affidavit contains the first-hand account of the horrifying childhood of Ms. Hocutt and Perkins, her brother, including continuing violent sexual abuse by her stepfather, a neglectful alcoholic mother, and extreme poverty and deprivation. Perkins argues that Ms. Hocutt's first-hand testimony "is significant because the three witnesses who testified

at [his penalty phase – Ms. Snow, Mr. Owens, and Dr. Goff –] admitted that they [had] based their testimony[,] not on personal observations, but on reports from either secondhand sources or from Perkins." (Doc. 15 at 115 [citing doc. 10, Vol. 17, Tab 31 at 2966; *id*., Vol. 18, Tab 34 at 2981].) As previously noted, however, Ms. Hocutt was unable to testify in person before the sentencing jury, (*see* doc. 10, Vol. 64 at 482); therefore, her testimony, by necessity, could only be presented secondhand by her written statement, the admissibility of which was doubtful at the time of Mr. Perkins's trial, or through another person, whose testimony would be subject to challenge as hearsay.

Even if Ms. Hocutt's statements had been admitted and considered by the sentencing jury and the trial judge, the weight of that evidence to mitigate Perkins's punishment is limited by the remoteness of the abuse and poverty suffered by Perkins as a child to the adult Perkins's murder of Mrs. Gilliam. *See Anderson v. Sec'y, Fla. Dep't of Corr.*, 752 F.3d 881, 908 (11th Cir. 2014)("Although evidence of sexual abuse may constitute a mitigating circumstance, '[w]hen a defendant is several decades removed from the abuse being offered as mitigation evidence its value is minimal.'")(quoting *Callahan v. Campbell*, 427 F.3d 897, 937 (11th Cir. 2005)); *Callahan*, 427 F.3d at 937 ("The mitigation evidence offered at the Rule 32 hearing primarily concerned physical abuse Callahan suffered as a child, yet Callahan was 35

when he committed the crime. When a defendant is several decades removed from the abuse being offered as mitigation evidence its value is minimal." (citing *Francis v. Dugger*, 908 F.2d 696, 703 (11th Cir. 1990)); *Francis*, 908 F.2d at 703 ("Given the particular circumstances of this case including, among other things, the fact that [defendant] was thirty-one years old when he murdered [the victim], evidence of a deprived and abusive childhood is entitled to little, if any, mitigating weight." (citing *Francois v. Wainwright*, 763 F.2d 1188, 1191 (11th Cir. 1985)); *Washington v. State*, 95 So. 3d 26, 45 (Ala. Crim. App. 2012)("Moreover, Washington was 55 years of age when he committed the murders. We question, as have other courts, the mitigation value of evidence of school records and childhood experiences when a defendant is 55 at the time of the offense.")(citing *Francis*, 908 F.2d 696, 703). *See also Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982) ("Eddings was a youth of 16 years at the time of the murder. Evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation. In some cases, such evidence properly may be given little weight. But when the defendant was 16 years old at the time of the offense there can be no doubt that evidence of a turbulent family history, of beatings by a harsh father, and of severe emotional disturbance is particularly relevant.").

In this case, "[t]he sentencing jury [and the trial judge were] . . . 'well acquainted' with [Perkins's] background," of a horrific and impoverished childhood. *See Wong v. Belmontes*, 558 U.S. 15, 23 (2009). The second-hand account of Ms. Snow, as well as testimony of Dr. Goff and Mr. Owens, presented an accurate picture of Mr. Perkins's past, which was credited by the trial court. Indeed, the sentencing judge found these "non-statutory mitigating circumstances" existed: (1) Perkins "lacked socialization and had a horrible childhood, involving the death of his father, the drowning of his brother in his presence, the sexual abuse of his sister by his stepfather in his presence, physical abuse of Defendant by his stepfather, being run away from home at a very early age and being sexually abused," and (2) Perkins "and his family were very poor, and Defendant had to 'raise himself'[, and] [h]is mother and stepfather and other family members were alcoholics." (Doc. 10, Vol. 2 at 352-53.) Due to Ms. Hocutt's inability to testify in person, the benefits of presenting her testimony second-hand, even if admissible, "would have offered an insignificant benefit, if any at all." *See Wong*, 558 U.S. at 22-23 (Court of Appeals held that trial counsel "should have presented more humanizing evidence;" Supreme Court found that trial counsel had presented "substantial mitigation evidence, much of it targeting [a] 'humanizing' theme," and that "[a]dditional evidence on this [theme] would have offered an insignificant benefit, if any at all").

The court also finds that counsel's failure to offer expert testimony that Perkins would not present a danger in prison did not prejudice Perkins. Such evidence would not have altered the balance between the aggravating and mitigating circumstances. Dr. Strickland's testimony at the R. 32 hearing, explaining the effects of his childhood on Perkins's development and her conclusion – that he would not be dangerous in prison – was "neither complex nor technical" and her conclusions "required only that the [sentencer] make logical connections of the kind a layperson is well equipped to make" between information already in evidence. *Id*. at 24. "The [sentencer] simply did not need expert testimony to understand [that Perkins would not be dangerous in prison]; it could use its common sense or own sense of mercy." *Id*. at 23-24. This seems to be a straight-forward conclusion because all of Perkins's past violent or dangerous acts have been visited upon women, and, in prison, he would have little, if any, opportunity to violate another woman. Nevertheless, considering Dr. Strickland's testimony, the court finds it would not significantly change the balance of aggravating and mitigating factors.

When asked "[w]hy [Perkins's] behavior [was] so different in prison," Dr. Strickland responded –

> because it provides this external structure. It provides rules and regulations that Mr. Perkins is unable to attain on his own. . . . He doesn't have internal structures to control his impulses, control his

drinking, control these messages and scripts that he's created over his lifetime.

(Doc. 10, Vol. 64 at 529-30.) Her testimony, however, was not so different in meaning from the so-called "killing words" of Owens's testimony. At the penalty phase, Mr. Owens testified:

> Q Mr. Owens, explain how a – well what the term – What does the term, socialization, mean?
>
> A Okay. I guess, simply, it means the learning that we go through as individuals that help us to function in society the way society expects us to function based on the general society or possibly our subculture that we may live in. We would learn things, like, right and wrong, sex roles, how to get along with other people, what's an acceptable way to deal with angry or aggressive kind of feelings, just those types of – just general – everyday life that we live or socialize.
>
> . . .
>
> Q What type of things enter into that?
>
> A Well interactions we have with our parents, community peers. Of course, during the early stages, parents are the most important people that we come in contact with. I think it's fairly accepted that children go through various developmental stages. During the first year, you would form a secure kind of attachment, hopefully, with your parents, your primary care giver, whoever that may be. From one to three years, not all of the developmental things but some of the more important ones, you would begin to develop problem-solving skills, the ability to empathize with others. And then as years go by, somewhere between the seventh and the twelfth year, one of the more important things you learn is a sense of right and wrong. You begin to internalize that.
>
> Q What do you mean by internalize that?

169

A   Well, to just know it without somebody having to tell you that's right or that's wrong.  I guess, develop . . . morality, just a sense of right and wrong so if you walk into a situation, something is going on, you would have a feeling of whether it was right or wrong that you participate in it or observe it.

Q   All those factors that you mentioned, the family, the environment, would have an influence on a person's morality.

A  Sure.  The literature indicates that people – children – who fail to form that sense of attachment that I talked about during that first year or so of their life tend to have problems.  They exhibit poor social adjustment, have problems handling aggression, have significant problems handling impulse control.  They have very poor impulse control.

. . .

Q   Is there – What effect, if any, would a child being abused or witnessing abuse of a sibling have on their morality or socialization?

A   Well all those things would weaken their sense of or understanding of right and wrong.  In fact, again, literature indicates that witnessing physical assaults between parents or other siblings by the adults weakens their allegiance to societal norms.  The actual assault against a child would, basically, weaken the bond between the parent and the child.

Q   Is it fair to say that we learn, from our parents how to react to a situation?

A  Sure, I would think so.

. . .

Q   Based on all the information that you gathered and all the sources that you had, what is your, assessment, your social assessment, of Mr. Perkins'[s] younger life?

A   Well it sounds as if he grew up with very little, if any, nurturing or support.  Descriptions were that he was out of home more than he was there from the time he was seven years of age on up.  There would have been more than likely been very little bonding with the primary care giver.  And because of the fact that he was not receiving the nurturing that he needed during the early years, would feel there would be delays at best in his developmental stages, probably some area of deficit, things like empathy, social conscious, a sense of right and wrong.  Problem solving skills would probably be weak.

Q   So based upon those factors, you feel that it would have a definite impact on Roy Perkins as he was in 1990.

A   As an adult, yes.

Q   Tell us, again, specifically, what influence that would or what you would expect.

A   Well he would have a – like I say have – difficulties empathizing with other people.  He would have problems handling aggressive behavior, poor impulse control, poor interpersonal skills.  The environment that he grew up in would – as described would – tend to socialize him to accept violence as a normal and acceptable behavior as a way to deal with problems, as a method of problem solving.

. . .

Q   What do you mean by empathizing with other people?

A   Well, you know, empathize would be to be able to see things from their perspective, to feel or understand how they might feel about something, a problem. a situation.

. . .

Q  Would it be fair to say that Roy Edward Perkins never had a sense of compassion?

A  . . . I would think that it would be at least impaired.

Q  What do you mean by impaired?

A  Well, would not have as possibly the same level of compassion.  Maybe under some circumstances, there might be some compassion.

. . .

Q  Would it be fair to say that he never developed a sense of empathy, the ability as you defined it, believe, to understand others?

A  . . .  I think that that would have definitely been impaired.  Again, there might be some limited, but not to the level that we would hope that individuals would have.

Q  Would it be fair to say then that Roy Edward Perkins never developed a sense of  – a social – conscious?

A  Again, I would think it would be very impaired, not the level of social conscious.

Q  And would it be fair to say that acts of violence would be acceptable to him?

A  As I said, he did grow up in a home where violence was frequent.  And so he would have been – to use a term that I used earlier – socialized, to not view violence as necessarily wrong.

. . .

Q  And would it be fair to say that he does not have today and did not have back in August of 1990 and has never had a normal sense of guilt or remorse in an individual for social unacceptable actions, that he just doesn't have a normal sense of guilt or conscious?

A   As I said, I think this would have interfered with the development of it in a normal sense.  Again, there would – I would – hope or assume that there was some.  . . .

(Doc. 10, Vol. 17 at 2824 -26, 2833-35, 2837-39.)

At the Rule 32 hearing, Dr. Strickland testified that Perkins had an impaired ability to empathize and that, although he might know right from wrong, he was unable to conform his behavior due to ingrained behaviors and "scripts" from his childhood:

Q  We heard Mr. Owens testify . . . that Mr. Perkins has no sense of right and wrong, and I think these were, what Mr. Smith was testifying earlier this morning, were "killing words."  He left the jury with these killing words, no sense of right and wrong, no sense of empathy.  Do you agree that he has no sense of right and wrong?

A  No, I don't agree with that.

Q  Why not?

A  Well, I think there [are] examples, and I think I just read one moments ago, where he knows that this should stop and that he should call or that he should get help or that he should stop this in some way.  And so he knows that, and then he's met with ineffectiveness; nothing works.  He risks himself and it doesn't work, and so he gives up and he leaves.  So I think that to say he doesn't know right from wrong or doesn't have any kind of sense of attachment or involvement with doing the right thing would be inaccurate.

173

Q  If he knows right from wrong, why does he so often choose wrong?

A  Well, he chooses wrong because it is – it has become such an [ingrained] – he chooses violence; he chooses alcohol abuse that leads to violence.  He chooses rape as a – as the script that goes – that becomes very – that has already become so [ingrained] in the way that he operates and sees the world and behaves in the world.

. . .

Q  Mr. Owens also testified that Mr. Perkins lacked empathy, lacks social conscience, and lacks the sense of right and wrong.  I want to talk about the empathy and compassion or social conscience.  Do you believe that Mr. Owens was accurate, that he doesn't have empathy?

A  I think that the word "empathy" is – tends to be a misunderstood and misused word.

Q  Why?

A  I think that people think that empathy is something innate, something that we are born with, something that we naturally have, and that's not the case.  Empathy is a learned thing, a learned concept, and it's a skill that we develop as a result of socialization, as a result of caregiver involvement, training, modeling, all of those sorts of things.  And so we have a situation here where all of the skill, the skills involved in being empathetic, being thoughtful about other people, are not always – not always practiced or not always considered, because it's so compromised in Mr. Perkins.  That doesn't mean that he's not capable of that.

Q  Okay.

A  It's not a permanent state, I guess I should say.

(Doc. 10, Vol. 64 at 520-23.)

As the above quoted testimony shows, both Dr. Strickland and Mr. Owens testified that Perkins's ability to empathize and to control his behaviors was compromised because of his experiences as a child. Given the similar nature of the experts' findings and testimony, the court finds that weighing Dr. Strickland's testimony, together with evidence presented during the sentencing phase and Ms. Hocutt's affidavit, does little to shift the balance between the aggravating and mitigating factors.

The sentencing court found that the statutory aggravating factors outweighed the statutory and non-statutory mitigating factors.[30] (*See* doc. 10, Vol. 2, at 353-54.)

---

[30]The court found three statutory aggravating circumstances: (1) "The capital offense was committed by a person under sentence of imprisonment," (2) "The defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person," and (3) "The capital offense was committed while the defendant was engaged . . . in the commission of, or an attempt to commit . . . rape, robbery, burglary or kidnapping." (Doc. 10, Vol. 2 at 348-49.) The court found one statutory mitigating circumstance: "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." (*Id*. at 351.) And, it found the following non-statutory mitigating circumstances:

(1) Defendant took Victim near Ms. Hood's house. However, Victim said she'd been shot about an hour earlier. This was a belated act, at best, and Defendant may have been merely getting rid of the Victim.

(2) Defendant was drinking alcohol, taking pills and abusing

The court finds that "[t]he new material," Dr. Strickland's testimony and Ms. Hocutt's affidavit, "is . . . not so significant that, even assuming [Perkins's] trial counsel performed deficiently, it was necessarily unreasonable for the [Alabama court] to conclude that [Perkins] had failed to show a 'substantial' likelihood of a different sentence." *Cullen v. Pinholster*, 563 U.S. 170, 202 (2011)(citing *Richter*,

---

drugs during the general period of time of the offense. However, this was voluntary.

(3) Defendant suffers from borderline personality disorder, is an alcoholic, is of borderline intelligence, and probably has organic brain dysfunction.

(4) Defendant was under mental or emotional disturbance, although not to an extreme degree.

(5) Defendant lacked socialization and had a horrible childhood, involving the death of his father, the drowning of his brother in his presence, the sexual abuse of his sister by his stepfather in his presence, physical abuse of Defendant by his stepfather, being run away from home at a very early age and being sexually abused.

(6) Defendant s intelligence is below 92% of the population, and he has a full scale I.Q. of 76.

(7) Defendant and his family were very poor, and Defendant had to "raise himself". His mother and stepfather and other family members were alcoholics.

(*Id*. at 352-53.) In its Sentencing Order, the court stated it was "unable to justify a sentence of life imprisonment without parole after having weighed all of the circumstances previously stated. Furthermore, after full and thorough consideration, the Court is compelled to accept the recommendation of the jury." (*Id*. at 354.)

562 U.S. at 111-12 (citing *Strickland*, 466 U.S. at 693))).  Based on this evidence, the court finds that Perkins is not entitled to any relief based on his claim that he was denied a fair trial by the deficient performance of his trial counsel in investigating and presenting mitigation evidence.

## CONCLUSION

The state court's factual findings are supported by the record and must be given deference by this court.  Perkins has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner that was objectively unreasonable in light of such precedent.  Given these considerations, this court cannot conclude that the Alabama Court of Criminal Appeals unreasonably applied, or reached a decision contrary to, clearly established federal law.  Therefore, Perkins is not entitled to habeas relief on this ground.

### 5.  Failure to Challenge Perkins's Rape Conviction

Perkins contends that his trial counsel were ineffective for failing to investigate and challenge his Fayette County conviction for the rape of B.P.  (Doc. 1 ¶¶ 218-40.)  He alleges:

> 218.  Perkins's trial counsel were ineffective for failing to review the court file for a first-degree rape conviction that played a critical role in the State's case.  The court file revealed that the conviction was

invalid. The state court's holding that counsel performed effectively is an unreasonable application of clearly established federal law, see U.S.C. § 2254(d)(1), and an unreasonable determination of the facts in light of the evidence presented in state court, see 28 U.S.C. § 2254(d)(2).

. . .

219.   The State prosecuted Perkins for capital murder on the theory that he intentionally killed Cathy Gilliam in the course of a kidnapping, and that he intended to rape Gilliam during the kidnapping. . . . The defense disputed that Perkins intended to rape Gilliam, and the question of intent dominated the trial.

220. Perkins's trial counsel – Dennis Steverson and James Smith – were appointed by the trial court in April 1993 and July 1993, respectively.  [(Doc. 10, Vol. 2 at 292-93.)]  Upon appointment, they became aware "immediately" of rapes allegedly committed by Perkins prior to the abduction of Cathy Gilliam.  [(*Id.*, Vol. 64 at 428.)]  Counsel "suspected [the State] would use" the collateral crimes in its case, [(*id.*)], and they filed motions to prevent the State from mentioning the collateral rapes, [(*id.*, Vol. 1 at 177-78)], as well as to force the State to identify the specific aggravating circumstances that it intended to use, [(*id.*)].  The trial court denied both motions, so defense counsel knew that the collateral-act evidence would be admitted and that they would need to conduct their own investigation into aggravating circumstances. [(*Id.*, Vol. 63 at 260-61.)]

221.   One of the alleged rape victims was [B.P.].  Her case resulted in a conviction in the Circuit Court of Fayette County, Alabama, which is adjacent to Tuscaloosa County.  [(*Id.*, Vol. 60 at 5299.)] Counsel were specifically aware of this conviction immediately after they were appointed, and they expected the State to use it as collateral-act evidence.  [(*Id.*, Vol. 64 at 428-29.)]  Counsel also knew that the State would use the conviction to establish a prior-violent-felony aggravating circumstance, see Ala. Code § 13A-5-49(2), and that the evidence was inherently likely to inflame

jurors, *see*, *e.g.*, [(doc. 10, Vol. 11 at 1696-1714)]. The State did not attempt to conceal its plan to use the [B.P.] rape – it openly acknowledged that she would be called as a witness. [(*Id*., Vol. 3 at 149 [prosecutor stating that "sexual acts . . . with [B.P.] . . . would be admissible to prove" intent to rape and identity of perpetrator].)]

222. Despite knowing from the outset that Perkins had been convicted of first-degree rape of [B.P.], that [B.P.] likely would testify at Perkins's trial, and that the first-degree rape would constitute a statutory aggravating circumstance at the penalty phase, counsel did not examine the court file for the rape conviction before trial. [(*Id*., Vol. 64 at 430-31.)]

223. As expected, [B.P.] testified during the guilt phase of Perkins's trial that Perkins had raped her and that he had been convicted of rape as a result. [(*Id*., Vol. 12 at 1890-1912.)] Her testimony was detailed and graphic. [(*See id*.)] Defense counsel cross-examined [B.P.] about the details of the rapes, [(*id*. at 1907-11)], but they did not have the court file to assist them because they had not looked at it, [(*id*., Vol. 64 at 430-31)]. Perkins was convicted of capital murder. [(*Id*., Vol. 2 at 288, 299.)]

224. At the penalty phase of the trial, the State argued that the conviction for the [B.P.] rape supported the aggravating circumstance that Perkins had previously been convicted of a violent felony. [(*Id*., Vol. 17, Tab 3 at 2776]; *see* Ala. Code § 13A-5-49(2) (defining the aggravating circumstance). Jurors were told that, in deciding punishment, they could consider detailed testimony about the rape that had already been admitted during the guilt phase. [(Doc. 10, Vol. 17, Tab 3 at 2776.)] The jury recommended that Perkins be sentenced to death by a vote of ten to two. [(*Id*., Vol. 2 at 289, 299-300.)]

225. At the sentencing hearing before the trial court, the State offered a certified copy of "the entire file" for the first-degree rape conviction. [(*Id*., Vol. 18 at 3044.)] Defense counsel saw the court file for the first time at that hearing. [(*Id*., Vol. 64 at 431.)] They immediately recognized that the conviction was invalid and tried to

prevent the trial court from considering it. [(*Id*., Vol. 18 at 3047-48.)] The conviction was invalid due to a conflict of interest. The file contained a notice of disclosure and waiver of the conflict, and the notice and waiver had not been executed until the day after Perkins pleaded guilty. [(*Id*.)] *See generally Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980) (announcing test for unconstitutional conflict of interest). The trial court overruled the objection. [(Doc. 10, Vol. 18 at 3048.)]

226. The trial court then relied on Perkins's first-degree rape conviction to establish the prior-violent-felony aggravating circumstance and sentenced Perkins to death. [(*Id*., Vol. 2 at 354.)]

227. In Rule 32 proceedings, Perkins claimed that his trial counsel were ineffective for failing to investigate and challenge the first-degree rape conviction prior to the capital trial. [(*Id*., Vol. 41, Tab 11 at 1435-43.)] At the evidentiary hearing, counsel Dennis Steverson and James Smith acknowledged that they began representing Perkins in April and July of 1993, [(*id*., Vol. 63 at 181; *id*., Vol. 64 at 428)], and that they could have filed a Rule 32 petition [in the Fayette County rape case] prior to the capital trial, [(*id*., Vol. 63 at 208)]. They also stated that the rape conviction "was one of the main things that we wanted to keep out," [(*id*. at 197)], because it would "enhance . . . the [likelihood of] conviction of Mr. Perkins," [(*id*. at 198)], as well as "the likelihood of bringing back a death penalty . . . if he's already been convicted of rape before," [(*id*. at 199; *see also id*, Vol. 64 at 417 ("[T]he State's theory of the case, it was obvious, was to portray him as a sexual offender completely."), 422 ("It was almost like we were trying those [rape] cases [instead of trying the capital murder case].")]. Despite recognizing that the [B.P.] rape conviction would be presented at trial and that it was highly prejudicial, Perkins's trial counsel did not provide any strategic, tactical, or other justifiable reason for failing to look at the file from the collateral case.

228. In the Rule 32 proceedings, Perkins also presented evidence showing that there was an active conflict of interest when he pleaded guilty in the first-degree rape case, and the conflict adversely affected his counsel's performance. [(*Id*., Vol. 60 at 5235.)] Perkins's attorney,

Steven Nolen, was appointed to represent Perkins while simultaneously representing Perkins's uncle Raymond Watkins, who was charged with hindering prosecution.  [(*Id.* at 5233-34.)]  On November 19, 1991, Perkins entered a guilty plea with Nolen's assistance in exchange for a 99-year sentence.  [(*Id.* at 5301.)]  Nolen did not advise Perkins before Perkins entered the plea that he was also representing Watkins.[31]

229.  The day after Perkins pleaded guilty to first-degree rape and received a 99-year sentence, Steven Nolen assisted Raymond Watkins with entering a plea bargain that "became available only after Mr. Perkins pled guilty to rape."  [(*Id.* at 5235.)]  Nolen testified that he "would not have been able to negotiate the [favorable] plea for Mr. Watkins if Mr. Perkins had not first pled guilty" to the first-degree rape charge.[32]  [(*Id.* [alteration in doc. 1].)]  Nolen did not disclose his conflict of interest to Perkins until the day after Perkins entered the

---

[31]Nolen testified in his Affidavit that he had "no independent recollection" of a conversation with Perkins regarding a possible conflict, and "When I state that I have no independent recollection, it does not mean that there could not have been other conversations with either Mr. Perkins or Mr. Watkins regarding any possible conflict; it means I do not remember one way or the other."  (Doc. 10, Vol. 60 at 5235.)

[32]Nolen did not testify that he would not have been able to negotiate a **favorable** plea for Watkins without Perkins's guilty plea.  He testified, "To the best of my recollection, Mr. Watkins'[s] negotiated plea became available only after Mr. Perkins pled guilty to rape.  I believe that I would not have been able to negotiate the plea for Mr. Watkins if Mr. Perkins had not first pled guilty.  Once Mr. Perkins pled guilty, it was easier to secure the deal for Mr. Watkins.  Mr. Perkins'[s] plea of guilty and sentence certainly mitigated the case against Mr. Watkins."  (Doc. 10, Vol. 60 at 5235.)  He does not testify that Perkins's guilty plea was the quid pro quo for Watkins's plea deal or that he encouraged Perkins to pled guilty for the sake of Watkins or that he negotiated a harsher sentence for Perkins to benefit Watkins.  He states simply that Perkins's conviction on the rape claim mitigated the case against Watkins, who was charged with hindering the State's prosecution of Perkins.  (*Id.*)

99-year plea.[33]  [(*Id*. at 5235 and  5309 (sentencing order); *see also id*. at, 5254 (post-plea waiver of conflict).)]

230.    Nolen's conflict of interest violated Perkins's Sixth Amendment right to counsel and provided clear grounds for a Rule 32 petition challenging the first-degree rape conviction.  The controlling test of when a conflict is impermissible requires a showing of an active conflict of interest and an adverse effect on the representation.  *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980); *see also Holloway v. Arkansas*, 435 U.S. 475, 490-91 (1978).  Prior to Perkins's pretrial proceedings, Alabama courts had recognized that such a conflict was a ground for overturning a conviction under Rule 32.  *See*, *e.g.*, *Browning v. State*, 607 So. 2d 339, 342-44 (Ala. Crim. App. 1992)(vacating conviction in Rule 32 proceeding); *see also Pinkerton v. State*, 395 So. 2d 1080, 1089 (Ala. Crim. App. 1980).  Here, the Sixth Amendment standard was clearly met.  Nolen had an active conflict because he could not get Raymond Watkins a favorable plea deal unless he counseled Perkins to plead guilty to first-degree rape.  There was no valid waiver, because the waiver came after Perkins entered his plea.  *See generally Boykin v. Alabama*, 395 U.S. 238, 242 (1969) (holding waivers of rights must be voluntary and intelligent). And there was an adverse effect because taking the first-degree rape case to trial would have been a reasonable defense strategy.  As Nolen explained, he could not try Perkins's case without foreclosing Watkins's favorable plea deal. [(Doc. 10, Vol. 60 at 5235.)]    Faced with competing interests, Nolen chose to serve Watkins's, and this adversely affected his representation of Perkins.  Therefore, Perkins's first-degree rape conviction was invalid and could have been attacked through a collateral proceeding.

. . .

233. Clearly established federal law holds that counsel in a criminal case "has a duty to make [objectively] reasonable investigations

---

[33]This statement is not supported by a record cite.  Nolen testified he did not recall any conversation with Perkins about his potential conflict of interest other than the waiver and the record does not disclose the negotiated terms of the plea deal.

or to make [an objectively] reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington*, 466 U.S. 668, 691 (1984). In *Rompilla v. Beard*, 545 U.S. 374, 383 (2005), the United States Supreme Court addressed whether a state court unreasonably applied *Strickland* to a claim that a capital defendant's counsel were ineffective for failing to conduct a reasonable investigation for mitigation evidence, *id*. at 380-90. While counsel made some efforts to prepare a defense, they failed to review the file from their client's prior rape conviction even though they had notice that the prosecutor would attempt to establish an aggravating circumstance by using a transcript in the file. *Id*. at 384-85. Failure to examine the file constituted deficient performance because, by failing to do so, "they were seriously compromising their opportunity to respond to a case for aggravation." *Id*. at 385. The Supreme Court explained that the "prosecution was going to use the dramatic facts of a similar prior offense," and counsel therefore "had a duty to make all reasonable efforts to learn what they could about the offense. Reasonable efforts certainly included obtaining the [state's] own readily available file on the prior conviction to learn what the [state] knew about the crime, to discover any mitigating evidence the [state] would downplay, and to anticipate the details of the aggravating evidence the [state] would emphasize." *Id*. at 385-86.

234. The state court's conclusion that Perkins's counsel were not deficient is contrary to federal law under 28 U.S.C. § 2254(d)(1). Recognizing that there are no per se guidelines that govern counsel's performance, *Strickland*, 466 U.S. at 689, the facts underlying this claim are in material respects identical to those that established deficient performance in *Rompilla*, *see Williams v. Taylor*, 529 U.S. 362, 406 (2000)("A state-court decision [is] contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent."). No reasonable strategic reason overrode counsel's duty here; counsel had acute concerns about the conviction's impact on the jury and strong incentives to prepare a rebuttal. [(*See*, *e.g*., doc. 10, Vol. 63 at 199 (Steverson) ("[I]t will certainly increase the jury's likelihood of bringing back a death penalty . . . . A jury would be highly insensitive to that and

likely to return a verdict of guilty on that charge.").)] Counsel's performance was unreasonable, and the state court's conclusion is contrary to *Rompilla*.

235. The state court decision also involves an unreasonable application of clearly established federal law under 28 U.S.C. § 2254 (d)(1) by "ignoring the fundamental principles established by [the United States Supreme Court's] most relevant precedents." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 258 (2007)(holding state court decision involved unreasonable application of federal law). In *Strickland*, the Supreme Court held that counsel "has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. The Strickland Court made clear that "ardor" and "independence" of defense counsel are core Sixth Amendment values. *Id*. at 690. The state court ignored those principles. It held that counsel did not have a duty to examine the court file because "the facts surrounding Perkins's 1991 rape conviction were introduced, in depth, during the guilt proceedings." *Perkins*, [144 So. 3d at 483]. But the version of facts "introduced . . . during the guilt proceedings" was the prosecution's version – the version that defense counsel had a duty to investigate and test. If defense counsel had actually adopted a practice of relying on the guilt-phase proceedings to inform them about the State's case, that would certainly be an unjustifiable trial strategy. *See Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986)("Such a complete lack of pretrial preparation puts at risk both the defendant's right to an ample opportunity to meet the case of the prosecution . . . , and the reliability of the adversarial testing process." (citation and internal quotation marks omitted)). The state court's contrary holding involved an objectively unreasonable application of *Strickland*.

. . .

238. Clearly established federal law holds that counsel's deficient performance entitles a petitioner to relief where there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "Reasonable probability" means "a probability sufficient to undermine

confidence in the outcome" of the petitioner's trial. *Id*. In making this determination "a court . . . must consider the totality of the evidence before the judge or jury," imagine how the "evidentiary picture" would have been altered absent counsel's errors, and determine whether "the decision reached would reasonably likely have been different." *Id*. at 696. Where, as here, counsel's errors affect the penalty phase of a capital trial, a court must "reweigh the evidence in aggravation against the totality of available mitigating evidence" and determine whether the result is worthy of confidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

239. The state court's decision is contrary to or involves an unreasonable application of *Strickland* when it holds that "[c]ounsel was not ineffective for failing to . . . challenge Perkins's 1991 conviction by filing a collateral proceeding in another county during Perkins's capital-murder proceedings." *Perkins*, [144 So. 3d at 483]. Because Perkins's counsel did not learn that the conviction was invalid until the end of the trial, [(doc. 10, Vol. 64 at 431)], they could not make a reasonable decision about how to respond. Therefore, the state court appears to mean either that counsel never have a duty to challenge a prior conviction or that the court assumes for purposes of a *Strickland* prejudice analysis that counsel would not have challenged it. Both assumptions are contrary to or unreasonable applications of *Strickland*. First, an assumption that counsel never have a duty to challenge a prior conviction is contrary to *Strickland*'s holding that its test applies to "the range of legitimate decisions regarding how best to represent a criminal defendant," and that reasonableness depends "on the facts of the particular case . . . ." *Strickland*, 466 U.S. at 690. An exemption would violate the rule that *Strickland* "provides sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims." *Williams v. Taylor*, 529 U.S. 362, 392 (2000). Second, an assumption that counsel would not have collaterally challenged the conviction is inconsistent with *Strickland*'s "strong presumption" that counsel will make reasonable decisions on behalf of the client. *See Strickland*, 466 U.S. at 689. As the Supreme Court held in *Rompilla*, "once counsel had an obligation to examine the file, counsel had to make reasonable efforts to learn its contents; and once having done so, they could not reasonably

have ignored mitigation evidence or red flags simply because they were unexpected." *Rompilla*, 545 U.S. at 391 n.8.

. . .

243. Finally, the state court's ultimate conclusion that counsel's deficient performance did not prejudice Perkins is objectively unreasonable. Eliminating the first-degree rape conviction would "have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture." *Strickland*, 466 U.S. 695-96. The State would have lost its vehicle for moving the prejudicial collateral-rape evidence from the guilt phase to the penalty phase. This is significant because, under Alabama law, the decision to impose death or life-imprisonment-without-parole depends on the weight that jurors and judges assign to aggravating circumstances and mitigating circumstances. *See* Ala. Code § 13A-5-46(e); *id*. [§] 13A-5-48; *Cook v. State*, 369 So. 2d at 1257. On the mitigating side of the scale, Perkins had the statutory mitigating circumstance that his capacity to conform his conduct to the law was impaired. [(Doc. 10, Vol. 2 at 351 [citing Ala. Code § 13A-5-51(6)].)] Additionally, the trial court also found nonstatutory mitigating circumstances concerning Perkins's background, mental health, and substance abuse problems. [(*Id*. at 352-53.)] Invalidating the first-degree rape conviction would have greatly "reduced the ballast on the aggravating side of the scale" and allowed Perkins's mitigating circumstances a reasonable likelihood of convincing jurors and the sentencing judge to vote for life. *See Porter*, 558 U.S. at 42. The state court's holding that Perkins failed to show prejudice is objectively unreasonable. *See*, *id*.

(*Id*. ¶¶ 218-30, 233-35, 238-39, 243 [original footnotes omitted; footnotes added].)

The Alabama Court of Criminal Appeals rejected this claim:

Perkins next argues that counsel was ineffective for failing to investigate and to challenge, in a collateral proceeding, Perkins's 1991 conviction in Fayette County for rape. Specifically, Perkins argues that this prior conviction was the only conviction used to support the

aggravating circumstance that Perkins previously had been convicted of a crime involving the use or threat of violence, § 13A-5-49(2), Ala. Code 1975; thus, counsel was ineffective for failing to investigate that conviction.

When denying relief on this claim, the circuit court stated:

> "Trial counsel had no duty or obligation to engage in a collateral challenge to [Perkins's] Fayette County conviction for rape. Even if such a duty or obligation is found to exist, there is insufficient proof that the challenge would have been effective or meaningful as the evidence against [Perkins] in that case overwhelmingly established his guilt."

[(Doc. 10, Vol. 58 at 4493.)]

At the postconviction evidentiary hearing, Perkins introduced an affidavit executed by attorney Steven Nolen. Nolen wrote that he had been appointed to represent Perkins in two rape charges in Fayette County and that he had also represented Perkins's uncle, who had been charged with hindering prosecution by assisting Perkins in avoiding apprehension for those rape charges. Nolen stated:

> "On November 19, 1991, the day after Mr. Perkins pled guilty in case number CC-90-096, I represented Raymond Watkins [Perkins's uncle] as he entered a plea of guilty in case number CC-90-128. In return for Mr. Watkins's plea of guilty, the charge of hindering prosecution in the first degree, a felony, was reduced to hindering prosecution in the second degree, a misdemeanor.

> ". . . .

> "I have been shown by Mr. Perkins's postconviction counsel two 'waivers of conflict' purportedly signed by

187

Mr. Perkins and Mr. Watkins, both dated November 19, 1991, and both witnessed and notarized by me on that day. I have no independent recollection of any other conversations with either Mr. Perkins or Mr. Watkins regarding any possible conflict of interest in my representation of them. When I state that I have no independent recollection, it does not mean that there could not have been other conversations with either Mr. Perkins or Mr. Watkins regarding any possible conflict; it means I do not remember one way or the other. I believe that the court may have required some type of written waiver before accepting Mr. Watkins's plea on November 19, 1991, and that was the reason I secured the waivers. However, I do not have a clear recollection of the court requiring a written waiver prior to accepting Mr. Watkins's plea of guilty in case number CC-90-128."

[(*Id.*, Vol. 60 at 5233.)]

At trial, when proof of Perkins's 1991 guilty-plea conviction for rape was introduced during the penalty phase, Steverson objected, stating that the waiver of conflict of counsel was dated the day after Perkins pleaded guilty. The court overruled counsel's objection. Steverson testified at the evidentiary hearing that he did not challenge Perkins's rape conviction by filing a postconviction petition in Fayette County and that he had never filed a postconviction petition attacking one of his client's prior convictions. The trial record also shows that extensive testimony was introduced at the guilt phase concerning Perkins's 1991 conviction. The victim testified, in depth, concerning the facts surrounding the conviction. The record affirmatively shows that counsel was not ignorant concerning the facts and circumstances of Perkins's 1991 rape conviction.

In *Hamm v. State,* 913 So. 2d 460 (Ala. Crim. App. 2002), we addressed a similar issue and stated:

"Hamm contends, in the alternative, that trial counsel's performance was deficient because he '*could have challenged the Tennessee convictions in Tennessee courts and had the courts address the merits of the claims in 1987.*' (Hamm's brief at p. 25)(emphasis in original). Hamm's assertion that Alabama trial counsel had a duty to challenge in a Tennessee court the merits of the nine-year-old convictions so that he could then prevent consideration of the prior convictions at the 1987 capital sentencing hearing is not supported by any legal authority."

913 So. 2d at 479 (emphasis in original).

Our neighboring State of Georgia in *Barker v. Barrow,* 290 Ga. 711, 723 S.E.2d 905 (2012), addressed whether counsel was ineffective for failing to research a prior guilty-plea conviction the State intended to use to enhance the defendant's sentence. That court, in declining to find counsel ineffective, stated:

"Barker maintains that his trial counsel's performance was deficient because counsel failed to adequately investigate the validity of his prior guilty pleas in that counsel did not review transcripts of the plea colloquies, which he claims would have revealed the pleas' constitutional defects. Relying principally upon *Rompilla v. Beard,* 545 U.S. 374, 377, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005), Barker urges that, given the State's notification that it would seek to enhance his sentence by his prior pleas, his trial counsel had a basic legal duty to retrieve and read the plea transcripts.

"Certainly, as Barker maintains, trial counsel has the obligation to make reasonable investigations or to make a reasonable decision that makes a particular investigation unnecessary. *Terry v. Jenkins,* 280 Ga. 341, 346(2)(c), 627 S.E.2d 7 (2006). But, in any case in which the ineffectiveness of counsel for inadequate investigation is

claimed, the reasonableness of a particular decision not to investigate in the manner urged must be assessed in light of all the circumstances at that time, and such assessment must include a heavy measure of deference to counsel's judgments. *Id.* at 347(2)(c), 627 S.E.2d 7.

"The decision in *Rompilla v. Beard* does not alter this. The Supreme Court expressly held that 'when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial.' 545 U.S. at 377, 125 S. Ct. 2456. The Court explained that its analysis did not create a '"rigid, per se" rule that requires defense counsel to do a complete review of the file on any prior conviction introduced.' *Id.* at 389, 125 S. Ct. 2456. Instead, it found counsel in that case lacking for failing to make reasonable efforts to review the file of the defendant's prior conviction despite knowledge that the prosecution intended to introduce Rompilla's prior conviction not 'merely by entering a notice of conviction into evidence but by quoting damaging testimony of the rape victim in that case.' *Id.* Thus, unlike the present case, there was no viable substitute for retrieval and examination of the damaging testimony itself. Moreover, the Court noted that the found unreasonableness of not securing the actual file for review 'was heightened by the easy availability of the file,' and the 'great risk that testimony about a similar violent crime would hamstring counsel's chosen defense of residual doubt.' The Supreme Court expressly cited these circumstances as rendering unacceptable the conclusion that Rompilla's 'counsel could reasonably decline to make any effort [whatsoever] to review the file.' *Id.* at 389-390, 125 S. Ct. 2456. The Court expressly acknowledged that in situations in which

the prosecutor does not intend to use a defendant's prior conviction in the manner as in *Rompilla v. Beard,* a different assessment of reasonableness might well be warranted. *Id.* at 390, 125 S. Ct. 2456. And, so it is in this case.

"In the present order denying Barker the sought relief, the habeas court made relevant findings in regard to the issue of the reasonableness of trial counsel's investigation, including but not limited to: trial counsel, who had been a member of the Georgia bar since 1991, was on a list of appointed counsel and had done predominantly criminal work; at the time of representing Barker, counsel had been second defense chair at criminal jury trials and had handled at least 100 guilty pleas; prior to representing Barker, counsel had handled a similar case involving a defendant's exposure to punishment of life without the possibility of parole based upon a drug statute; it was obvious to counsel that the State intended to pursue recidivist treatment, if possible, as the charging instrument referenced Barker's prior convictions; counsel researched Barker's previous pleas, which involved counsel physically going to the clerk's office, taking the list of prior convictions, and reviewing every file to see if a certified copy of each previous conviction existed; counsel was able to verify that the pleas were 'factually entered'; the pleas were purportedly signed by Barker, and entered in the court record as part of the clerk's file; during consultation with Barker, counsel discussed the gravity of Barker's situation arising from his prior convictions; counsel's normal practice was to go over a defendant's possible punishment, including the impact of any previous convictions; counsel sent Barker a letter outlining the way he would be sentenced based upon his prior convictions; counsel was confident that Barker was aware of the trial court's lack of discretion in sentencing should Barker be convicted; Barker was very helpful in trying to think of things with

which to differentiate his case from others in order to avoid a sentence of life without parole, but he never made any claim that his prior convictions were improper; and the issue of possible irregularity with any of the prior pleas had never arisen until it was raised by Barker's habeas counsel. What is more, evidence of a routine or standard practice or procedure of the court in which the pleas are entered can be used in demonstrating compliance with constitutional standards. *Bazemore v. State,* 273 Ga. 160, 162(1), 535 S.E.2d 760 (2000); *Jackson v. Hopper,* 243 Ga. 41, 42, 252 S.E.2d 467 (1979). And, the habeas court additionally found that trial counsel had experience with guilty pleas in the county of Barker's prior convictions and with the judge who sentenced Barker in conjunction with his prior guilty pleas: counsel practiced before that judge from 1991 until the judge's death approximately ten years later, and spent an extensive amount of time in various capacities in front of that judge; the judge had a standard way of doing things, including a normal routine with handling guilty pleas; in fact, a written checklist of the *Boykin* rights was kept in the courtroom.

"The habeas court found no requirement that trial counsel research every aspect of the colloquy of each of Barker's prior guilty pleas, and based upon the circumstances of record, concluded that trial counsel was not ineffective as counsel had made reasonable efforts to obtain and review Barker's prior convictions to ensure their validity. This Court likewise declines to, as Barker in essence urges, impose an absolute duty upon defense trial counsel when representing a recidivist to retrieve and review transcripts of prior plea proceedings or otherwise be deemed ineffective. This is not only unwarranted as a matter of law, but in many instances, would prove unworkable as a matter of fact."

290 Ga. at 713-15, 723 S.E.2d at 908-09.

The analysis used by the Supreme Court of Georgia is applicable to the facts in this case. In this case, the facts surrounding Perkins's 1991 rape conviction were introduced, in depth, during the guilt proceedings. Counsel was not ineffective for failing to "research every aspect" and challenge Perkins's 1991 conviction by filing a collateral proceeding in another county during Perkins's capital-murder proceedings. *See Barker v. Barrow.* Based on the record in this case, we cannot say that counsel's actions were unreasonable.

Moreover, at the penalty phase of Perkins's trial, the State introduced evidence that Perkins had a 1983 conviction for second-degree rape and a 1991 conviction for first-degree rape. On direct appeal, Perkins argued that his *two* prior convictions had been improperly used to support the aggravating circumstance that Perkins had previously been convicted of a crime of violence. *Perkins,* 808 So. 2d at 1121-22. Contrary to Perkins's assertions, his 1991 conviction was not the only conviction used to support the aggravating circumstance that he had previously been convicted of a crime of violence. At the penalty phase, testimony was presented that in 1983 Perkins was convicted of raping a mentally deficient 14-year-old girl. A "crime of violence" is defined in § 13A-11-70, Ala. Code 1975, as: "Any of the following crimes or an attempt to commit any of them, namely, murder, manslaughter (except manslaughter arising out of the operation of a vehicle), rape, mayhem, assault with intent to rob, assault with intent to ravish, assault with intent to murder, robbery, burglary, kidnapping and larceny."

Perkins's 1983 conviction for rape in the second degree was sufficient, in itself, to support the aggravating circumstance that Perkins had previously been convicted of a crime of violence. *See Simmons v. State,* 797 So. 2d 1134 (Ala. Crim. App. 1999). Thus, Perkins failed to show how he was prejudiced by counsel's failure to specifically challenge his 1991 conviction for rape. Perkins failed to meet his burden of proving ineffective assistance of counsel in regard to this claim, and relief was correctly denied.

*Perkins*, 144 So. 3d at 480-84.

As set forth above, in order to succeed on this ineffective-assistance claim, Perkins must show that his trial counsel's performance was defective and that he was prejudiced by this defective performance. When reviewing a claim of ineffective assistance of counsel in a habeas petition this court is not required to decide both deficient performance and prejudice prongs because the petitioner's claim will fail if he cannot show both prongs. *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000)("Because both parts of the [*Strickland*] test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa." (citing *Strickland*, 466 at 694; internal citations omitted)). Also, if the court finds, pursuant to de novo review, that the claim is without merit, it need not discuss whether the state court's decision is entitled to deference. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010)("Even if the state court used an incorrect legal standard, we need not determine whether AEDPA's deferential standard of review, 28 U.S.C. § 2254(d), applies in this situation. That is because, even if AEDPA deference does not apply, [petitioner] cannot show prejudice under de novo review, the more favorable standard of review for [petitioner]. . . . Courts can . . . deny writs of habeas corpus under §2254 by engaging in de novo review when it is unclear whether AEDPA deference

applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review, see § 2254(a).").

As to this claim – alleging that Perkins was denied the assistance of constitutionally effective counsel because counsel failed to discover the untimely-executed waiver of Nolen's conflict of interest and, thus, did not file a collateral challenge to his conviction in Fayette County – the court finds, on de novo review, that Perkins cannot establish prejudice; therefore, this claim will be denied.

In order to establish that trial counsel were ineffective for failing to investigate and collaterally challenge his prior rape conviction from Fayette County, Perkins is required to show that counsel's deficient performance prejudiced him – that is, there is a reasonable probability that the result of the proceeding would have been different had his trial counsel collaterally challenged the Fayette County conviction. To make this showing, Perkins must show as an initial matter that the collateral challenge to the Fayette County conviction had merit.

The fact that Nolen represented Perkins and Watkins simultaneously, the fact that Watkins's deal depended on Perkins's guilty plea, and the fact that Perkins signed the waiver of Nolen's conflict of interest after he pled guilty do not show an actual conflict of interest sufficient to void the Fayette County rape conviction. "[I]t was at least necessary, to void the conviction, for petitioner to establish that the

conflict of interest adversely affected his counsel's performance," *Mickens v. Taylor*, 535 U.S. 162, 174 (2002); that is, Nolen's simultaneous representation of Perkins and his uncle adversely affected Nolen's performance as Perkins's counsel.

Contrary to Perkins's assertion, his Fayette County conviction is not "invalid" based on the lack of a timely-signed waiver. In order to show that the collateral challenge to the Fayette County conviction based on a conflict of interest would have been successful, Perkins "must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980); *see also Molton v. State*, 651 So. 2d 663, 669 (Ala. Crim. App.1994)("The appellant did not raise the matter of a conflict of interest on the part of his trial counsel until well after the trial. Consequently, in order to establish a violation of the Sixth Amendment, he must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." (quoting *Sullivan*, 446 U.S. at 348))(internal quotations omitted).

> To prove adverse effect, a habeas petitioner must satisfy three elements. First, he must point to some plausible alternative defense strategy or tactic that might have been pursued. Second, he must demonstrate that the alternative strategy or tactic was reasonable under the facts. Because prejudice is presumed, the petitioner need not show that the defense would necessarily have been successful if the alternative strategy or tactic had been used, rather he only need prove that the alternative possessed sufficient substance to be a viable alternative. Finally, he must show some link between the actual conflict and the decision to

196

forgo the alternative strategy of defense.  In other words, he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.

*Freund v. Butterworth*, 165 F.3d 839, 860 (11th Cir. 1999)(internal citations and quotations omitted).  "[Petitioner] must make a factual showing of inconsistent interests and must demonstrate that the attorney 'made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other.  If he did not make such a choice, the conflict remained hypothetical.'"  *United States v. Mers*, 701 F.2d 1321, 1328 (11th Cir. 1983)(quoting Comment, *Conflict of Interests in Multiple Representation of Criminal Co-Defendants*, 68 J. CRIM. L. & CRIMINOLOGY 226, 232 (1977)).  Generally,

. . . cases reversing convictions on the ground of actual conflict of interest could be classified as falling into at least one of three rubrics:

(1) the conflict was brought to the trial court's attention at the outset of the trial or at the time when the conflict first became apparent; (2) one defendant had evidence that would have exculpated himself but inculpated a codefendant; (3) the prosecution's evidence offered defendant a theory under which he could prove his own innocence by proving his codefendant's guilt.

*Id.* (quoting *United States v. Benavidez*, 664 F.2d 1256, 1259 (5th Cir. 1982)).

None of these "rubrics" have been shown in this case; therefore, the court finds that Perkins has not shown an actual conflict sufficient to support the reversal of his

Fayette County rape conviction. No one involved in Perkins's Fayette County case objected to Nolen's representation of Perkins or otherwise "brought [the alleged conflict] to the trial court's attention at the outset of the trial or at the time when the conflict first became apparent." *Benavidez*, 664 F.2d at 1259. Nothing in Nolen's Affidavit or otherwise shows that Watkins "had evidence that would have exculpated himself but inculpated [Perkins]." *See id*. Moreover, proof of Perkins's guilt on the rape charge was required to prove Watkins's guilt on a hindering-prosecution charge, *see Nichols v. State*, 500 So. 2d 92, 94-95 (Ala. Crim. App. 1986);[34] therefore, "the

---

[34]In Alabama –

Despite the fact that in the instant case the offense of hindering prosecution and the offense of rape are separate offenses, as the trial court indicated, an adequate presentation of the facts and evidence in the [hindering prosecution] case would necessitate that some testimony would refer to the underlying [rape] prosecution that was alleged to have been hindered; in essence, the appellant is charged with hindering the prosecution of a case of rape in the first degree. It seems clear from the language of the statutes that the State must prove three separate elements to present a prima facie case of hindering prosecution. The actor must "render criminal assistance" as that term is defined in § 13A-10-42, 1975 Alabama Code (Supp. 1981), the criminal assistance must be rendered to one who has committed a Class A or Class B felony or murder and the actor must know or believe that such person has engaged in conduct constituting the Class A or Class B felony or murder. . . . In proving the two latter issues, some evidence of the Class A or Class B felony or murder must be proved. Obviously, one cannot hinder the prosecution or conviction of another for [a] crime unless a crime actually occurred. . . . The interrelationship and activities that lead to the involvement between the person accused or convicted of the felony

198

prosecution's evidence [did not] offer[ ] Watkins a theory under which he could prove his own innocence by proving [Perkins's] guilt," *see Benavidez*, 664 F.2d at 1259.

Perkins's waiver of Nolen's conflict of interest, signed the day after he entered his plea of guilty does not demonstrate an actual conflict of interest based on Nolen's representation of Perkins of the B.P. rape charge and Watkins on the charge of hindering the prosecution of Perkins on the rape charge. He has shown only that Nolen represented two defendants in related cases and that one defendant's deal required the antecedent guilty plea of the other defendant – which in the context of claims of hindering prosecution is not indicative of an actual conflict of interest adversely affecting Nolen's representation. Because Perkins has not shown that the Fayette County rape conviction was "invalid" based on an actual conflict of interest and an untimely waiver, he has not shown that earlier discovery of the untimely

---

and the other individual give rise to the charge of hindering prosecution and, as such, are relevant in a trial for hindering prosecution.

The State has the burden of proving beyond a reasonable doubt that the person whose prosecution was hindered actually committed the felony. . . . Thus, the underlying crime is an essential element of the offense of hindering prosecution and must be adequately proved.

*Nichols v. State*, 500 So. 2d 92, 94-95 (Ala. Crim. App. 1986)(internal citations, footnote, and quotations omitted).

waiver by his trial attorneys would have made any difference in his conviction and/or sentence in the instant case. Thus, there is no *Strickland* prejudice.

From the beginning of their representation of Perkins, Smith and Steverson, Perkins's trial counsel, knew that Perkins had raped B.P. and that he had pled guilty to that crime. They knew that, as a result of his guilty plea, he was sentenced to 99 years in prison. However, before sentencing in the capital case, trial counsel learned that Nolen, Perkins's counsel in the Fayette County case, obtained a waiver of any conflict of interest between his representation of Perkins and his representation of Perkins's uncle, who had been charged with hindering the prosecution of Perkins for the rape of B.P. The waiver was signed the day after Perkins had pled guilty in Fayette County. Although the waiver was obtained after Perkins's plea, that fact alone does not establish that trial counsel's failure to collaterally challenge the Fayette County conviction prejudiced Perkins. Indeed, the untimely-executed waiver, standing alone, does not establish an actual conflict that adversely affected Fayette County counsel's performance.

Nothing indicates that Perkins has ever denied raping B.P. or that, had the conflict not existed, he would not have pled guilty. Perkins alleges, "Nolen had an active conflict because he could not get Raymond Watkins a favorable plea deal unless he counseled Perkins to plead guilty to first-degree rape." (Doc. 1 ¶ 230.)

Such a statement implies that Perkins had other options and that he would not have pled guilty unless encouraged by Nolen because of Nolen's desire to get a good deal for Watkins. This conjecture regarding the outcome of a collateral attack on the Fayette County rape conviction is insufficient to establish prejudice based on the alleged deficient performance of Steverson and Smith in discovering the untimely-executed waiver. Assuming that reasonable counsel, knowing what trial counsel knew, would have collaterally challenged the Fayette County conviction, there is no reasonable probability that the result of the capital case would have been different. Given the fact that Perkins does not deny raping B.P. and he does not allege that he would not have pled guilty to first degree rape, he has not shown a reasonable possibility that at the time of his capital sentencing he would not have a felony conviction for the first degree rape of B.P.

Therefore, this claim will be denied.

## CONCLUSION

The state court's factual findings are supported by the record and must be given deference by this court. Perkins has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner that was objectively unreasonable in light of such precedent. Given these considerations, this court cannot

conclude that the Alabama Court of Criminal Appeals unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Perkins is not entitled to habeas relief on this ground.

## G. THE JURY'S CONSIDERATION OF EXTRINSIC EVIDENCE – THE BIBLE IN THE JURY ROOM

Perkins contends that he "was denied a fair trial and reliable determination of sentence," in violation of the Due Process Clause because the jury "consulted biblical passages prior to and during its sentencing deliberations." (Doc. 1 ¶ 285.) According to Perkins –

> 287.  During the trial, the jurors were sequestered at a hotel. [(Doc. 10, Vol. 63 at 337.)]  As [J.T., a juror in Perkins's trial,] explained, the jurors gathered as a group at the hotel on the Sunday of the trial and conducted their own religious service. [(*Id*. at 378.)]  They prayed together and read from the Bible, and two of the jurors preached to the others.  [(*Id*. at 378; *id*., Vol. 64 at 405.)]  One juror preached about the "eye for an eye" passage, [(*id*., Vol. 63 at 378-79; *id*., Vol. 64 at 405)], conveying the message that "if you kill someone, you should expect to be killed," [(*id*., Vol. 63 at 379)].

> 288.  During deliberations the following day, the jurors addressed the issue of Perkins's punishment.  Several of the female jurors were hesitant to vote for a death sentence. [(*Id*., Vol. 64 at 384-85.)] Because of the disagreement, some jurors read aloud from Bibles that they had brought with them into the jury room.  [(*Id*. at 384, 389-91.)]  They focused on the "eye for an eye" passage "to let the women know that, you know, you do the crime you should have to . . . pay for it."  [(*Id*. at 384.)]  After further reading, discussion, and prayers, the jurors took another vote on the question of Perkins's punishment.  Several of the

jurors who had previously voted in favor of a life sentence changed their votes, now voting for the death penalty. [(*Id*. at 384, 390.)]

(Doc. 1 ¶¶ 287-88.) The only Bible passage J.T. remembered specifically being discussed was "the one that was the eye for an eye." (Doc. 10, Vol 64 at 384.) However, he testified that he had based his decision to impose the death penalty "on the evidence and what all [he had] heard in the . . . trial," and that the readings from the Bible did not help him make his decision. (*Id*. at 393, 395.) No other juror testified at the Rule 32 hearing.

The Alabama Court of Criminal Appeals held, "J.T. testified that the Bible had no impact on his verdict in the penalty phase. No other jurors testified. Without more, this Court cannot say that the [trial] court abused its discretion in finding that Perkins failed to establish prejudice. Accordingly, this claim does not entitle Perkins to any relief." *Perkins*, 144 So. 3d at 494-99.

Perkins was "entitled to a verdict based on the independent judgment of twelve jurors. Jury deliberations are kept private and secret to ensure that the verdict represents the judgment of a properly constituted jury and is not affected by outside influences or matters extrinsic to evidence presented at trial." *United States v. Watson*, 669 F.2d 1374, 1391 (11th Cir. 1982). The Supreme Court "generally [has]

analyzed outside intrusions upon the jury for prejudicial impact." *United States v. Olano*, 507 U.S. 725, 738 (1993)(citations omitted).

> "[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. . . . [I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." [*Smith v. Phillips*], [455 U.S. 209,] 217, 102 S. Ct. [940,] 946 [(1982)].

> There may be cases where an intrusion should be presumed prejudicial, see, e.g., *Patton*, *supra*, 467 U.S., at 1031-1035, 104 S. Ct., at 2888-2890; *Turner v. Louisiana*, 379 U.S. 466, 85 S. Ct. 546, 13 L. Ed. 2d 424 (1965), but a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: ***Did the intrusion affect the jury's deliberations and thereby its verdict?***

*Id*. at 738-39 (emphasis added). When a defendant alleges improper intrusion upon a jury's deliberations, generally "courts apply a settled two-step framework." *See Godoy v. Spearman*, 861 F.3d 956, 959 (9th Cir. 2017).

> At step one, the court asks whether the contact was ***possibly*** prejudicial, meaning it had a tendency to be injurious to the defendant. If so, the contact is deemed presumptively prejudicial and the court proceeds to step two, where the burden rests heavily upon the state to establish the contact was, in fact, harmless. If the state does not show harmlessness, the court must grant the defendant a new trial. When the presumption arises but the prejudicial effect of the contact is unclear from the existing record, the trial court must hold a hearing to determine the

circumstances of the contact, the impact thereof upon the juror, and whether or not it was prejudicial.

*Id.* (quoting *Remmer v. United States*, 347 U.S. 227, 229-30 and *Mattox v. United States*, 146 U.S. 140, 150 (1892), *called into doubt on other grounds by Warger v. Shauers*, 135 S. Ct. 521, 526-27 (2014))(internal quotations and citations omitted; emphasis added).

In this case, the trial court held such a hearing as part of the Rule 32 hearing. The only juror to testify was J.T. He testified that the service on Sunday "didn't have an effect on [him]." (Doc. 10, Vol. 63 at 379 to Vol. 64 at 380.) Also, the only specific Bible passage he could recall being discussed in the jury room was "the eye for an eye."[35] (*Id.*, Vol. 64 at 391.) This Bible verse was also referenced by counsel and prospective jurors during voir dire. (*See id.*, Vol. 6 at 796; *id.*, Vol. 7 at 875, 881, 982, 998, 999, 1002; *id.*, Vol. 8 at 1096, 1224; *id.*, Vol. 9 at 1231, 1246-47, 1322; *id.*, Vol. 10 at 1469-70). The court finds that the "eye for an eye" Bible verse is within the common knowledge of all jurors and had specifically been discussed with them during jury selection. While the jury was discussing whether Perkins should receive

---

[35]Exodus 21:23-25: "But if there is serious injury, you are to take life for life, eye for eye, tooth for tooth, hand for hand, foot for foot, burn for burn, wound for wound, bruise for bruise."

the death penalty, the jury "said a little prayer . . . to try to ease our mind, to comfort us into making that decision." (*Id.*, Vol. 64 at 384.)

The only juror to testify, J.T., did not have a Bible in the jury room and he did not read a Bible in the jury room. (*Id*. at 390.) He based his decision "on the evidence and what all [he] heard in the . . . trial." (*Id*. at 393; *see also id*. at 395.) The court finds that Perkins has not established, through J.T.'s testimony, possible prejudice caused by the jury's contact with the Bible and prayer during deliberations, even if it there was an intrusion.

Based on this evidence, the court finds that Perkins is not entitled to any relief based on his claim that he was denied a fair trial by the jury's consideration of Biblical references external to evidence and instructions presented at trial.

## CONCLUSION

The state court's factual findings are supported by the record and must be given deference by this court. Perkins has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner that was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Alabama Court of Criminal Appeals unreasonably applied, or

reached a decision contrary to, clearly established federal law.  Therefore, Perkins is not entitled to habeas relief on this ground.

## H.  PERKINS IS INTELLECTUALLY DISABLED; THEREFORE, HIS DEATH SENTENCE VIOLATES THE EIGHTH AMENDMENT

Perkins claims that he is intellectually disabled and, therefore, his execution would violate the Eighth Amendment.  (*See* doc. 1 ¶ 299.)  After the Alabama Supreme Court affirmed Perkins's conviction on direct appeal and while his petition for certiorari review was pending before the United States Supreme Court, the Court decided *Atkins v. Virginia*, which held, "Construing and applying the Eighth Amendment in the light of our evolving standards of decency, we . . . conclude that [the death penalty] is excessive [punishment] and that the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender." *Atkins v. Virginia*, 536 U.S. 304, 321 (2002)(internal quotations omitted). The Court vacated the Alabama Supreme Court's affirmance of Perkins's conviction and remanded his case for further consideration in light of *Atkins*.  *Perkins v. Alabama*, 536 U.S. 953 (2002).  On remand, the Alabama Supreme Court "conclude[d] that Perkins does not suffer from mental retardation under the definitions considered by the United States Supreme Court in reaching its holding in *Atkins* or as defined by any of the state statutes that prohibit the imposition of the

death sentence on a mentally retarded defendant." *Ex parte Perkins*, 851 So. 2d 453, 455-56 (Ala. 2002)(footnotes omitted).

In his habeas petition, Perkins argues that the Alabama Supreme Court's decision on remand was "contrary to and an unreasonable application of *Atkins*, 28 U.S.C. § 2254(d)(1), and also an unreasonable determination of the facts, 28 U.S.C. § 2254(d)(2)." (*Id*. ¶ 313.) Specifically, he argues:

> 314.  First, while the Alabama court relied on evidence presented by the defense at trial, it failed to recognize that the defense did not have a strong interest at trial in highlighting the extent of Perkins's intellectual disability. The United States Supreme Court recognized in *Atkins* itself that without *Atkins*, capital defendants had very different incentives in this regard. *See Atkins*, 536 U.S. at 321 ("reliance on mental retardation as a mitigating factor can be a two-edged sword"); *see also Bobby v. Bies*, 556 U.S. 825, 836 (2009)(citing *Atkins* for the proposition that "[m]ental retardation as a mitigator and mental retardation under *Atkins* [ ] are discrete legal issues"); *id*. (noting that *Atkins* "substantially altered" the parties' incentives in terms of evidence of intellectual disability). The Alabama court's assumption that the evidence presented at trial provided a complete portrait of Perkins's intellectual ability was an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2). *See Wiggins v. Smith*, 539 U.S. 510, 528 (2003) (holding that the state court's incorrect assumption that records contained certain information was an unreasonable determination of the facts).

> 315.  Second, given that Perkins did not have a strong interest in presenting a low IQ score at trial, the Alabama court placed far too much emphasis on the rigid number of 76, the score Perkins obtained on the WAIS-R in 1994. The clinical definitions of intellectual disability on which the United States Supreme Court relied in *Atkins* have long recognized the standard error of measurement, meaning that IQ scores

are properly understood as the midpoint in a range, not a defining number. *See Atkins*, 536 U.S. at 308 n.3. The Court elaborated on this point in *Hall v. Florida*, [572 U.S. 701] (2014), stating the following: "The clinical definitions of intellectual disability, which take into account that IQ scores represent a range, not a fixed number, were a fundamental premise of *Atkins*. And those clinical definitions have long included the SEM." *Id*. at [720]. The Alabama court's dismissal of Perkins's 76 in an analysis requiring a score of "70 or lower" is contrary to and an unreasonable application of *Atkins* and *Hall*.

316.    In addition, factors such as the Flynn effect, which recognizes that scores must be adjusted as tests get older,[36] are critical

---

[36]"The Flynn Effect 'is a phenomenon positing that, over time, standardized IQ test scores tend to increase with the age of the test without a corresponding increase in actual intelligence in the general population. Those who follow the Flynn effect adjust for it by deducting from the IQ score a specified amount [0.3] for each year since the test was normalized.'" *In re Cathey*, 857 F.3d 221, 227 (5th Cir. 2017); *see Burgess v. Commn'r. Ala. Dep't of Corr.*, 723 F.3d 1308, 1321 n.16 (11th Cir. 2013)("The Flynn effect acknowledges that as an intelligence test ages, or moves farther from the date on which it was standardized, or normed, the mean score of the population as a whole on that assessment instrument increases, thereby artificially inflating the IQ scores of individual test subjects. Therefore, the IQ test scores must be recalibrated to keep all test subjects on a level playing field." (quoting *Thomas v. Allen*, 607 F.3d 749, 753 (11th Cir. 2010)))(internal quotations omitted). The Eleventh Circuit has held:

> (1) a district court is not required to apply a Flynn effect reduction to an individual's IQ score in a death penalty case; (2) a district court should consider all of the expert medical testimony, including evidence about the Flynn effect, and make its own fact findings; and (3) as in *Thomas* [*v. Allen*], a district court's application or rejection of the Flynn effect constitutes a fact-finding subject to review only for clear error. The district court should consider and weigh the expert testimony presented in each case. The assessment of an individual's intellectual functioning is a fact-specific inquiry that often requires the fact-finder to weigh competing expert opinions. As long as the district court's ultimate

to a proper understanding of an IQ score. Although the State of Alabama has acknowledged in other cases that the SEM and the Flynn effect are proven statistical phenomena, the Alabama court did not account for either when relying on Perkins's 76 and refusing to consider additional evidence. Because *Atkins* clearly established that intellectual disability is to be based on "clinical definitions," *Atkins*, 536 U.S. at 318, the Alabama court's disregard of established clinical phenomena was contrary to or involved an unreasonable application of *Atkins* under 28 U.S.C. § 2254(d)(1). *Cf. Panetti v. Quarterman*, 551 U.S. 930, 950-51 (2007) (holding that the state court unreasonably applied federal law governing competency by failing to provide the petitioner an "opportunity to submit psychiatric evidence" to rebut the government's evidence).

---

determination regarding the Flynn effect is plausible in light of the record viewed in its entirety, there will be no clear error.

*Ledford v. Warden, Georgia Diagnostic & Classification Prison*, 818 F.3d 600, 640 (11th Cir. 2016)(internal citations omitted), cert. denied 137 S. Ct. 1432 (2017).

Alabama courts are not required to employ the Flynn effect when calculating a criminal defendant's IQ score:

This Court has repeatedly held that a circuit court is not required to accept, consider, or apply the "Flynn Effect" in determining intellectual disability. *See Carroll v. State*, 215 So. 3d 1135, 1151 (Ala. Crim. App. 2015)("[T]he circuit court could have reasonably rejected the 'Flynn Effect.'"); *Smith v. State*, 112 So. 3d 1108, 1131 (Ala. Crim. App. 2012) ("[T]his Court has previously held on several occasions that a trial court need not accept the 'Flynn Effect' as binding, and that it has not been accepted as scientifically valid by all courts."); and *Albarran v. State*, 96 So. 3d 131, 200 (Ala. Crim. App. 2011)("[T]he circuit court could have reasonably rejected the 'Flynn Effect.'").

*Reeves v. State*, 226 So. 3d 711, 739 (Ala. Crim. App. 2016).

317.    Third, the Alabama court held that Perkins is not intellectually disabled because he got married, earned a GED, and worked as an electrician "for a short while." *Ex parte Perkins*, 851 So. 2d at 456. That finding is unreasonable. In *Atkins*, the Court quoted the definitions of adaptive functioning from the American Association on Mental Retardation and the American Psychiatric Association. *See Atkins*, 536 U.S. at 308 n.3. Both list numerous areas – including communication, self-care, home living, social skills, self-direction, functional academics, health and safety, and work – and state that a person would meet the adaptive deficits criterion if he has significant limitations in any two of those areas. *Id*. Thus, the fact that an individual can get married or take on certain tasks does not mean the individual is not intellectually disabled. *See Holladay*, 555 F.3d at 1363 ("Individuals with mental retardation have strengths and weaknesses, like all individuals."); *see also Thomas*, 607 F.3d at 759 (holding that the petitioner was intellectually disabled even though he had held several jobs and noting that even the State's expert testified that "mentally retarded persons can drive cars and hold menial jobs"). Moreover, because Perkins did not have an interest in presenting evidence of the full extent of his adaptive functioning deficits at trial, the court's assumptions are based on an unreasonably incomplete understanding of the issue. *Cf. Panetti*, 551 U.S. at 954 (holding state court's factfinding procedures "seriously inadequate for the ascertainment of the truth" (citation and internal quotation marks omitted)).

(Doc. 1 ¶¶ 314-17 [footnote added; original footnote omitted].)

Perkins asked the Alabama Supreme Court for an opportunity to present evidence that he was intellectually disabled; however, the court denied his request. The court held:

We have conducted a thorough review of the record to determine if there is any inference that Perkins is mentally retarded. Although the Legislature has not had an occasion to address this State's policy on this

matter and establish a procedure for determining whether a capital defendant is mentally retarded and, therefore, not subject to the death penalty, we conclude that Perkins does not suffer from mental retardation under the definitions considered by the United States Supreme Court in reaching its holding in *Atkins*[, 536 U.S. at 309 n.3,] or as defined by any of the state statutes that prohibit the imposition of the death sentence on a mentally retarded defendant.

We agree with the State that this Court can determine, based on the facts presented at Perkins's trial, that Perkins, even under the broadest definition of mental retardation, is not mentally retarded. Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).

The record establishes that Dr. John Goff, a licensed clinical neuropsychologist and clinical psychologist, testified on Perkins's behalf. According to Dr. Goff, Perkins, when tested as an adult, has a full-score IQ of 76, with a verbal score of 80 and a performance score of 74. Dr. Goff stated that Perkins's IQ scores indicate a borderline range of psychometric intelligence, and that his intellectual functioning has probably declined as he has aged because of his abuse of alcohol. Moreover, the record indicates that Perkins earned a GED certificate while he has been in prison and has completed community college courses there. Dr. Goff diagnosed Perkins with a borderline personality disorder and an alcohol dependence; he did not conclude that Perkins was mentally retarded. We find Dr. Goff's diagnosis pivotal in light of the fact that, when the penalty phase of Perkins's trial was conducted, *Penry v. Lynaugh,* 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989), and its progeny were applicable, and evidence of mental retardation established a strong mitigating circumstance to be considered in determining the appropriate sentence. [Footnote 4]

[Footnote 4] *Penry* has been abrogated by *Atkins*.

Additionally, the evidence presented at trial indicates that Perkins did not exhibit "significant" or "substantial" deficits in adaptive behavior before or after age 18. Perkins was able to have interpersonal relationships. Indeed, he was married for 10 years. He maintained a job as an electrician for a short period. Perkins did not present any evidence during the penalty phase of his trial to establish that he was mentally retarded. The record does not create any inference that Perkins is mentally retarded. Because Perkins cannot establish the common requirements for mental retardation, we reject Perkins's contention that we must remand this cause for resentencing.

. . .

Applying the plain-error standard of review, we hold that because, applying the most common definitions of mental retardation, we find no indication in the record that Perkins is mentally retarded, no reversible error occurred and the imposition of the death sentence in this case is not unconstitutional. Therefore, we affirm the judgment of the trial court sentencing Perkins to death.

*Ex parte Perkins*, 851 So. 2d at 455-57, *cert. denied* 540 U.S. 830 (2003).

The state court's determination that Perkins is not intellectually disabled is a finding of fact entitled to deference under the AEDPA. *See Ledford v. Warden, GDCP*, 818 F.3d 600, 632 (11th Cir. 2016). "As the Court noted in *Atkins*, the medical community defines intellectual disability according to three criteria: significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and onset of these deficits during the developmental period." *Hall*, 572 U.S. at 710

(citing, *inter alia*, *Atkins*, 536 U.S. at 308 n.3). "In the context of a formal assessment, the existence of concurrent deficits in intellectual and adaptive functioning has long been the defining characteristic of intellectual disability." *Id*. (internal quotations and citation omitted). The Alabama Supreme Court has held:

> In *Ex parte Perkins*, we concluded that the "broadest" definition of mental retardation consists of the following three factors: (1) significantly subaverage intellectual functioning (i.e., an IQ of 70 or below); (2) significant or substantial deficits in adaptive behavior; and (3) the manifestation of these problems during the defendant's developmental period (i.e., before the defendant reached age 18). 851 So. 2d at 456. All three factors must be met in order for a person to be classified as mentally retarded for purposes of an *Atkins* claim.

*Smith v. State*, 213 So. 3d 239, 248 (Ala. 2007); *see also* Ala. Code § 15-24-2(3)(defining "intellectually disabled person" for purposes of the "Intellectually Disabled Defendant Act" as, "A person with [1] significant subaverage general intellectual functioning [2] resulting in or associated with concurrent impairments in adaptive behavior and [3] manifested during the developmental period, as measured by appropriate standardized testing instruments"). For the reasons set forth below, the court finds that Perkins has failed to show that the state court's determination – that he is not intellectually disabled – was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *see* 28 U.S.C. § 2254(d)(2).

### 1. The IQ Test Score – Intellectual Functioning

Dr. John Goff, a licensed clinical neuropsychologist, testified on Perkins behalf during the penalty phase of his trial. Dr. Goff testified that he administered the WAIS-R test to Perkins and that Perkins got a full scale score of 76, a verbal score of 80, and a performance score of 74. (*See* doc. 10, Vol 17, Tab 31 at 2868-69; *id.*, Vol. 63 at 363; *see also id.*, Vol. 2 at 323.) During the penalty phase, Dr. Goff testified that Perkins's IQ score placed him in the borderline range of intellectual functioning. (*Id.*, Vol. 17, Tab 31, at 2868-69.) At the Rule 32 hearing, he testified that, based on his evaluation of Perkins in 1994, he did not believe Perkins was intellectually disabled. (*Id.*, Vol. 63 at 363-65.) This is the only evidence of IQ testing or expert testimony regarding Perkins's intellectual functioning in the record before this court.

Perkins contends that the Alabama court erred by failing to adjust his IQ score based on the Flynn effect and the standard error of measurement [SEM]. (Doc. 1 ¶ 316.) The failure to consider the Flynn effect does not make the Alabama court's finding with regard to Perkins intellectual functioning "unreasonable." *See Ledford*, 818 F.3d at 637; *Reeves*, 226 So. 3d at 739. Also, the Alabama court's failure to account for the SEM does not support a finding that its determination of Perkins's intellectual functioning was unreasonable given the fact that Dr. Goff, Perkins's trial

expert, testified that Perkins is not intellectually disabled and that his intellectual functioning was in the borderline *range*. A diagnosis of borderline intellectual functioning "is mutually exclusive of [a diagnosis of] mental retardation." *Jordan v. Comm'r of Soc. Sec. Admin.*, 470 Fed. Appx. 766, 768-69 (11th Cir. 2012)(citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 47-48, 741 (4th ed. text rev. 2000)).

> The professionals who design, administer, and interpret IQ tests have agreed, for years now, that IQ test scores should be read not as a single fixed number but as a range. Each IQ test has a "standard error of measurement," often referred to by the abbreviation "SEM." A test's SEM is a statistical fact, a reflection of the inherent imprecision of the test itself. An individual's IQ test score on any given exam may fluctuate for a variety of reasons. These include the test-taker's health; practice from earlier tests; the environment or location of the test; the examiner's demeanor; the subjective judgment involved in scoring certain questions on the exam; and simple lucky guessing.

> The SEM reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score. For purposes of most IQ tests, the SEM means that an individual's score is best understood as a *range* of scores on either side of the recorded score. The SEM allows clinicians to calculate a range within which one may say an individual's true IQ score lies.

*Hall*, 572 U.S. at 712-13 (internal citations omitted; emphasis added). The SEM for the IQ test given to Perkins, the WAIS-R, is ±5. Applied to Perkins's full-scale score of 76, the range of IQ scores within which was his "true IQ" fell was 71 to 81 (76-5=71; 76+5=81). Dr. Goff reported that Perkins's IQ scores were valid and that they

216

represented "fairly consistent performance within the ***borderline range*** of psychometric intelligence." (Doc 10, Vol. 2 at 323 [emphasis added].) As Dr. Goff testified that Perkins's IQ was in the borderline range, the application of the SEM is not necessary to determine the "range" of Perkins's intellectual functioning.

Dr. Goff's report, which was before the Alabama courts, stated that Perkins's results on the WAIS-R indicated that his IQ was "within the borderline range," and that his "full scale score [76] is probably a valid estimate at that level." (*Id*. at 323, 326.) He also stated, "This patient is currently functioning within the borderline range of psychometric intelligence. This probably represents something of a ***decline*** from previous levels of function. The patterns of performance seen in this patient are frequently encountered among patients with long-term histories of alcohol abuse." (*Id*. at 326 [emphasis added]; *see also id*. at 327.) At the Rule 32 hearing, Dr. Goff again testified that Perkins was not intellectually disabled. (*See* doc. 10, Vol. 63 at 363-65.)

The court finds that the Alabama Supreme Court's failure to consider Perkins's IQ to be within the range of intellectually disabled, based on application of the SEM, or to reduce his score to account for the Flynn effect, was not unreasonable and does not provide a basis for relief.

## 2. Adaptive Functioning

The Alabama court found no evidence in the record that Perkins had "'significant' or 'substantial' deficits in adaptive behavior before or after age 18," noting "Perkins was able to have interpersonal relationships," including being married for ten years," and that he had worked "as an electrician for a short period."[37] *Ex parte Perkins*, 851 So. 2d at 456. Perkins contends, "the fact that an individual can get married or take on certain tasks does not mean the individual is not intellectually disabled." (Doc. 1 ¶ 317.) The court does not disagree. However, working as an electrician requires greater intellectual functioning than merely "tak[ing] on certain tasks" or performing simple or menial tasks. The Alabama court

---

[37]Perkins began working as an electrician when he was released from prison in May 1990. (*See* doc. 10, Vol. 2, Tab 3 at 314. He apparently stopped working as an electrician at or around the time he murdered Mrs. Gilliam in August 1990. (*Id*. at 315.) Dr. Goff reported Perkins –

> says he worked [with an electrical company] for about four months. He indicated that there was a disagreement about a car that he had borrowed and he felt that he was going to be violated (that he had violated his parole) and he began drinking heavily. The patient indicates that over a period of approximately two weeks he was heavily intoxicated and it was during that period of time that the events leading to his arrest occurred.

(*Id*. at 320.) Nothing in the record indicates that Perkins stopped working as an electrician because of difficulties with performing his job duties due to some factor other than intoxication.

could reasonably determine that the ability to learn the craft and to work as an electrician rebuts Perkins's assertion that he has significant or substantial deficits in adaptive behavior.

"The adaptive impairment prong of an intellectual disability diagnosis requires an evaluation of the individual's ability to function across a variety of dimensions." *Brumfield v. Cain*, 135 S. Ct. 2269, 2279 (2015). The record in this case contains evidence that, "[w]hile on parole for approximately three months in 1990, [Perkins] was employed as an electrician at Miller Electric Company. (Doc. 10, Vol. 2 at 315.) The job of electrician is a skilled craft, requiring significant training and the performance of complex tasks. *See Clapper v. Comm'r of Soc. Sec.*, No. 4:17-CV-00401-JHE, 2018 WL 4568615, *7, 9, and n.11 (N.D. Ala. Sept. 24, 2018)(noting work as electrician and electrician's helper is skilled or semi-skilled work and that claimant's "ability to do skilled electrician or electrician's helper work prior to age 22 supported that he had no discernable significant subaverage intellectual functioning or any deficit in adaptive functioning prior to that age"). This court finds that the state court could reasonably determine that work as an electrician was inconsistent with any claim that Perkins is intellectually disabled. Perkins has not argued otherwise to this court.

Also, as set forth above, the only expert opinion as to Perkins's level of intellectual ability is Dr. Goff's opinion that Perkins is not intellectually disabled.

Therefore, the court finds that Perkins is not entitled to relief on this ground.

### 3. Failure to Grant Evidentiary Hearing

Perkins contends that he was denied the opportunity to submit evidence to establish his intellectual disability and, "because [his *Atkins*] claim hinges on factual matters and Perkins was denied an opportunity to develop the factual record in state court, an evidentiary hearing is appropriate." (Doc. 1 ¶ 318 [citing 28 U.S.C. § 2254(e)].). Section 2254(e) states:

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –

(A) the claim relies on –

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e).

Recognizing that "evidence presented pre-*Atkins* may not in every case be conducive to an *Atkins* inquiry and may not enable a court to make reasonable factual determinations relating to mental retardation for the purposes of the Eighth Amendment," the court finds, in this case, the record provided a "concrete, verifiable IQ score" and unequivocal expert testimony that Perkins's IQ was within the borderline range. *See Burgess v. Comm'r, Alabama Dep't of Corr.*, 723 F.3d 1308, 13161, 1317 (11th Cir. 2013). The Alabama Supreme Court was not required to allow Perkins an opportunity to present additional evidence that he was intellectually disabled because the record evidence that he was ***not*** intellectually disabled was adequate to support its finding. Although Perkins asked the Alabama Supreme Court to allow him to submit additional evidence, he did not make any offer of proof to that court of such additional evidence and he has not offered clear and convincing evidence of his intellectual disability to this court.

Therefore, the court finds that Perkins is not entitled to an evidentiary hearing on his *Atkins* claim.

**CONCLUSION**

The state court's factual findings are supported by the record and must be given deference by this court. Perkins has failed to demonstrate that the state court's rejection of this claim relied on erroneous or insufficient facts, or applied law contrary to established United States Supreme Court precedent or in a manner that was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Alabama Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Perkins is not entitled to habeas relief on this ground.

## I. THE *BATSON* CLAIM

Perkins alleges, "The State violated the Equal Protection Clause of the Fourteenth Amendment by excluding black prospective jurors on account of race," and "The state court's holding that Perkins failed to establish a prima facie case of race discrimination is contrary to and involves an unreasonable application of clearly established federal law, *see* 28 U.S.C. § 2254(d)(1), and is based on an unreasonable determination of the facts in light of the evidence in the record, *see* 28 U.S.C. 2254(d)(2)." (Doc. 1 ¶ 325 [citing *Batson v. Kentucky*, 476 U.S. 79 (1986)].) He alleges that (1) the State "used its peremptory strikes disproportionately against black veniremembers, striking 10 of the 17 black prospective jurors and only 8 of 30 white

prospective jurors," (*id.* ¶ 326); (2) "[t]he Tuscaloosa County District Attorney's Office had a history of racial discrimination in its use of peremptory strikes," (*id.* ¶¶ 327-28 [citing *Jackson v. Herring*, 42 F.3d 1350, 1354-57 (11th Cir. 1995); *Hemphill v. State*, 610 So. 2d 413, 414-17 (Ala. Crim. App. 1992)]), (3) "[t]he excluded black prospective jurors shared no characteristic in common except for race," (*id.* ¶¶ 330-32).

At trial Perkins challenged the State's use of 10 of its 18 peremptory challenges to strike African-American veniremembers:

> MR. SMITH:  On behalf of the Defense, Your Honor, we would move under the Batson case that we think that they've established a prima facie case by the fact that the State in [its] eighteen challenges including the [alternate] challenge struck ten black jurors, more than fifty percent.

> THE COURT:  Ten of the eighteen?

> MR. SMITH:  Yes, sir.

> THE COURT:  All right.  Any other basis?

> MR. SMITH:  I think that's sufficient to establish a prima facie basis.  It goes back to them.

> THE COURT:  All right.  Any other basis?

> MR. [SMITH]:  No, sir.

> MR. LEMLEY:  Judge, we would first note that this jury is now – of these jurors remaining – there [are] seven jurors of minority race

who are actually on it.  And I believe one of the [alternates] which is well over fifty percent . . . .  We would also note for the record that to my knowledge, zero, that is zero, that I know of Defense strikes were of the minority race.  And the Defense struck entirely white citizens.

THE COURT:  Okay. Anything further by the Defense?

MR. SMITH:  No, Your Honor.

THE COURT:  Okay.  Let me take one quick look at that.

(Pause in the proceedings.)

THE COURT:  Okay.  Does the Defense disagree with the State's statement about the number of minority jurors?

MR. SMITH:  That are still on there?

THE COURT:  Right.

MR. SMITH:  I believe that's correct.

THE COURT:  Okay.  Well the Court will find that the Defense fails to make a prima facie case and the Batson motion based on the fact that the remaining venire was somewhere in the neighborhood of about thirty[-]six percent minority.  And the county makeup is somewhere in the range of about twenty[-]six to thirty percent, somewhere in that neighborhood.

MR. FREEMAN:  Approximately twenty[-]seven percent, I believe, Your Honor.

THE COURT:  Something like that.  And we have a majority of minority on the jury panel, so the Court denies the motion.

(Doc. 10, Vol. 11 at 1667-69.)

The Alabama Court of Criminal Appeals affirmed the denial of Perkins's

*Batson* motion on direct appeal. It held:

> . . . [T]he State's use of 10 of its 18 peremptory strikes to remove blacks from the venire was not sufficient, in and of itself, to establish a prima facie case of racial discrimination. Contrary to Perkins's contention, the prosecutor did not use "such a large portion of his strikes against blacks as to indicate a pattern of striking blacks from the venire." [*Ex parte*] *Thomas*, 659 So. 2d [3,] 8 [(1994)]. It is well established that the mere fact that the prosecutor used one or more of his strikes to remove blacks is not sufficient to establish a prima facie case of discrimination. In *Harrell v. State,* 555 So. 2d 263, 268 (Ala. 1989), on return to remand, 571 So. 2d 1269 (Ala. Cr. App.), writ quashed, 571 So. 2d 1270 (Ala. 1990), cert. denied, 499 U.S. 984, 111 S. Ct. 1641, 113 L. Ed. 2d 736 (1991), the Alabama Supreme Court stated:
>
>> "The defendant may not prove his prima facie case solely from the fact that the prosecutor struck one or more blacks from his jury. *United States v. Lane,* 866 F.2d 103, 106 (4th Cir. 1989). The defendant must offer some evidence in addition to the striking of blacks that would raise the inference of discrimination. In determining whether the evidence is sufficient to create an inference of discrimination, the court should look to the factors listed in [*Ex parte*] *Branch*, [526 So. 2d 609 (1987)], for guidance."
>
> Perkins failed to offer the trial court – and has failed to offer this court – any evidence, other than the number of strikes used by the prosecutor to remove blacks, that would raise an inference of discrimination and establish a prima facie case. After thoroughly reviewing the record in light of the factors set out in *Branch*, supra, we find no evidence that the black veniremembers who were struck by the State shared only the characteristics of race. [footnote 6] We find nothing in the type or manner of the prosecutor's questions during the extensive voir dire examination that indicates any intent to discriminate against black jurors; nor do we find a lack of meaningful voir dire

directed at black jurors. On the contrary, it appears that the prosecutor thoroughly questioned both black and white jurors alike. Furthermore, Perkins has provided no evidence that the prosecutor in this case had a history of misusing peremptory challenges so as to discriminate against blacks. [footnote 7] In essence, Perkins offers this court nothing, other than the number of blacks struck, to support his contention that the State improperly struck jurors based solely on their race. "Without more, we do not find that the number of strikes this prosecutor used to remove [blacks] from the venire is sufficient to establish a prima facie case of [racial] discrimination." *Ex parte Trawick*, 698 So. 2d 162, 168 (Ala.), cert. denied, 522 U.S. 1000, 118 S. Ct. 568, 139 L. Ed. 2d 408 (1997).

> Footnote 6: To the contrary, it is clear from the voir dire examination and the jury questionnaires that many of the blacks struck by the State shared several characteristics other than race. For example, many of those struck either had been convicted of a crime themselves or knew someone who had been convicted of crime. One of those struck was strongly opposed to the death penalty; although his answers during voir dire examination were not enough to justify a challenge for cause (the trial court denied the State's challenge for cause as to this particular veniremember) they were more than sufficient to justify a peremptory strike. Also, one indicated during individual voir dire examination that she had heard rumors that Perkins and Mrs. Gilliam had had a personal, intimate relationship before Mrs. Gilliam's abduction. Thus, Perkins's contention that "the only common criterion among the ten struck African-American jurors was their race'" is clearly belied by the record. (Perkins's brief to this court, p. 89.)

> Footnote 7: Although Perkins does cite two federal cases in which the court found *Batson* violations by a prosecutor in Tuscaloosa County, this, alone, is not sufficient to establish a history of discriminatory striking for the prosecutor in this case.

Because we find that Perkins failed to establish a prima facie case of racial discrimination through the pattern of the prosecutor's strikes, or any of the other factors set out in *Branch,* supra, the trial court's

reference, in response to Perkins's purely statistical argument at trial, to the fact that the percentage of blacks on the jury exceeded the percentage of blacks on the venire did not violate the Supreme Court's holding in *Thomas*. Clearly, the trial court was merely responding in-kind to Perkins's purely statistical argument by also referring to statistics, a factor that the Alabama Supreme Court specifically stated could be considered in determining whether a prima facie case existed. Such a reference to statistics is not an indication that Perkins had established a prima facie case or that the trial court refused to make that finding solely because of statistics – practice expressly disapproved of in *Thomas*. Rather, this reference indicates that the trial court, faced with an argument based solely on numbers, decided to frame its response also in terms of numbers. Because Perkins failed to establish a prima facie case of racial discrimination in the first place, the trial court could not have, as Perkins contends, violated the principles in *Thomas* by negating a prima facie case through the use of statistics. In a case such as this, where the trial court cites statistics in response to a defendant's purely statistical *Batson* motion, the trial court does not violate the principles of *Thomas* when the record clearly indicates that the defendant failed to establish a prima facie case of racial discrimination. Accordingly, we find that the trial court's denial of Perkins's *Batson* motion was not clearly erroneous.

*Perkins*, 808 So. 2d at 1075-77.

In *Batson v. Kentucky*, the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prohibits a prosecutor from striking potential jurors "solely on account of their race." *Batson*, 476 U.S. at 89. In *Batson*, the Supreme Court has "enumerated" three steps, "which together guide trial courts' constitutional review of peremptory strikes:

First, the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of

227

discriminatory purpose.  Second, once the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes.  Third, if a race-neutral explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination.

*Johnson v. California*, 545 U.S. 162, 168 (2005)(citing, *inter alia*, *Batson*, 476 U.S. at 93-94)(internal quotations and citations omitted).  In this case, the trial court found that Perkins had not demonstrated a prima facie case; therefore, it did not progress beyond the first step of *Batson*.

A finding of a prima facie showing pursuant to *Batson* is a question of fact. *See King v. Moore*, 196 F.3d 1327, 1334 (11th Cir. 1999)("Whether a defendant has thus made a prima facie showing is (perhaps counterintuitively) treated as a question of fact to be decided by the trial judge.").  "In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances," including whether the prosecutor engaged in "a 'pattern' of strikes against black jurors," and whether "[s]imilarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges . . . support or refute an inference of discriminatory purpose." *Batson*, 476 U.S. at 96-97.  Also, relevant circumstances include whether the subject matter of the case is racially

sensitive and whether the defendant is the same race as the struck jurors.[38]  *United States v. Hill*, 643 F.3d 807, 839-40 (11th Cir. 2011).  In other words, "In making out a prima facie case, ***the defendant must point to more than the bare fact of the removal of certain venirepersons and the absence of an obvious valid reason for the removal***."  *United States v. Allison*, 908 F.2d 1531, 1538 (11th Cir. 1990)(emphasis added).  At trial, Perkins did not "point to" any fact supporting a prima facie *Batson* showing except for the total number of strikes the State had used to remove African-Americans from the venire.

After challenges for cause and hardship excuses, the venire was about 36% minority.  The State had, and exercised, 18 peremptory strikes; it used 10 (56%) of them against black venire members.  The final jury of 14 (12 plus 2 alternates) included eight (57%) minority jurors (7 jurors and 1 alternate).  The Eleventh Circuit has held that such "statistics, without more, do not establish a prima facie case." *United States v. Hill*, 643 F.3d 807, 838-39 (11th Cir. 2011)(citing *United States v. Campa*, 529 F.3d 980, 989 (11th Cir. 2008); *Central Alabama Fair Housing Center v. Lowder Realty Co.*, 236 F.3d 629, 638 (2000); *United States v. Puentes*, 50 F.3d 1567, 1578 (11th Cir. 1995); *Allison*, 908 F.2d at 1537).

---

[38]Perkins and Mrs. Gilliam are white.  Therefore, neither of these circumstances applies to Perkins's case.

In this case, a majority of the jury was African-American and the State had additional peremptory strikes it could have used to remove them. *See Allison*, 908 F.2d at 1537-38 ("Allison has pointed to nothing that strongly suggests racial motivation was the basis for the strikes used. Fifteen percent of the venire for this case were black. The percentage of blacks on the jury (including alternates) was twenty-one percent. The prosecutor struck three black jurors; he also struck two white jurors. The prosecutor preserved three black jurors, even though he had enough peremptory challenges to strike all the black jurors. Under such circumstances, we reject Allison's *Batson* claim.") "Although the presence of African-American jurors does not dispose of an allegation of race-based peremptory challenges, it is a significant factor tending to prove the paucity of the claim." *Puentes*, 50 F.3d at 1578 (citing *Allison*, 908 F.2d at 1537); *see United States v. Dennis*, 804 F.2d 1208, 1211 (11th Cir. 1986)("It is thus obvious that the government did not attempt to exclude all blacks, or as many blacks as it could, from the jury," and "the unchallenged presence of two blacks on the jury undercuts any inference of impermissible discrimination that might be argued to arise from the fact that the prosecutor used three of the four peremptory challenges he exercised to strike blacks from the panel of potential jurors and alternates.").

"Of course, the prima facie case determination is not to be based on numbers alone but is to be made in light of the totality of the circumstances." *Hill,* 643 F.3d at 839 (citing *Johnson*, 545 U.S. at 168). However, Perkins did not offer the trial court any circumstances other than the number of challenges against African-American venire members in support of his *Batson* challenge. (Doc. 10, Vol. 11 at 1667.) "Because [circumstances other than numbers] were not properly before the court, it was not an unreasonable application of *Batson* for the court to decline to consider them." *Jenkins v. Allen*, No. 4:08-CV-0869-VEH, 2016 WL 4540920 at *81 and n.42 (N.D. Ala. Aug. 31, 2016).

The Court of Criminal Appeals held that "Perkins [had] offer[ed] this court nothing, other than the number of blacks struck, to support his contention that the State improperly struck jurors based solely on their race," and "[w]ithout more, [it did] not find that the number of strikes this prosecutor used to remove blacks from the venire [was] sufficient to establish a prima facie case of racial discrimination." *Perkins*, 808 So. 2d at 1076. This decision, which is based on a reasonable determination of the facts, is neither contrary to nor an unreasonable application of *Batson* and its progeny. Therefore, this claim will be denied.

## CONCLUSION

The state court's factual findings are supported by the record and must be given deference by this court. Perkins has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner that was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Alabama Court of Criminal Appeals unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Perkins is not entitled to habeas relief on this ground.

## VII.  CONCLUSION

For the foregoing reasons, the court finds that Perkins's claims are due to be denied and his Petition is due to be dismissed. An Order dismissing Perkins's Petition for Writ of Habeas Corpus, (doc. 1), will be entered contemporaneously with this Memorandum Opinion.

## CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the habeas petitioner. This Court may issue a certificate of appealability "only if the applicant has a made a substantial

showing of the denial of a constitutional right." 28 U.S.C. 2253(c)(2). To make such a showing, Perkins must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)(citation and internal quotation marks omitted). This court finds that Perkins's claims do not satisfy either standard.

Therefore, the district court will deny Perkins a certificate of appealability in the Order entered contemporaneously herewith.

**DONE**, this 19th day of September, 2019.

Sharon Lovelace Blackburn
—————————————————
SHARON LOVELACE BLACKBURN
UNITED STATES DISTRICT JUDGE